I.     NO. 22-15166

# In the United States Court of Appeals for the Ninth Circuit

CORONAVIRUS REPORTER, CALID INC.
PRIMARY PRODUCTIONS LLC,

*Plaintiffs-Appellants,*

v.

APPLE INC.,

*Defendant-Appellee.*

and

FEDERAL TRADE COMMISSION

*Defendant*

On Appeal from the United States District Court
for the Northern District of California
No. 3:21-cv-05567-EMC
Hon. Edward M. Chen

## APPELLANTS' OPENING BRIEF

KEITH MATHEWS
ASSOCIATED ATTORNEYS OF NEW ENGLAND
1000 Elm Street #800
Manchester, NH 03101
(603) 622-8100
*Attorneys for Appellants*
  *Coronavirus Reporter, Calid Inc.,*
  *Primary Productions LLC*

## CORPORATE DISCLOSURE STATEMENT

Coronavirus Reporter, CALID Inc. and Primary Productions LLC do not have any parent corporations, and no publicly held corporation owns 10% or more of their stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................ i

TABLE OF CONTENTS ...................................................... ii

TABLE OF AUTHORITIES ................................................... iv

ISSUES PRESENTED ........................................................ 1

STATUTORY PROVISIONS ................................................... 2

JURISDICTIONAL STATEMENT .............................................. 2

INTRODUCTION .......................................................... 2

STATEMENT OF THE CASE ................................................. 5

SUMMARY OF THE ARGUMENT ............................................. 6

STANDARD OF REVIEW ................................................... 8

ARGUMENT ............................................................. 10

   I.   THE PRELIMINARY INJUNCTION SHOULD HAVE ISSUED AND THE MOTION TO DISMISS SHOULD HAVE BEEN DENIED ........................................................ 10

      A.  Appellants Have Sufficiently Pled Violations of Sherman Act § 1 (Counts 3, 5) ................................................ 11

         1.  Antitrust Injuries are Alleged in the FAC .................... 14

         2.  Tying (Count 5) ........................................ 17

            a.  Tying the iPhone smartphone hardware to all software distribution stores represents exceptional anticompetitive tying meant to invoke *per se* analysis and likelihood to prevail. The Court should direct the District Court to issue the Preliminary Injunction without further delay. ........................... 17

      B.  Appellants Have Sufficiently Pled Violations of Sherman Act § 2 (Counts 1, 2, 4, 6) ......................................... 24

         1.  Apple's Monopoly Power in the Relevant Markets is Pled in the FAC .............................................. 25

            a.  Two-Sided App Store Does Not Equal Two-Sided Economic Marketplace. ............................. 28

   b. Market Contours Including Elasticity SSNDQ may be finalized at jury ....................................................................30

   c. DOJ Position on Marketplace as a Tool ...............................32

  2. Apple's Willful Maintaining of Monopoly Power is Properly Alleged in the FAC ......................................................................33

C. Plaintiffs' Cameron Opt-Out Claims Should Not be Dismissed (Count 7)...........................................................................................36

D. Appellants Alleged a Valid Breach of Contract Claim (Count 8) ......37

E. Appellants Alleged a Valid Breach of The Implied Covenant Of Good Faith And Fair Dealing Claim (Count 9) ...................................38

F. Appellants Asserted a Valid RICO Claim (Count 10) ........................40

  1. Appellants Complied With Rule 9(b) in Pleading Their RICO Claim......................................................................................40

  2. Appellants Alleged Multiple Predicate Acts Sufficient to State a RICO Claim ....................................................................44

  3. Appellants Alleged an Enterprise Distinct from Apple ..............45

G. Appellants Sufficiently Stated a Claim for Civil Fraud (Count 11) 46

II. APPELLANTS SHOULD BE GRANTED LEAVE TO AMEND IN THE ALTERNATIVE ................................................................................47

CONCLUSION .....................................................................................................55

STATEMENT REGARDING ORAL ARGUMENT ............................................55

iii

# TABLE OF AUTHORITIES

**Cases**

*3500 Sepulveda, LLC v. Macy's West Stores, Inc.*,
980 F.3d 1317 (9th Cir. 2020) ...............................................................38

*Agnew v. National Collegiate Athletic Ass'n*,
683 F.3d 328 (7th Cir. 2012) .........................................................................8

*Allied Orthopedic Alliance Inc. v. Tyco Health Care Group LP*,
592 F.3d 991 (9th Cir. 2010) ...............................................................34

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................... 9, 13, 14

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979) .........................................................................35

*Brady v. Dairy Fresh Products Co.*,
974 F.2d 1149 (9th Cir. 1992) ...............................................................46

*Breier v. Northern Cal. Bowling Proprietors' Ass'n*,
316 F.2d 787 (9th Cir. 1963) .........................................................................11

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962)........................................................... 9, 27, 33

*Cal. Computer Prods.* v. International Buis. Machines Corp.
613 F.2d 727 (9th Cir. 1979) ...............................................................20

*Cameron v. Apple* ................................................................................. *passim*

*Careau & Co. v. Security Pacific Business Credit, Inc.*,
222 Cal.App.3d 1371 (1990) .........................................................................37

*Carvalho v. Equifax Info. Servs., LLC*,
629 F.3d 876 (9th Cir. 2010) ...............................................................10

*Celebrity Chefs Tour, LLC v. Macy's, Inc.*,
16 F. Supp. 3d 1141 (S.D. Cal. 2014) .......................................................43

*Corley v. Rosewood Care Ctr., Inc.,*
142 F.3d 1041 (7th Cir. 1998) ...............................................................42

*Cost Mgmt. Servs. v. Wash. Natural Gas*,
99 F.3d 937 (9th Cir. 1996) .........................................................................25

iv

*Craftsmen Limousine, Inc. v. Ford Motor Co.*,
    363 F.3d 761 (8th Cir. 2004) ...........................................................8

*Datagate, Inc. v. Hewlett-Packard Co.*,
    941 F.2d 864 (9th Cir. 1991) ........................................................20

*DCD Programs, Ltd. v. Leighton*,
    833 F.2d 183 (9th Cir. 1987) ........................................................48

*Digidyne Corp. v. Data Gen. Corp.*,
    734 F.2d 1336 (9th Cir. 1984) ......................................................20

*Dimidowich v. Bell & Howell*,
    803 F.2d 1473 (9th Cir. 1986) ......................................................12

*Eastman Kodak Co. v. Image Technical Servs., Inc.*,
    125 F.3d at 1218-19 ......................................................................36

*Eastman Kodak v. Image Technical Services, Inc.*,
    504 U.S. 451 (1992)............................................................... 22, 34

*Eminence Capital, LLC et al. v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003) ................................................ 48, 49

*Epic v. Apple* ..................................................................... *passim*

*First Commercial Mortgage Company v. Reece*,
    89 Cal.App.4th 731 (2001) ...........................................................37

*Foman v. Davis*,
    371 U.S. 178 .......................................................................... 48, 50

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*,
    703 F.2d 534 (9th Cir.1983) .........................................................33

*FTC v. Whole Foods Market, Inc.*,
    548 F.3d 1028 (D.C. Cir. 2008)................................................9, 36

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) ................................................ 48, 50

*Hildes v. Arthur Andersen LLP*,
    734 F.3d 854 (9th Cir. 2013) ........................................................10

*Hirata Corp. v. J.B. Oxford and Co.*,
    193 F.R.D. 589 (S.D. Ind. 2000) .................................................42

*Hurd v. Monsanto Co.*,
    908 F. Supp. 604 (S.D. Ind. 1995)................................................41

*Image Tech. Srvs., Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) ...............................................34

*Immobiliare, LLC v. Westcor Land Title Ins. Co.*,
    424 F. Supp. 3d 882 (E.D. Cal. 2019) .........................................43

*In re Flat Glass Antitrust Litigation*,
    385 F.3d 350 (3rd Cir. 2004)..................................................8

*In re Insurance Brokerage Antitrust Litigation*,
    618 F 3d 300 (2010) .........................................................9

*In re Southeastern Milk Antitrust Litigation*,
    739 F.3d 262 (2014) .........................................................9

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
    No. MDL 2672 CRB, 2017 WL 4890594 (2020) ........................................44

*Jarvis v. Regan*,
    833 F.2d 149 (9th Cir. 1987) ...............................................40

*Jefferson Parish Hosp. Dist. v. Hyde*,................................................20
    466 U.S. 2 (1984)

*Jepson, Inc. v. Makita Corp.*,
    34 F.3d 1321 (7th Cir. 1994) ...............................................40, 42

*Lachmund v. ADM Investor Servs., Inc.*,
    191 F.3d 777 (7th Cir. 1999) ...............................................40, 41

*Lazar v. Superior Court*,
    12 Cal.4th 631(1996).......................................................47

*Liquid Air* ......................................................................46

*Living Designs, Inc. v. E.I. Dupont De Nemours and Co.*,
    431 F.3d 353 (9th Cir. 2005) ...............................................46

*McDonald v. Schencker*,
    18 F.3d 491 (7th Cir. 1994) ................................................44

*MCI Communications Corp. v. American Tel. & Tel. Co.*,
    708 F.2d 1081 (7th Cir. 1983) ..............................................35

*Mendiondo* v. *Centinela Hosp. Med. Ctr.*,
521 F.3d 1097 (9th Cir. 2008) .................................................................9

*Midwest Commerce Banking Co. v. Elkhart City Centre*,
4 F.3d 521 (7th Cir. 1993) ...................................................................41

*Midwest Grinding Co. v. Spitz*,
976 F.2d 1016 (7th Cir. 1992) ..............................................................41

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984)...................................................................... 12, 13

*Moore v. Kayport Package Exp., Inc.*,
885 F.2d 531 (9th Cir. 1989) ................................................................42

*National Soc. of Professional Engineers v. U.S.*,
435 U.S. 679 (1978)...............................................................................8

*Neubronner v. Milken*,
6 F.3d 666 (9th Cir. 1993) ...................................................................42

*Northern Pac. Ry. Co. v. US*,
356 US 1 (1940)..............................................................................8, 21

*Pelfresne v. Stephens*,
35 F. Supp. 2d 1064 (N.D. Ill. 1999)......................................................42

*Petro-Tech*...........................................................................................46

*Polich v. Burlington Northern, Inc.*,
942 F.2d 1467 (9th Cir.1991) ...............................................................48

*Primary Prods LLC v. Apple Inc.*
("D. Me. Dkt."), No. 21-cv-137, Dkt. 1 (D. Me.) .................................. 51, 53

*Racine & Laramie, Ltd. v. Department of Parks & Recreation*,
11 Cal. App. 4th 1026 (1992) ...............................................................38

*Rae v. Union Bank*,
725 F.2d 478 (9th Cir. 1984) ................................................................45

*River City Markets, Inc. v. Fleming Foods West, Inc.*,
960 F.2d 1458 (9th Cir. 1992) ..............................................................45

*Rohlfing v. Manor Care, Inc.*,
172 F.R.D. 330 (N.D. Ill. 1997) ........................................................ 40, 42

vii

*Soundgarden v. UMG Recordings, Inc.*,
2020 WL 1815855 ........................................................................39

*Standard Oil Co. of New Jersey v. U.S.*,
221 U.S. 1 (1911)..........................................................................25

*U.S. v. Socony-Vacuum Oil Co.*,
310 U.S. 150 (1940)........................................................................8

*United States v. Benny*,
786 F.2d 1410 (9th Cir.), *cert. denied*,
479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986) ................................45

*United States v. Corinthian Colleges*,
655 F.3d 984 (9th Cir. 2011) ...........................................................9

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) ............................................... 19, 20

*United States v. Redwood City*,
640 F.2d 963 (9th Cir. 1981) ...........................................................9

*United States v. Sealy, Inc.*,
388 U.S. 350 (1967)........................................................................8

*United States v. Stapleton*,
293 F.3d 1111 (9th Cir. 2002) ......................................................44

*United States v. Topco Associates, Inc.*,
405 U.S. 596 (1972)........................................................................8

*United States v. Webb*,
655 F.2d 977 (1981) ....................................................................48

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)......................................................................35

*Vess v. Ciba–Geigy Corp. USA*,
317 F.3d 1097 (9th Cir. 2003) ......................................................41

*Wabash Valley Power Ass'n*,
678 F. Supp. at 762 .....................................................................42

**Statutes**

18 U.S.C. §§ 1341, 1343 .................................................................44

Sherman Act....................................................................... *passim*

## Other Authorities

5 Charles Alan Wright & Arthur R. Miller,
    Federal Practice and Procedure § 1357 (3d ed. 2004)....................................9

Emma C. Smizer,
    *Epic Games v. Apple: Tech-Tying and the Future of Antitrust*,
    41 Loy. L.A. Ent. L. Rev. 215 (2021) ..........................................................23

U.S. Dep't of Justice and Federal Trade Comm'n,
    Antitrust Guidelines for Collaborations Among Competitors from April
    2000 *(Section 3.2)*..............................................................................................8

## Rules

Fed.R.Civ.P. 15(a)...................................................................................................48

Fed.R.App.P. 4(a)(4)(A)(iv) ....................................................................................2

Fed.R.Civ.P. 12(b)(6)......................................................................... 9, 13, 37, 39, 49

Rule 9(b)..................................................................................................................46

## ISSUES PRESENTED

1. Whether the District Court's manifest error resulted in dismissal of Plaintiffs' antitrust claims (Counts 1-7) based on a failure to allege an antitrust injury.

2. Whether the District Court should have granted a Preliminary Injunction that invoked *per se* liability for Defendant tying hardware, the iPhone smartphone, to software distribution stores (the "App Store").

3. Whether the District Court erred in dismissing Plaintiffs' antitrust claims (Counts 1-7) based on a failure to allege a plausible relevant market.

4. Whether the District Court erred in dismissing Plaintiffs' contract claims (Counts 8-9).

5. Whether the District Court erred in dismissing Plaintiffs' RICO and fraud claims (Counts 10-11) for failure to cite fraud with particularity, when in fact, photographic App Store connect portal evidence for three developers was provided.

6. Whether the District Court abused its discretion in dismissing all claims without leave to amend, when represented Plaintiffs had only amended their complaint once as a matter of course, and an unrepresented party had never amended the initial pleadings.

## STATUTORY PROVISIONS

The Addendum reproduces the pertinent statutory provisions.

## JURISDICTIONAL STATEMENT

The Ninth Circuit Court of Appeals has jurisdiction over this appeal of a final District Court decision pursuant to 28 U.S.C. § 1291. Plaintiffs-Appellants filed a Notice of Appeal on February 2, 2022, following the District Court's November 30, 2021 Order Denying Motion for Preliminary Injunction and Granting Motion to Dismiss, November 30 Judgment, and February 2, 2022 Denial of Rule 59/60 Motion for Reconsideration. The appeal is timely, as the deadline for filing of a Notice of Appeal is based upon Federal Rule of Appellate Procedure 4(a)(4)(A)(iv). This appeal is of a denial of a critically needed preliminary injunction, and a District Court dismissal of all of Plaintiffs-Appellants' claims for failure to state a claim without granting leave to amend.

## INTRODUCTION

Most everyone knows a loved one or a friend whose life was touched by Dr. Robert Roberts, Plaintiff-Appellant Coronavirus Reporter's Chief Medical Officer. Prerequisite to nearly every cardiac procedure or hospital screening for myocardial infarction ("heart attack") is laboratory blood analysis to detect damaged cardiac muscle tissue. In the 1980s, Dr. Roberts pioneered the MBCK blood test used for two decades as a "gold standard," and which directly laid the foundation for the

current troponin lab test. Apple deprived its userbase the benefit of Dr. Roberts' scientific expertise and dedication towards saving lives, when the Defendant corporation improperly blocked his app in February 2020 to develop their own. Apple's SARS-CoV-2 tracing system remains widely unavailable in the United States, some two years later. Dr. Roberts' voluntary symptom reporting app, the first of its kind, was exactly the app needed over two years ago at the onset of the pandemic. Notably, Apple blocked the entire class of startup COVID apps, even those with institutional affiliation such as Dr. Roberts, a Director of Cardiac Translational Research at University of Arizona.

Apple today wields authoritarian control over the vast network of interconnected smartphones that, combined, represent an extraordinary computational-communications capability ("network effect"). After the United States government spent decades building what is now known as the Internet, we as a nation collectively invested in putting a smartphone, an amalgamation of sensors, operating software, and communication devices, in the hands of nearly every citizen, forming a network with capabilities amounting to fantasy of science-fiction of prior generations.

The underlying action was brought to assert that the vast network capabilities of interconnected smartphones are the property of the customers who paid for them. Apple iPhone users should enjoy unrestricted use of their smartphones to run

necessary applications, such as Coronavirus Reporter, that ultimately are the *raison d'être* of this network. Free markets should define what apps are selected by end-users, as opposed to Apple's conflicted regime.

There exist serious and growing ramifications of the *status quo* monopoly. Apple's anticompetitive proceeds, a *de facto* tax on the Internet and developers, are increasingly influencing geopolitical matters. Just this week, the company took a stance adverse to United States interests, changing product labels from "Made in Taiwan" to "Made in Chinese Taipei." Similarly, the company's CEO was recently discovered to have made a surreptitious $270 billion payment to China, never disclosed to Apple shareholders. Political censorship of an entire domestic political party, the Parler app, was highlighted in the Motion for Preliminary Injunction. Censoring Dr. Roberts, trusted by NASA as John Glenn's pre-mission cardiologist, was an assault on science, and certainly un-American.

Apple's courtroom and lobbying response is that the company should be trusted to self-regulate the nation's entire smartphone infrastructure. There are reasons the Sherman Act was legislated to avoid one company taking on monopoly powers that could ultimately endanger not only the progress of scientific medical work like *Coronavirus Reporter* lobby, but even geopolitical entities.

The Complaint describes an "international consensus," which Apple never refuted exists, that formed to remedy Apple's antitrust censorship violations.

4

Seventy-three percent of Americans support now-delayed legislation in the United States Senate to address app censorship and self-preferencing, which in Senior Senator Blumenthal words is the "most offensive [practice] of how [Apple] strangles new app development."

When the United States sought regulation of AT&T, the monopolist warned that telecommunication quality and cost would suffer from government intervention. That of course was plain wrong, as a telecommunications revolution occurred the following decade. Apple's opposition to the Preliminary Injunction invokes similar fear-based arguments already disproven by the historic AT&T example: safety and quality will suffer. The stakes here are higher than in 1984: 80% of commerce now takes place on Apple devices, and the entire free speech of a nation depends on its "network effect" infrastructure.

## STATEMENT OF THE CASE

Apple has thus far evaded Sherman Act enforcement because smartphone internet connectivity fueled significant and complex sociological changes that obfuscate the role of the Apple monopoly, which formed simultaneously as widespread smartphone adaptation occurred.

The underlying class action was filed in the District Court to redress the injustices Apple committed to the developer base that labors to create functionality for the smartphone. The case brings together four developers to represent a sample

of a class of free app developers subjected to censorship and app ranking suppression.

Notably differentiated from other pending Apple antitrust litigation, Appellants asserted first-to-file class action claims that Apple's censorship of free apps violates the Sherman Act. District Judge Yvonne Gonzalez Rogers ruled that this case was to remain independent from *Cameron v. Apple*, which was a class action for paid app fees. That case recently settled, without reforming digital censorship. It is also noted that Gonzalez Rogers oversaw the *Epic v. Apple* case, which is presently pending appeal in the Ninth Circuit. *Epic* has some ramifications for app censorship, in that it seeks an injunction permitting third-party app distributors for paid gaming. The Appellants' proposed injunction seeks various other solutions, such as sideloading, App Store non-preferencing, and App Store due process arbitration rights. *Epic* is not a class action and deals with gaming revenues of paid apps, per the verdict reached after a three week bench trial. Nonetheless, the court below heavily relied upon *Epic* findings of fact in its decision on *Coronavirus Reporter*.

## SUMMARY OF THE ARGUMENT

The Northern California District Court's conclusion that "Plaintiffs make no allegation that Apple's conduct excluded Apple competitors, suppressed output of the market, increased app prices, or otherwise harmed competition" is not reasonably

supported by the pleadings. The court below claims "the allegations of injury contained in the FAC are either confined to specific harms experienced by Plaintiffs or a small group of competitors, rather than harm to the market," but that is simply untrue in light of the evidence provided by the international consensus documents, Subcommittee Report, and pleadings. But even if damage to competition was limited to COVID startups— it cost lives, and as Dr. Roberts said during his CNBC interview, could have been akin to blocking independent scientists inventing penicillin. This itself *is* widespread damage, even foregoing damage to other types of apps mentioned by the Subcommittee, such as screen time apps.

With 40,000 weekly app rejections, a blanket ban on COVID startups, Chinese evidence of 4x size open markets, compelling evidence raised by the Subcommittee, and an international consensus by thirty-some countries, the District Court incorrectly categorized substantiated, international outrage at dangerous censorship as "threadbare recital" of injury. Here a pattern emerges of a District Judge simply unwilling to acknowledge Apple's anticompetitive conduct. Apple's version of the facts—that "curation" is a competitive advantage—are incorporated into the erroneous order, becoming judicial opinion.

The Motion for Preliminary Injunction, subject of this appeal, is necessary to reform Apple's conduct. After years of fruitless efforts by other parties and

government agencies, thus far Appellants have made the most compelling case to represent the class of developers oppressed by Apple's monopoly.

## STANDARD OF REVIEW

Restraints analyzed under the *per se* rule are those that are always (or almost always) so inherently anticompetitive and damaging to the market that they warrant condemnation without further inquiry into their effects on the market or the existence of an objective competitive justification. *(U.S. v Socony-Vacuum Oil Co.*, 310 U.S 150 (1940); *United States v. Sealy, Inc.*, 388 U.S. 350 (1967); *United States v. Topco Associates, Inc.*, 405 U.S. 596 (1972); *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761 (8th Cir. 2004); U.S. Dep't of Justice and Federal Trade Comm'n, Antitrust Guidelines for Collaborations Among Competitors from April 2000 *(Section 3.2).*

In other words, first (besides antitrust injury), a plaintiff is only required to prove that the specific anticompetitive conduct actually took place. The plaintiff does not need to demonstrate the conduct's competitive unreasonableness or negative competitive effects in the relevant product and geographic markets. Second, under the *per se* rule, defendants are not entitled to justify their behavior based on any objective competitive justifications. (*Northern Pac. Ry. Co. v. US*, 356 US (1940); *Agnew v. National Collegiate Athletic Ass'n*, 683 F.3d 328 (7th Circ. 2012); or *In re Flat Glass Antitrust Litigation*, 385 F.3d 350 (3rd Cir. 2004)).

Finally, a plaintiff has less responsibility to analyze the market where the restraint is deemed *per se* anticompetitive. (*National Soc. of Professional Engineers v. U.S.*, 435 U.S. (1878); *In re Insurance Brokerage Antitrust Litigation*, 618 F 3d 300 (2010); or *In re Southeastern Milk Antitrust Litigation*, 739 F.3d 262 (2014).

Market definition is a tool that helps courts ascertain the "locus of competition" in which to judge the challenged conduct, identify market participants, and assess market concentration. *Brown Shoe Co. v. United States*, 370 U.S. 294, 320-21 (1962). But "[t]hat is not to say that market definition will always be crucial," and it "does not exhaust the possible ways to prove" competitive effects. *FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028, 1036 (D.C. Cir. 2008).

This Court reviews *de novo* a district court's dismissal of a complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). *Mendiondo* v. *Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1102 (9th Cir. 2008), and the Court must accept as true all material factual allegations in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "It is only the extraordinary case in which dismissal is proper." *United States v. Redwood City*, 640 F.2d 963, 966 (9th Cir. 1981); 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2004).

The court's decision to deny leave to amend and denying reconsideration as to leave to amend and for discovery is reviewed for abuse of discretion. *United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011). This Court reviews *de novo* a district court's denial of leave to amend on grounds of futility. *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859 (9th Cir. 2013). Leave to amend is to be "freely given when justice so requires," and denial of a motion to amend is proper only if it is clear "the complaint would not be saved by any amendment." *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892-93 (9th Cir. 2010).

## ARGUMENT

## II. THE PRELIMINARY INJUNCTION SHOULD HAVE ISSUED AND THE MOTION TO DISMISS SHOULD HAVE BEEN DENIED

Apple submitted a Motion to Dismiss to the District Court that was fatally flawed with knowingly incorrect case law citations and that relied upon the Defendant's preferred portrayal of the facts. The District Court injected its own opinion into the ruling ("the Order"), chiefly, that Apple's "curation" of apps was not censorship, but rather, a competitive advantage compared to other platforms. Similarly, it is incontrovertible that the judge engaged in market definition fact-finding, determining the appropriate market comparison was a 'newspaper selling classifieds in one town.' The Order contained large verbatim portions written by Gibson Dunn, and in a concerning trend, the District Court failed to check plainly incorrect application of case law. Even after acknowledging *Epic* is "not controlling

10

here," the Order repeatedly and erroneously relied upon *Epic* as precedent, failing to recognize that the Appellants' counsel brought together a diverse group of developers that represented a class of *all* free smartphone apps, in contrast to the *Epic* market for non-zero priced gaming transactions. Appellants cannot raise new facts on appeal, "and in any event it is inappropriate for an appellate court to evaluate possible amendments not yet considered by the court below." *Breier v. Northern Cal. Bowling Proprietors' Ass'n*, 316 F.2d 787, 790 (9th Cir. 1963). Nonetheless, the District Court was presented on *Motion for Relief* with a DOJ amicus brief and DOJ/26 AG relevant market definition. The District Court, and Apple, still claimed these to be futile pleadings, reinforcing the Subcommittee concern that district courts simply are not upholding the intent of the Sherman Act. The Preliminary Injunction should have issued; the Motion to Dismiss should have been denied, or at a minimum, leave to amend should have been granted.

### A. Appellants Have Sufficiently Pled Violations of Sherman Act § 1 (Counts 3, 5)

The elements for a violation of Section 1 of the Sherman Act are: (1) the existence of a contract, combination, or conspiracy between or among at least two separate entities; (2) that the contract, combination, or conspiracy unreasonably restrains trade; (3) that the restraint affects interstate or foreign commerce; and (4) that the restraint caused plaintiff to suffer an injury to its business or property. (ABA Antitrust Jury Instructions)

11

The face of the FAC contains facts supporting all these elements. Appellants have sufficiently pled the existence of a contract that unreasonably restrains trade. (5-ER-1020 ¶ 198.) The effect of limiting competition in the US institutional app marketplace was stated to affect interstate or foreign commerce. (5-ER-1019 ¶ 191.) The damage to Appellants' business due to the restraint is also pled on the face of the FAC. (5-ER-1021 ¶ 204). Thus, the facts pleaded on the face of the FAC establish this claim. The only argument provided by Apple to suggest otherwise is a lack of concerted action. Yet again, Apple was solely depending on the holding from *Epic Games*, a District Court case currently on appeal, for its assertion that the DPLA is a unilateral contract. (5-ER-810, ln. 22-25.) This is the only case that has held this, and it is currently on appeal. This should not be enough to dismiss Appellants' claim with prejudice.

Significantly, Appellant Primary Productions never even signed the DPLA, but was transferred into this case from the Maine District because Apple persuaded the Maine District Court that an app developer was "bound to sign the DPLA to qualify as a publisher... even if it hadn't actually signed the document." There are serious questions as to the DPLA as a contract of adhesion, when any developer, anywhere in the world, is bound to this contract without any intent to sign it.

Regardless, unilateral conduct is not itself enough to dismiss this claim. Where the unilateral conduct extends beyond announcing a policy and refusing to

deal with non-compliant partners to coercing an agreement, the conduct falls under Section 1. *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 765; *see also Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1478 (9th Cir. 1986) (recognizing an exception to the "unilateral refusal to deal" rule where a party "imposes restraints on dealers or customers by coercive conduct and they involuntarily adhered to those restraints"). Appellants' FAC pleads coercion. (FAC ¶ 199) This allegation would be conduct that falls under Section 1. *Monsanto,* 465 U.S. at 765. When considering a motion to dismiss, a court must accept as true the complaint's allegations and reasonable inferences to be drawn from them. *Twombly*, 550 U.S. at 556.

Absent anywhere in the order is the District Court's Section 1 Sherman analysis of the unilateral DPLA and a related tying claim subject to *per se* analysis. Instead, the District Court determined that no antitrust injury was even possible, halting further Sherman Act analysis. The District Court harpooned Appellants' concerns about Apple's 40,000 weekly app rejections, opining the rejections could only evidence Defendant's "quality control." This is a rather surprising position for a District Judge to take at a 12(b)(6) level, effectively overruling and contravening the international consensus and Congressional Subcommittee report findings of antitrust injury stemming from Apple's self-preferencing and censorship. In essence, the District Court declared—with zero discovery into facts—that the entire Subcommittee and European Union were simply wrong, and that no jury could

possibly find Apple's curation, and blockade of a world-renowned coronavirus researcher, to be anti-competitive.

### 1. Antitrust Injuries are Alleged in the FAC

Appellants have pleaded injuries to themselves and other competitors resulting from Defendant's anticompetitive conduct, contrary to what Defendant suggests. A plain example of Defendant's conduct's harm to Appellants and other competitors is in paragraph 53 of the FAC. (5-ER-977 ¶ 53.) Thus, the FAC alleged an injury not only to Plaintiff Coronavirus Reporter, but to other competitors who were hoping to enter the app market. The relevant market here is the National App Marketplace, which includes the US institutional app market and the corresponding consumer app distribution market. COVID start-up firms are just participants in that market. Harm to competitors other than Appellants or harm to the market are further pled throughout the FAC. (5-ER-983-1020 ¶¶ 81, 173, 174, 179, 200.) It is enough that Appellants pleaded that there was harm to Appellants and competition marketwide. When considering a motion to dismiss, a court must accept as true the complaint's allegations and reasonable inferences to be drawn from them. *Twombly*, 550 U.S. at 556. The descriptions of the harm to competition stemming from Defendant's behavior is explained in detail in Exhibit A of the FAC (*See* 3-ER-233-408), which includes the Congressional Subcommittee report, and the allegations in these reports are incorporated into the FAC. (5-ER-968 ¶ 36.)

The FAC and hundreds of pages of supporting evidence almost entirely revolve around the antitrust injury caused by censorship of iOS apps. The lower court's assertion that Plaintiffs only offered a "threadbare recital" (i.e., a conclusory boilerplate statement such as "*Defendant restricted interstate trade*") of antitrust damages is at best a manifest error.

The FAC starts with the television censorship example—which the judge rejected and replaced with his own newspaper example. The FAC opening paragraph states censorship blocks "60% of the country (and 80% of movie ticket sales) from seeing important content." Hence the analogy informs a reasonable reader—from the first paragraph—that this case concerns vast censorship harm. FAC paragraph 3 identifies the specific harm in Apple censoring Plaintiff's lifesaving COVID app, and *all* COVID startup apps. (5-ER-953 ¶ 3.) FAC Paragraph 6 puts a number on the harm—40,000 apps rejected per week. (5-ER-954 ¶ 6.) Paragraph 10 explains that Plaintiffs' five apps, and the class members' apps, represent "**millions of person-hours of work tossed away by Apple, with improper rejections [uncovered by] the Congressional Subcommittee Report. To emphasize, while other litigation concerns Apple's fees—this case addresses the significant loss of competitive efficiency, i.e. millions of person-hours, that results from Apple's denial of some 40,000 apps weekly**." (5-ER-954-5 ¶ 10.) This is not boilerplate. This is global outrage over Apple's stronghold over the internet.

15

FAC Paragraph 41 expands upon the Subcommittee Report revelation that Apple's history of "closely monitoring the success of apps in the App Store, only to copy the most successful. Apple takes other companies innovative features." There, the FAC asserts this was the case with Coronavirus Reporter and Facetime 15/WebCaller. (5-ER-972 ¶ 41.) Further evidence from the Subcommittee is restated verbatim "the report describes how apple has 'absolute discretion' in approving apps, resulting in 'complete tyranny.'

### Ranking Suppression Also Evidenced Antitrust Injury

Preferring its own facts, Apple improperly argues in a Rule 12 motion that App Store rankings are a zero-sum game, where one app is lifted at another's expense, but in sum, the net selection of choice and quality are unaffected by rankings. However, the reality is most users only look at the first ranking result—or perhaps the first three—or first ten, even. Imagine (which is what is alleged) Apple hand-picks the first several results, amongst the three million apps. If users only effectively see Apple's handpicked Top Three results, and those are picked for anti-competitive reasons, then it is not a zero-sum game. Apple (and their favored affiliates) win this game, at the expense of other developers.

The FAC (and Congressional Report, and international EU consensus) alleges that ranking suppression self-preferences Apple and its cronies, which must be accepted in a Rule 12 motion. The District Court should investigate this matter, via

16

discovery, rather than accept Apple's implausible factual assertion. The District Court erred in blindly accepting Apple's zero-sum game factual argument.

### 2. Tying (Count 5)

Apple's design of the iPhone requires end-users to purchase software, i.e. apps, through the proprietary App Store. The pleadings in this case make clear that before this tie, people almost exclusively bought software in brick-and-mortar stores. Modern software stores, such as an open market in China, are four times the size of closed proprietary systems. The Android OS allows alternative app installations outside of their own proprietary store. The book publisher analogy was used throughout the case documents to describe how a healthy app distribution market would look. These facts, taken together, make it abundantly clear that Apple has, remarkably, tied its smartphone to eighty percent of all software distribution stores.

**a.** **Tying the iPhone smartphone hardware to all software distribution stores represents exceptional anticompetitive tying meant to invoke *per se* analysis and likelihood to prevail. The Court should direct the District Court to issue the Preliminary Injunction without further delay.**

The Motion for Preliminary Injunction asserted a likelihood to prevail based upon a *per se* analysis of this Sherman-prohibited tying that bottlenecks the entire software industry. The Motion for Preliminary Injunction should have been granted after applying the *per se* standard, because Apple failed to raise any valid defenses

17

on the likelihood to prevail. This injunction represents the most foreseeable[1] solution to mitigating Apple's anticompetitive stronghold of the internet, and draws into question whether Congress even needs new antitrust legislation, if the courts demonstrate that the Sherman Act can be enforced for smartphone digital products.

Apple premised their opposition to the Preliminary Injunction on two incorrect, if not sanctionable, falsities. The first incorrect premise of Apple's opposition is that they purportedly weren't put on proper notice of the tied and tying marketplaces—the smartphone and the software distribution store ("App Store"), respectively. But no sooner than the ink had dried on the District Court's rejection of the preliminary injunction, did Apple plead that a Southern Florida District case asserted the "same app market and app distribution market alleged in *Coronavirus Reporter*." In other words, Apple sufficiently understands—and was certainly on notice—what the smartphone and software markets are. They were able to compare and seek consolidation of a case all the way in Southern Florida which used wording authored by a totally different source (26AGs) yet alleged the same hardware and software.

---

[1] Other similar attempts, e.g. Coalition for App Fairness, *Cameron, Epic,* and the aforementioned Senate Open App legislation with 73% popular support have thus far failed to change the unacceptable *status quo*. This preliminary injunction is now long overdue—and the Congressional Subcommittee has directed the courts to enforce Sherman Act with regard to this exact issue.

The second inconsistency pertains to a discrepancy found in Apple's attempt to invoke the Rule of Reason, rather than the *per se* standard for hardware-software tying. Apple mislead the District Court that *Microsoft* exempted *per se* analysis for the smartphone market, because it should be viewed as platform software, namely, the iOS operating system. The problem with this argument is Apple vigorously argued the opposite point in *Epic;* in *Epic*, Apple argued the Sherman market for operating systems was "entirely litigation driven" and not based on economic reality, and that the proper market is the smartphone hardware itself.

Apple's Motion to Dismiss, and Opposition to the Preliminary Injunction, raised disingenuous defenses to the *per se* tying claim. Apple claimed "the rule of reason, rather than *per se* analysis" governs Plaintiffs' tying claims because they "involve software that serves as a platform for third-party applications," citing *United States v. Microsoft Corp.*, 253 F.3d 34, 89 (D.C. Cir. 2001). This defense contradicts the *Microsoft* ruling, and moreover, contradicts Apple's own position in *Epic* that it is the hardware iPhone, not the iOS software, that is an actual product market.

The *Microsoft* court cautioned not to use that ruling for all software, let alone, hardware:

> "Because this claim applies with distinct force when the tying product is platform software, we have no present basis for finding the *per se* rule inapplicable to software markets generally. Nor should we be interpreted as setting a precedent for switching to the rule of reason

every time a court identifies an efficiency justification for a tying arrangement. Our reading of the record suggests merely that integration of new functionality into platform software is a common practice and that wooden application of *per se* rules in this litigation may cast a cloud over platform innovation in the market for PCs, network computers and information appliances." *U.S. v. Microsoft Corp.*, 253 F.3d 34, 95 (D.C. Cir. 2001)

The *Microsoft* ruling differentiated itself from prior *Jefferson Parish* precedent on hardware-software bundling:

> "Most tying cases in the computer industry involve bundling with hardware. See, e.g., *Datagate, Inc. v. Hewlett-Packard Co.,* 941 F.2d 864, 870 (9th Cir. 1991) (holding that plaintiff's allegation that defendant conditioned its software on purchase of its hardware was sufficient to survive summary judgment); *Digidyne Corp. v. Data Gen. Corp.*, 734 F.2d 1336, 1341-47 (9th Cir. 1984) (holding that defendant's conditioning the sale of its OS on the purchase of its CPU constitutes a *per se* tying violation); *Cal. Computer Prods*., 613 F.2d at 743-44(holding that defendant's integration into its CPU of a disk controller designed for its own disk drives was a useful innovation and not an impermissible attempt to monopolize)" *Id*.

Apple hence conditioned its opposition to the preliminary injunction on patently incorrect premises: 1) that *Microsoft* exempted it from *per se* tying analysis, and similarly, 2) that the tying product was iOS rather than the iPhone, and 3) that the FAC's "smartphone" and "app distribution" markets weren't actual marketplaces based on reality. All three arguments fail. When it suited them in *Epic*, Apple argued that a relevant market for iOS was "artificially drawn and entirely litigation based"—indeed, that finding exists in USDJ Gonzalez Rogers' final order on *Epic.* Apple can't argue it both ways—if the proper market is smartphones/iPhones, then *per se*

20

analysis applies to the App Store tie, which itself is a software store yielding credit card transactions more than it is a software platform. The reality in 2022 is that software platforms exist for nearly everything, from telemedicine consults to Apple's rumored Apple Car to its so-called metaverse goggles. Apple would be hard pressed to argue that smartphones and software stores don't exist, are all part of a single platform, or are litigation driven. But that is exactly what the company did— and the court below was conspicuously silent on performing *per se* analysis.

Indeed, the tying arrangement of all smartphones to one single software store represents exactly the sort of tying that concerned Justice Black in *Northern Pacific*:

> *"There are certain agreements or practices which because, of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use."*

To most smartphone users, the only "publisher" of apps they ever knew was Apple. This, fundamentally, is what has stalled Sherman Act enforcement, and the time to correct this dangerous misunderstanding is with the immediate passage of the preliminary injunction.

The elements of a tying claim are: (1) that the purportedly tied and tying items entail separate products or services in the sense that there is separate market demand for each of them without the other; (2) that the availability of the tying item has been conditioned upon purchase, rental, or license of the tied item or on not dealing with

21

the defendant's competitors in the market for the tied item; (3) that the party imposing the tie has sufficient market power in the market for the tying item to "appreciably restrain free competition" in the tied market; and (4) that a "not insubstantial" amount of commerce in the tied item is affected by the tying arrangement. *Eastman Kodak v. Image Technical Services, Inc.*, 504 U.S. 451, 462-4 (1992).

Apple did not contest that elements two (2) through four (4) have been established,[2] but rather focuses on two alleged issues—the separateness of the tied and tying products (the first element) (5-ER-811 ln. 10-28–5-ER-812 ln. 1-11.) and Appellants' standing to bring this claim (5-ER-812, ln. 12-23.) As discussed in greater detail below, neither of these arguments are enough to defeat the injunction, let alone warrant granting a motion to dismiss.

Appellants pleaded the separateness of the tied and tying products throughout the FAC. (5-ER-1024-5 ¶¶ 218, 220, 222.) Note that the tying product is always Apple's iOS smartphone device (i.e. an Apple iPhone), while different tied products are plead (the App Store, notary stamps, and onboarding software). Moreover, Appellants explain the consumer interest/demand for each of these tied products on

---

[2] Regardless, Plaintiffs have pled facts establishing these elements on the face of the FAC. (See, *e.g.*, FAC ¶¶ 217, 219, 221 for the second element, FAC ¶ 216 for third element, and FAC ¶223 for the fourth element.)

the face of the FAC.[3] Apple would have the court believe that *Epic Games* (a case currently on appeal) should be used to determine a lack of a separate product. (5-ER-812, ln. 6-8.) However, the *Epic Games* Court made a factual decision on this issue at trial, and the purported tied product in Epic Games (in-app purchases) differs from the tied products plead by Appellants (the app store, notary stamps, and onboarding software). Moreover, *Epic Games* should not be used to decide this issue because Apple's conduct here constitutes "tech-tying" and competitors like Appellants should be permitted to enter the aftermarkets of both iOS app distribution and iOS in-app payments processing. See analysis on this issue in Emma C. Smizer, *Epic Games v. Apple: Tech-Tying and the Future of Antitrust*, 41 Loy. L.A. Ent. L. Rev. 215, 216–51 (2021). As noted in that law review article, Epic's claims did "not capture the full scope of Apple's tying conduct." *Id.* at 242-43.

Appellants have standing to bring this claim and seek an injunction. Apple's Motion admits that competitors who are restrained from entering the market for the tied product have standing to bring forth this claim. (5-ER-812, ln. 12-15.)

---

[3] "The U.S. Supreme Court has held that 'the answer to the question whether one or two products are involved turns not on the functional relation between them, but rather on the character of demand for the two items.' Thus, the most important factor in determining whether two distinct products are being tied together is whether customers want to purchase the products separately. Here, the tied products meet the SCOTUS requirement for consumer interest. Clearly, consumers are interested in purchasing apps separately from smartphones." (5-ER-1027 ¶ 228, emphasis added.)

Appellants have alleged that they are competitors who are restrained from entering the market for the tied product on the face of the FAC. Appellants are developers, who are competitors that could open their own app stores (one of the tied products alleged) if not for Apple's EULA and notarization requirements. (See 5-ER-1024 ¶ 218.) It follows that if Appellants were allowed to open their own app stores, they would also be in the market for their own notary stamps (one of the tied products alleged) to use for the apps in their app stores, making Appellants' competitors in the notary stamp market. (See 5-ER-1024 ¶ 219.)

Based on the authority used by Apple itself, Appellants have standing to bring this claim based on the facts on the face of the FAC. (See 5-ER-812, ln. 12-15.) Similarly, Apples' argument against Counts IV and VI depend on factual conclusions and dependance on *Epic Games* (currently on appeal), for contentions such as "But nothing in antitrust law requires Apple to give away its intellectual property for free." (5-ER-809, ln.11-12.)   Not only was this not the stage of proceedings to decide this issue, but as noted in Appellants' Motion to Strike, judicial notice of which was requested when the Opposition was filed, the Court in *Epic Games* rejected Apple's IP argument. (See 4-ER-672.)

### B.   Appellants Have Sufficiently Pled Violations of Sherman Act § 2 (Counts 1, 2, 4, 6)

Section 2 of the Sherman Act makes it an offense to monopolize, attempt to monopolize, or combine or conspire to monopolize any part of the nation's interstate

or foreign commerce. 15 U.S.C.A. § 2. Appellants sufficiently plead all three elements of their monopolization claims: (1) defendant possesses monopoly power in the relevant markets; (2) defendant has willfully acquired or maintained that power; and (3) defendant's conduct has caused antitrust injury. *See Cost Mgmt. Servs. v. Wash. Natural Gas*, 99 F.3d 937, 949 (9th Cir. 1996).

### 1. Apple's Monopoly Power in the Relevant Markets is Pled in the FAC

Appellants have plainly laid out a relevant foremarket on the face of the FAC, the market for US Smartphones (and an alternative single-brand market for iPhones.) (*See, e.g.,* 5-ER-958-960 ¶¶ 16, 18.) Related downstream markets exist and are also plead on the face of the FAC. (*See, e.g.,* 5-ER-955 ¶ 8, fn. 1) Each of these markets satisfy the relevant market inquiry.

The relevant market inquiry has two dimensions. *Standard Oil Co. of New Jersey v. U.S.*, 221 U.S. 1, 61 (1911). First, it is necessary to identify the cluster of products or services with which the defendant's product or service effectively competes, termed the "relevant product market." *Id.* Second, it is necessary to identify the geographic area within which the defendant practicably competes in marketing its product or service, termed the "relevant geographic market." *Id.* All of the relevant markets plead in the FAC have a clear geographic area—the United States, as pled in paragraph 128 of the FAC. This is further evident by the description of the markets as "US" or "national" markets throughout the FAC. (*See, e.g.,* 5-ER-

955-1028 ¶¶ 8, 16, 18, 76, 121, 129, 197, 209, 233.) The Preliminary Injunction offers additional evidence of FCC geographic licensure and applicable product SKU numbers, which the Court is given judicial notice thereof. Furthermore, Apple's Motion does not argue a lack of geographic market and is solely focused on the product market. (5-ER-804, ln. 9-22.)

Downstream from smartphones are the app market and userbase market (and related onboarding/notary stamps), plainly delineated:

> *[Plaintiffs] are also first-to-file in this pleading:*
>
> *1) the institutional app market (i.e. wholesale app competition),*
>
> *2) the iOS institutional app market (iPhone app single-product wholesale marketplace),*
>
> *3) iOS notary stamps market (permission tokens to launch iOS apps),*
>
> *4) iOS onboarding software ("Mac Finder" capability disabled on all non-enterprise iOS devices), and*
>
> *5) access rights to the iOS userbase.*

The FAC specification of the National Institutional App marketplace states that "technically, this marketplace is the wholesale/B2B side of a two-sided National App Marketplace… app distribution is two sided; the consumer facing side and the institutional side. Apple is a monopsony purchaser of apps on the wholesale B2B side." (FAC ¶ 11). (*See, e.g.,* 5-ER-955 ¶ 8, fn. 1) Item 2 on this list is a single-brand <u>alternative</u> to item 1. (5-ER-1001 ¶ 125.) The product in both institutional app market are smartphone apps, which is plead in the FAC. (5-ER-1022 ¶ 209.) The

FAC explains that an app store is a consumer facing side of the app market, and institutional sales are the wholesale side. This distinction, as will be evident, is critical for free apps, which have a zero-price to consumers, but often have multi-million or even billion-dollar valuation to wholesale institutions such as Apple, venture capitalists, banks, etc. The products included in the other markets are further discussed throughout the FAC but are largely different redundant mechanisms to describe Apple's sale of userbase access. The product of the notary stamps market is the notary stamps. (5-ER-1014 ¶ 171.) The product of the onboarding software market is the software onboarding. (5-ER-1014 ¶ 172.) The product of the iOS userbase market is access to the userbase. (5-ER-1012 ¶ 163.) Hence, as Apple has even conceded in related pleadings, this case primarily deals with the app market for "all apps," and related distribution and userbase access channels. Every one of these markets is a valid antitrust product market or submarket as explained by the Supreme Court:

> "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962).

27

Discovery is needed to allow a proper determination of whether there is industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors for the submarkets plead in the FAC. Moreover, a relevant market was alleged without issue for these reasons:

### a. Two-Sided App Store Does Not Equal Two-Sided Economic Marketplace.

In what Appellants characterize as the 'core' or fundamental discrepancy of the District Court's rejection of their marketplace definitions, the court invoked the *Epic* verdict regarding the App Store as a "two-sided platform," and applied it to the Institutional App marketplace—a wholesale market, part of a larger *non-platform* app market, which has a consumer facing distribution channel.

The first concept, a "two-sided" transactional platform, is one where buyers and sellers are matched and there is always "symmetry" in a transaction with a buyer and a seller paying and receiving the same price. The transaction platform receives a fee—such as a stock market, where a buyer and seller exchange stock shares and pay a fee to the exchange. The second concept is that of corresponding supply and demand, in a market of a supply chain. Every economic market has a supply, and related demand, but that does not mean every market is a transaction platform.

Likewise, an upstream purchaser may become a downstream supplier, in the case of a wholesaler.

The court below incorrectly viewed these related supply and demands as one-to-one. But the FAC referenced the wholesale side of the app market, meaning the corresponding economic demand represented by the downstream retail App Store. Apple, after purchasing an app from a developer, subsequently becomes the seller when it sells on the "consumer facing" App Store.

That is different from saying the entire App Market is a two-sided transactional marketplace. The analogy in Plaintiffs' book example is a publisher buys a book from an author in the "institutional wholesale book" market, then turns around and sells the book to a bookstore, who has a consumer-facing distribution platform.

In short, capitalist supply chains have multiple levels of supply and demand, by definition, and Plaintiffs have specifically alleged that the entire app supply chain shouldn't be bottlenecked and reduced to a single "two-sided transactional" platform. Despite Plaintiffs best and reasonable efforts to describe the complexities of digital product capital supply chains, Apple has in turn created chaos in this litigation by stirring confusion and faulting Appellants for said complexity.

The confounding problem is that as long as iOS smartphones have existed, we largely only know of one "bookstore"—the App Store. Hence it is conceptually easy

to confound the markets of app supply from creators, and app distributors to consumers. Apple has been the only "wholesale" demand in this market since its existence, and of course, is the only "consumer-facing" supplier. This clarification, finally, allows us to understand why the FAC called this wholesale market "largely hypothetical"—Apple's monopoly in the App Store market has never permitted an alternate buyer—or seller—of apps. As the FAC plainly points out—Apple is the only merchant of record for billions of app transactions. All credit card app purchases are, for iOS, from Apple. This is in violation of the Sherman Act.

### b. Market Contours Including Elasticity SSNDQ may be finalized at jury

In this case, the District Court erred by requiring Plaintiffs fully describe cross-elasticity of demand for free apps at the beginning of a lawsuit. Cross-elasticity of demand for free apps is not possible using traditional metrics, and by definition, it doesn't even exist. How can a change in price be measured when an app is free? Plaintiffs would invoke a new metric from a congressional expert for free apps, if permitted to proceed according to the "*Antitrust and Big Tech*" report to the United States Congress.[4] As the report explains:

> "[Antitrust experts] maintain that antitrust law has an important role to play in zero-price markets. Some of these commentators have argued that zero-price transactions are not in fact "free" to consumers, and that

---

[4] https://sgp.fas.org/crs/misc/R45910.pdf (Page 7 of the Report explains SSNDQ).

consumers ultimately "pay" for putatively "free" goods and services with both their attention and personal data...

While many observers accordingly agree that zero-price markets are not categorically immune from antitrust scrutiny, the optimal approach to defining the scope of such markets remains open to debate.

Some commentators have argued that regulators should modify the SSNIP test to account for quality-adjusted prices, creating a new methodology called the "small but significant and non-transitory decrease in quality" (SSNDQ) test..." (Full document in appendix.)

In the opposition to the Motion to Dismiss, it was already noted that the Court should not require "small but significant and non-transitory increase in price" ("SSNIP") type pleadings for free apps, and instead, defer to expert witnesses in discovery for defining free apps. Nonetheless, SSNIP type boundaries were included for the US Smartphone market. But this Appeals Court should acknowledge, as above, that zero-price markets are different, and difficult, and allow expert debate on this subject, rather than surmising futility at the Rule 12 level.

It should be noted in the *Epic* case that the word "foremarket" was not even used in Quinn Emmanuel's Complaint, and Judge Gonzalez Rogers stated that "intensive fact-finding" was necessary to determine a relevant market at *trial*. The United States is frequently allowed several amendments in antitrust market definitions. Appellants have taken on a challenging topic, the District Court and Apple did not (and cannot) find any bad faith in their endeavors, and as such, the markets at this stage should be viewed with a scope of reasonable latitude.

*Coronavirus Reporter* has met the "substance over form" bar for free app censorship.

Moreover, Apple cannot reasonably claim the DOJ and 26 AGs, and the

Congressional report on SSNDQ, are wrong under the applicable Rule 12 threshold.

### c. DOJ Position on Marketplace as a Tool

As the lower court was reviewing its order, the DOJ filed an amicus brief with

the Ninth Circuit not to "[take] position on the merits of the [*Epic*] claims," but

rather, to "ensure that the Sherman Act is not unduly narrowed through legal error."

(2-ER-62, 100.)  The District Court was requested to take judicial notice of the DOJ

guidance regarding marketplace definition:

> "By potentially obscuring market realities, the rigid rules suggested by
> the district court could significantly harm antitrust enforcement,
> especially in the digital economy." (Page 28)…
>
> The DOJ contends the "Epic District Court's Opinion could be read as
> adopting inflexible market-definition principles that would improperly
> limit the Sherman Act's scope…
>
> Market definition is a tool that helps courts ascertain the "locus of
> competition" in which to judge the challenged conduct, identify market
> participants, and assess market concentration. Brown Shoe Co. v.
> United States, 370 U.S. 294, 320-21 (1962). But "[t]hat is not to say
> that market definition will always be crucial," and it "does not exhaust
> the possible ways to prove" competitive effects. FTC v. Whole Foods
> Market, Inc., 548 F.3d 1028, 1036 (D.C. Cir. 2008)."

The District Court refused to take judicial notice of the DOJ *amicus*, let alone,

consider the valid arguments made that market definition is not a crucial element to

a Sherman claim, especially with regard to free digital products. The Ninth Circuit

should adopt the position of the DOJ, and not reject digital product cases—moreover the free digital products in this case—for marketplace definition requirements that are simply not part of the Sherman statute nor the *Brown Shoe* Supreme Court precedent.

### 2. Apple's Willful Maintaining of Monopoly Power is Properly Alleged in the FAC

To satisfy the requirement for alleged willful conduct, Appellants must allege facts showing that Apple engaged in anticompetitive conduct, with the intent to control prices or destroy competition. *See Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534 (9th Cir.1983). The House Subcommittee on Antitrust expressed concerns about Apple. In fact, it noted the continued monopolization by a small group of tech companies, including Apple, has substantially reduced "consumer choice, eroded innovation and entrepreneurship in the U.S. economy, weakened the vibrancy of the free and diverse press, and undermined Americans' privacy." This House Subcommittee report is attached as Exhibit A to the Complaint (See 3-ER-233-408) and is incorporated into the FAC. (5-ER-968 ¶ 36.) This Report explains Apple anticompetitive conduct in greater detail, but regardless, the face of the FAC contains facts establishing anticompetitive conduct. Appellants contend that Apple used its overwhelming monopoly power to restrict others from publishing competing apps, or becoming app distributors, by restricting the iOS notary stamps

market and iOS onboarding software.[5] Apple did not do this based on any meritorious reasoning. Instead, Apple abused its monopoly power and intentionally excluded competition from these markets.

Appellants' claims are analogous to the Section 2 violations recognized by the Ninth Circuit in *Image Tech. Srvs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997), and, in *Allied Orthopedic Alliance Inc. v. Tyco Health Care Group LP*, 592 F.3d 991 (9th Cir. 2010). In *Eastman Kodak*, the Ninth Circuit affirmed the jury's finding that Kodak violated Section 2 by taking steps to exclude independent service organizations ("ISOs") from competition in the market for servicing Kodak copying machines. "Section 2 of the Sherman Act prohibits a monopolist's unilateral action ... if that conduct harms the competitive process in the absence of a legitimate business justification." *Eastman Kodak*, 125 F.3d at 1209. Just as Apple does here, Kodak argued that it was entitled to exclude competitors from the market to protect its intellectual property rights. *Id.* at 1214-20. However, the jury rejected Kodak's purported business justification as pretextual. *Id.* at 1218-19. Similarly, as Appellants allege in the FAC, Apple refused to sell notarization stamps, onboarding software, or access to userbases to harm competing app developers. (5-ER-1015 ¶ 173.) Likewise, they offered infra-competitive wholesale prices for free apps. The

---

[5] See, e.g., 5-ER-1013-4 ¶¶ 168, 169, 171, 172.

FAC furthers pleads that there was no legitimate business justification for Apple's conduct. (5-ER-1019 ¶ 190.) Apple's alleged procompetitive justification is pretextual and cannot support a motion to dismiss. *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 286 n.30 (2d Cir. 1979) (product introductions are not immune from antitrust scrutiny); *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, *LLP*, 540 U.S. 398, 408 (2004) ("Under certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate Section 2.").

An essential facility (Count 2) has been sufficiently pleaded. Denial of access to an essential facility is a widely recognized form of anticompetitive conduct, which has the following elements: (1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility. *MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1132 (7th Cir. 1983). Each of these elements is pled on the face of the FAC.[6] Apple argues that it is not on notice as to what the essential facilities are, yet cites to the portions of the FAC which plainly state what the different essential facilities are. (5-ER-807, ln. 1-4.) Apple  wants to the Court to believe that Appellants' FAC should be dismissed simply because they are pleading more than

---

[6] See 5-ER-1017-8 ¶¶ 183-185 for the first element, ¶ 188 for the second element, ¶ 186 for the third element, and ¶ 188 for the third element.

one essential facility. Appellants plainly pled what the three different essential facilities at issue are. (See 5-ER-1017 ¶ 185, "Notary stamps, application loaders, and contractual iOS userbase access are therefore essential facilities under Apple's control.") Moreover, Appellants pled that they are competitors to Apple (5-ER-1017), so they have standing to bring forth this claim.

Apple uses its IP rights to argue that it is entitled to exclude competitors from these essential facilities, citing only an antitrust textbook (5-ER-807, ln. 15-24.) However, this reason alone cannot be used as a basis for deciding a Motion to Dismiss because this purported business justification can be found to be pretextual, similar to what the jury found regarding Kodak's IP justification in *Eastman Kodak Co. v. Image Technical Servs., Inc. See Eastman Kodak*, 125 F.3d at 1218-19. Clearly, it is too early to resolve this factual question at this stage of the proceedings, and the Motion to Dismiss should have been denied. Whether or not a patent gives a Big Tech company "Big Brother" control over the final end-user is a choice for the jury to determine.

### C. Plaintiffs' Cameron Opt-Out Claims Should Not be Dismissed (Count 7)

The free app class action claims were deemed not subject to consolidation with *Cameron* by the Honorable Yvonne Gonzalez Rogers. Nonetheless, certain Plaintiffs also had paid apps and sought redress in this action as opt-outs from Cameron. As the FAC states, "In order to streamline litigation, and to avoid

36

confusion, Plaintiffs CALID and Jeffrey Isaacs assert claims for non-zero price apps as specified in the already docketed complaint *Cameron v. Apple*. These causes of action, and all supporting facts from that complaint are incorporated herein, as if they had been stated in the Amended Complaint." (5-ER-1030 ¶ 243.)

### D. Appellants Alleged a Valid Breach of Contract Claim (Count 8)

The elements of a claim for breach of contract are: (i) the existence of a valid contract; (ii) performance by the plaintiff or excuse for non-performance; (iii) breach by the defendant; and (iv) damages. *See First Commercial Mortgage Company v. Reece* (2001) 89 Cal.App.4th 731, 745; *Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1388. As shown below, Appellants have pled each of the elements of a claim for breach of contract.

Appellants pleaded the existence of the contract. (5-ER-1031 ¶ 245.) Appellants pleaded their performance under the contract. (5-ER-1031-2 ¶¶ 246–249, 251–253.) Appellants pleaded breach of the contract by Apple. (5-ER-1032-3 ¶¶ 250, 254–258.) Appellants pleaded damages. (5-ER-1034 ¶ 260). For purposes of pleading, Appellants have sufficiently pled a claim for breach of contract.

As Apple has attempted to do throughout its 12(b)(6), Apple ignores that the factual allegations of Plaintiff's First Amended Complaint must be deemed as true. Apple was completely rewriting Plaintiff's allegations in the First Amended Complaint and the Breach of Contract cause of action. Appellants pled the contract, Appellants'

performance, Apple's breach and damages. Accepting as true that some contractual clauses violate Sherman and UCL, the contract claim may not be dismissed under Apple's suggestion they have "sole discretion" to deny any app. The contract claim must be viewed in the context of the entire lawsuit, not a vacuum. If a jury may find some of the contract represented an "adhesion agreement," a downstream jury determination of breach may be inevitable. Appellants met the pleading requirements of a claim for breach of contract and Apple's Motion should have been denied.

### E. Appellants Alleged a Valid Breach Of The Implied Covenant Of Good Faith And Fair Dealing Claim (Count 9)

The elements of a claim for breach of implied covenant of good faith and fair dealing are: (1) existence of a contract between the parties; (2) the plaintiff's performance of that contract; (3) conduct by the defendant that breached the implied covenant of good faith and fair dealing; and (4) damages. *See Racine & Laramie, Ltd. v. Department of Parks & Recreation* (1992) 11 Cal. App. 4th 1026, 1031-32.

In every contract or agreement there is an implied promise of good faith and fair dealing. This means that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract. *3500 Sepulveda, LLC v. Macy's West Stores, Inc.*, 980 F.3d 1317, 1324 (9th Cir. 2020).

Here, Appellants pleaded the existence of the contract. (5-ER-1031 ¶ 245.) Appellants pleaded their performance under the contract. (5-ER-1031-2 ¶¶ 246–249, 251–253.) Appellants pleaded conduct by Apple breaching the implied covenant of good

faith and fair dealing by Apple. (5-ER-1035 ¶¶ 263–265.) Appellants pleaded damages. (5-ER-1035 ¶ 266.)   Appellants have sufficiently stated a claim for breach of the implied covenant of good faith and fair dealing.

Apple was again impermissibly attempting to rewrite Appellants' allegations. Plaintiff's allegations must be taken as true.  Furthermore, Apple's argument was contradictory.  On the one hand, Apple was arguing that Appellants' Breach of the Covenant of Good Faith and Fair Dealing cause of action "merely rehashes Appellants' breach allegations."  (5-ER-814, ln. 1–2.)  On the other hand, Apple argues that a specific contractual term that was breached by the implied covenant must be alleged.  In fact, the case cited by counsel for Apple, which counsel for Apple briefed and argued, specifically held "'breach of a specific provision of the contract is not a necessary prerequisite' to establishing breach of the implied covenant of good faith and fair dealing. . ." *Soundgarden v. UMG Recordings, Inc.*, 2020 WL 1815855, 17.  Apple's own case citation, itself a ruling on a 12(b)(6), contradicts Apple's arguments. The threshold for good covenant is clearly below that of breach of contract; a jury may reasonably find that Apple invoked its "sole discretion" clause in bad faith, even if it weren't to violate the Sherman Act. Appellants have sufficiently pled a claim for breach of the implied covenant and, therefore, Apple's Motion should have been denied.

### F. Appellants Asserted a <u>Valid</u> RICO Claim (Count 10)

To allege a claim under RICO, a plaintiff must allege facts establishing four elements: (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity. *Jarvis v. Regan,* 833 F.2d 149, 151-52 (9th Cir. 1987). The FAC properly alleges facts demonstrating all of these elements in the context of a classic and destructive RICO scheme: an-ongoing scheme to exploit the work of developers by screening their ideas for purported compliance with DPLA, meanwhile lifting and appropriating their ideas into their own competing apps and suppressing the original creators' work by blocking distribution.

#### 1. Appellants Complied With Rule 9(b) in Pleading Their RICO Claim

Rule 9(b) of the Federal Rules of Civil Procedure applies to allegations of mail and wire fraud. *See, e.g., Jepson, Inc. v. Makita Corp.,* 34 F.3d 1321, 1327 (7th Cir. 1994). Therefore, for at least two acts of mail or wire fraud, "a plaintiff must, within reason, describe the time, place, and content of the mail and wire communications, and it must identify the parties to these communications," in order to state a RICO claim. *Id.* at 1328; *Lachmund v. ADM Investor Servs., Inc.,* 191 F.3d 777, 784 (7th Cir. 1999) ("a plaintiff must allege with particularity two predicate acts"). Further, "[t]he allegations must be specific enough to provide the defendants with a *general outline* of how the alleged fraud scheme operated and of their purported role in the scheme." *Rohlfing v. Manor Care, Inc.,* 172 F.R.D. 330, 347

(N.D. Ill. 1997) (emphasis added). In addition, the complaint must indicate "what is false or misleading about a statement, and why it is false" and "be specific enough to give defendants notice of the particular misconduct that they can defend against the charge and not just deny that they have done anything wrong." *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003) (internal citations omitted).

Because Rule 9(b)'s particularity requirement "contrasts significantly with the general standard enunciated in Rule 8 .... we must take care not to permit the more demanding standard of Rule 9(b) to encroach unduly on the general approach to pleading that Congress has established in Rule 8." *Lachmund v. ADM Investor Servs., Inc.,* 191 F.3d 777, 783 (7th Cir. 1999); *see Hurd v. Monsanto Co.,* 908 F. Supp. 604, 613 (S.D. Ind. 1995). Moreover, "Rule 9(b) does not require that the complaint explain the plaintiffs theory of the case, but only that it state the misrepresentation, omission, or other action or inaction that the plaintiff claims was fraudulent." *Midwest Commerce Banking Co. v. Elkhart City Centre,* 4 F.3d 521, 523 (7th Cir. 1993). Regarding mail and wire fraud, "[a]ll Rule 9(b) require[s] ... [is] that [plaintiff] set forth the date and content of the statements or omissions that it claim[s] to be fraudulent. [Plaintiff is] not required to go further and allege the facts necessary to show that the alleged fraud was actionable." *Id.*; *Midwest Grinding Co. v. Spitz,* 976 F.2d 1016, 1020 (7th Cir. 1992); *Hurd,* 908 F. Supp. at 614, n.9.

Certain additional principles relating to the application of Rule 9(b) are also

well-recognized. "[T]he particularity requirement of Rule 9(b) must be relaxed where the plaintiff lacks access to all facts necessary to detail his claim, and that is most likely to be the case where, as here, the plaintiff alleges a fraud against one or more third parties." *Corley v. Rosewood Care Ctr., Inc.,* 142 F.3d 1041, 1051 (7th Cir. 1998); *see Hirata Corp. v. J.B. Oxford and Co.,* 193 F.R.D. 589, 592 (S.D. Ind. 2000); *Pelfresne v. Stephens,* 35 F. Supp. 2d 1064, 1071-72 (N.D. Ill. 1999) (predicate acts maybe pled more generally when facts are exclusively known to defendants).

Further, specific actors need not be identified when the "role of each corporate defendant in the scheme is reasonably clear." *Rohlfing,* 172 F.R.D. at 348; *see Jepson, Inc.,* 34 F.3d at 1329 (collective allegations permissible when corporate defendants were "related corporations that can most likely sort out their involvement without significant difficulty"); *Wabash Valley Power Ass'n,* 678 F. Supp. at 762 (allegations of collective actions by unidentified senior officials of a business are adequate). In "instances of corporate fraud [where it is] difficult to attribute particular fraudulent conduct to each defendant as an individual[,] the allegations should include the misrepresentations themselves with particularity and, *where possible*, the roles of the individual defendants in the misrepresentations." *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989)

*See Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993) (noting that

elements of fraud claim can be pleaded "on information and belief" when plaintiff provides basis for that belief and fact is one that is within defendant's knowledge); *Immobiliare, LLC v. Westcor Land Title Ins. Co.*, 424 F. Supp. 3d 882, 890 (E.D. Cal. 2019) (noting that plaintiffs must allege the names of employees that made fraudulent statements or, "at a minimum identify them by their titles and/or job responsibilities") (citation omitted).

Applying these standards and principles, there can be no doubt that Appellants more than adequately pleaded a pattern of racketeering activity. As previously noted, the racketeering activity here involves predicate acts of fraud which requires a scheme to defraud, intent to defraud and use of wire communications or the mail in furtherance of the scheme. Appellants specifically allege all such elements. (5-ER-1035-49 ¶¶ 267–308). *See, e.g.*, *Celebrity Chefs Tour, LLC v. Macy's, Inc.*, 16 F. Supp. 3d 1141, 1150 (S.D. Cal. 2014) (concluding that the plaintiff had alleged false representations with specificity by identifying which statements were false, detailing who made the statements, the date on which they were made, and in what form they were said). The App Review team correspondence was directly included in the FAC, showing the time, place and identity of the App Review team member. A pattern, through multiple screenshots, shows the App Review team used misleading, false, and fraudulent communications to make small developers think their works were somehow improper, when, in fact, cronies' similar works were widely permitted on

the App Store.

### 2. Appellants Alleged Multiple Predicate Acts Sufficient to State a RICO Claim

RICO's "predicate acts" are certain listed federal and state offenses, including mail and wire fraud. *See* 18 U.S.C. §§ 1341, 1343. To state a claim for mail or wire fraud, a plaintiff must allege "(1) that [defendant] engaged in a scheme to defraud, (2) with the intent to defraud, and (3) that [defendant] used the mails or interstate wires in furtherance of that scheme." *McDonald v. Schencker,* 18 F.3d 491, 494 (7th Cir. 1994). "[A] defendant may be held liable for mail or wire fraud if (1) the defendant was a knowing participant in a scheme to defraud; (2) the defendant had the intent to defraud; and (3) a co-schemer committed acts of mail or wire fraud during the defendant's participation in the scheme, and those acts were within the scope of the scheme." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. MDL 2672 CRB, 2017 WL 4890594, at *12 (N.D. Cal. Oct. 30, 2017) (citing *United States v. Stapleton*, 293 F.3d 1111, 1117–18 (9th Cir. 2002)). The Ninth Circuit in *Stapleton* reasoned that the "scheme to defraud" element of the mail and wire fraud statutes is akin to conspiracy. *Stapleton*, 293 F.3d at 1116–17. The predicate acts of mail and wire fraud themselves do not require use of the mail or wire by each member of the scheme. *See In re Volkswagen*, 2017 WL 4890594, at *12. Additionally, there are numerous predicate acts of wire communication and mail fraud specifically alleged in the First Amended Complaint.

(5-ER-1039-48 ¶¶ 275–303).

### 3. Appellants Alleged an Enterprise Distinct from Apple

Apple relied heavily on *Rae v. Union Bank,* 725 F.2d 478, 481 (9th Cir. 1984), which was limited and explained in *River City Markets, Inc. v. Fleming Foods West, Inc.*, 960 F.2d 1458, 1460–61 (9th Cir. 1992). According to the court in *River City*:

> … *Rae* simply embodies the maxim that an individual cannot associate or conspire with himself, and in subsequent decisions we have adhered to this narrow reading of *Rae. See United States v. Feldman,* 853 F.2d 648, 656 (9th Cir. 1988) (characterizing the *Rae* rule as providing that a defendant cannot be convicted of associating with himself); *United States v. Benny,* 786 F.2d 1410, 1415–16 (9th Cir.) (holding that although an individual defendant could not associate with himself for RICO purposes, he could associate with his own sole proprietorship), *cert. denied*, 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986).

*Id.*

Here, Appellants pled the enterprise as being not only Apple's App Review team and executives, but other persons and entities working in concert with Apple, including PR firms, law firms, and rival developers. (5-ER-1036 ¶ 270). Lobbyists that corruptly influence state legislative pleadings also form the enterprise. By way of addendum, Appellants have incorporated state law violations in Georgia and other elsewhere tantamount to bribery and corruption of public officials. Plainly from the face of the First Amended Complaint, the enterprise is not limited to Apple. Apple was again trying to rewrite Appellants' Complaint.

Additionally, Defendant Apple was named as defendant for this RICO claim under the principle of *respondeat superior*. The Ninth Circuit has adopted the reasoning of *Petro-Tech* and *Liquid Air*, holding that liability may arise under § 1962(a) under *respondeat superior* principles when the individual or entity is benefited by its employee or agent's RICO violations. *See Brady v. Dairy Fresh Products Co.*, 974 F.2d 1149, 1154 (9th Cir. 1992) Here, Apple's App Review team carried out the enterprise, along with senior Apple management, PR firms, law firms/lobbying firms, and a select group of crony rival developers. Plaintiff alleged this theory of liability in the First Amended Complaint as well. (5-ER-1036 ¶ 270).

Moreover, when a when a corporation engages in a pattern of racketeering activity through legal entities beyond its control, such as independent banks, law firms, accounting firms, or public relations firms, the person / enterprise distinction will more than likely be satisfied. *Living Designs, Inc. v. E.I. Dupont De Nemours and Co.*, 431 F.3d 353, 362 (9th Cir. 2005). This is precisely the conduct alleged against Apple as discussed in the First Amended Complaint, where a named Defendant works with other numerous other entities to form the RICO enterprise. (5-ER-1037 ¶ 271).

### G. Appellants Sufficiently Stated a Claim for Civil Fraud (Count 11)

As pointed out above, under Section IV.E.1, Appellants sufficiently alleged fraud under Rule 9(b) of the Federal Rules of Civil Procedure. The elements of fraud

are: "'(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.'" *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638. A plaintiff must show that he or she changed position in reliance upon the alleged fraud and was damaged by that change of position. Civ. Code, § 1709. For example, in *Lazar*, evidence that the plaintiff had quit his job and moved across the country in reliance upon the defendant's misrepresentations, would have been sufficient to demonstrate a detrimental change of position. *Lazar v. Superior Court*, supra, 12 Cal.4th at p. 639.

Appellants must allege who, what, when, where and how the representations were made to the best of Appellants' ability. Appellants identified who made the fraudulent misrepresentations, when they were made and what was said sufficient to state a claim for fraud when dealing with a corporate defendant as discussed above. (5-ER-1039-52 ¶¶ 275–303, 311–318). The FAC was clear that many small developers abandoned their work-product, after believing it was somehow forbidden by the App Store, when in fact it was not.

## III. APPELLANTS SHOULD BE GRANTED LEAVE TO AMEND IN THE ALTERNATIVE

Appellants here were never afforded the opportunity to amend their Complaint based on the guidance of the District Court, in a plain showing of abuse of discretion by the court below.

47

Leave to amend a complaint "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a); *Foman v. Davis*, 371 U.S. 178, 182 (1962); *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981); *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987) (reversing denial of leave to amend to file fourth amended complaint). "[T]here exists a presumption under Rule 15(a) in favor of granting leave to amend." *Eminence Capital, LLC et al. v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) "Dismissal without leave to amend is improper unless it is clear, upon *de novo* review, that the complaint could not be saved by any amendment." *Polich v. Burlington Northern, Inc.*, 942 F.2d 1467, 1472 (9th Cir. 1991). Here, Plaintiffs/Appellants were never given at least one chance to amend their complaint after a responsive pleading had been filed. Fed.R.Civ.P. 15(a) (A party is allowed to amend once as a matter of course).

In other antitrust cases, a district court refusal to grant leave to amend has been held to be an abuse of discretion by the Ninth Circuit Court of Appeals. In *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1124 (2018), the Ninth Circuit Court stated:

> The district court made a "simple denial of leave to amend" here without adequate explanation. *Id.* It only noted that the Caddies were not "able to explain how they could state an antitrust claim using a plausible product market definition." This insufficient consideration of the factors discussed in *Foman* constitutes an abuse of discretion" (Full decision in Appendix).

While Appellants believe the product market here was properly identified, the holding in *Hicks* demonstrates that even if there was a failure to plead a plausible

product market, it is an abuse of discretion to make a simple denial of leave to amend, just as the District Court did here.

Further, the facts of this case are more compelling and supporting of reversal of the District Court's order dismissing the complaint without leave to amend in *Eminence Capital, LLC et al. v. Aspeon, Inc.*, 316 F.3d 1048 (9th Cir. 2003). In *Eminence Capital*, the Ninth Circuit reversed a district court's dismissal of leave to amend after the 'district court concluded that leave to amend should be denied because "[p]laintiffs have had three 'bites at the apple'." The Court ruled that "we believe that the district court did not appropriately exercise its discretion by denying plaintiffs leave to amend where, as here, plaintiffs' allegations were not frivolous, plaintiffs were endeavoring in good faith to meet the heightened pleading requirements and to comply with court guidance, and, most importantly, it appears that plaintiffs had a reasonable chance of successfully stating a claim if given another opportunity." *Id.*

Here, Plaintiffs/Appellants had no 'bites at the apple' and had never been given opportunity for any court commentary or guidance to cure any pleading defects. Instead, the District Court abused its discretion by using other earlier actions against Apple as its basis to deny leave to amend the complaint in this case. Specifically, the Court stated:

> Plaintiffs are correct to note that this will be the first ruling under rule 12(b)(6) concerning Plaintiff's complaint, Apple is also correct in

observing that between the various iterations of this case being filed across jurisdictions and by different configurations of Plaintiffs—all challenging the same conduct by Apple and all by the same counsel— this is Plaintiff's *seventh* amended complaint on these claims… Plaintiffs have had the benefit of responding to Apple's fully briefed motions to dismiss in this case and previous cases, and, yet, in this seventh complaint they still fail to state any claims. Accordingly, the Court finds that it would be futile to grant leave to Plaintiffs to bring an eighth amended complaint, and thus dismisses the claims with prejudice.

(1-ER-39-40.)

The above quote is the only reasoning given for denial of leave to amend. There is no discussion of the *Foman* factors[7] whatsoever by the District Court here, just like the district court in *Hicks*, whose decision to deny leave to amend was reversed by the Ninth Circuit.

The District Courts language, relying on Apple's iteration count, is plainly erroneous. In the New Hampshire District, *Coronavirus Reporter* filed a First Amended Complaint—with Apple's assent—solely to provide Dr. Robert's CV and credentials as exhibit. There simply was no "iteration…responding to Apple's fully briefed Motion to Dismiss" in New Hampshire. The New Hampshire district

---

[7] In *Foman v. Davis*, 371 U.S. 178 (1962), the Supreme Court offered the following factors a district court should consider in deciding whether to grant leave to amend: "In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" *Id.* at 182.

disallowed an SAC in that case—and as the court below noted, the subsequent Complaint filed in this case was "substantially similar claims to the two prior actions." (Order at 8).

Similarly, *Primary Productions* was filed by this counsel in the Maine District Court, and as Apple has noted, was "nearly identical" to the *Coronavirus Reporter* case in New Hampshire.

Finally, a *pro se* party joined in the FAC in this case, and the claims by that developer didn't even exist until a month before filing of the FAC.

All told, *Coronavirus Reporter* has amended its Sherman claims fundamentally twice, absent the necessity to amend and include new parties and class members. One of these amendments incorporated *Cameron* causes of actions directly into the complaint—which Apple objected to as "cobblestone." That resulted in the current FAC, which moved *Cameron* to an exhibit.

The District Court has no basis to suggest that an amendment (if even necessary) would be futile or lacking in good faith. To the contrary, Appellants and their counsel have made substantial contribution towards increasing visibility of the free digital product antitrust censorship, as evidenced by the substantial technology and legal industry press attention to the underlying litigation.

The Order also implicitly suggests that further amendment would be futile, due to the sheer number of markets alleged. This, again, was an unfortunate instance

where the District Court verbatim copied Apple's MTD, without applying the necessary scrutiny. Nearly ten of Apple's "fifteen" markets are essentially punctuation, geographic identifiers, or alternative market (i.e. single-brand) variations. For example, Apple counts "the App market" six times—the "iOS App market" (a single brand alternative), the "US iOS Device App market," the wholesale "institutional app market," and the "iOS institutional app market," and the "national smartphone app distribution market." Apple's count-shaming and harpooning such an important antitrust matter for such minor technicalities is simply not permitted under Rule 1.

In sum, while the District Court mentions futility, it abused its discretion in concluding that granting leave to amend would be futile because Plaintiffs would be bringing an "eighth amended complaint" or "fifteen" Sherman markets. The District Court was erroneous in counting complaints and markets, and ultimately its rubber stamp was an assent to Apple's shameful litigation conduct. This conduct included accusations at the time of the first "iteration" that Dr. Roberts, a renowned scientist who saved countless lives, filed the New Hampshire complaint "in disregard for the law." To be chastised so inappropriately for properly voicing censorship antitrust concerns in a federal court is despicable.

Including all parties and classes—a substantial feat compared to *Epic* or *Cameron*—there were no more than three true "iterations" filed by all parties

52

*combined*, none of which were given District Court guidance on necessary improvement. Rather they were subjected to numerous motions by Apple, which Plaintiffs/Appellants explained were not in accordance with the FRCP by filing a Motion to Strike. Relying on these earlier "iterations of this case" to conclude that amendment would be futile presents a myriad of issues:

First, one of the earlier "iterations of this case" involved only one of the Plaintiffs present in this case**.** *Primary Prods LLC v. Apple Inc.* ("D. Me. Dkt."), No. 21-cv-137, Dkt. 1 (D. Me.) was filed in the District Court of Maine. It was an abuse of discretion to use that case as a means to conclude that amendment to the Complaint filed by three additional Plaintiffs, who were not involved in that other action whatsoever, was futile. Using this case as a basis to conclude amendment would be futile is extremely prejudicial to the Plaintiffs who were not involved whatsoever in the case.

Second, the earlier "iterations" were dismissed based on jurisdictional issues, not based on Appellants' ability to state a claim. The amendments concerned these jurisdictional issues. Apple admitted that the reason for the voluntary dismissal in that earlier case was due to a jurisdictional issue. (5-ER-798, ln. 24-25.) An earlier amendment in a different case that was dismissed based on jurisdictional issues should not be used to decide that leave to amend would be futile here.

Third, the earlier "iterations" were filed in different Federal Circuits with different binding authorities. Here, Defendant/Appellee used Ninth Circuit cases throughout its Motion to Dismiss, and Plaintiffs/Appellants used Ninth Circuit cases to oppose the Motion. Indeed, the vast majority of the cases cited in the District Court's Order were from the Ninth Circuit. This was first time a ruling based on Ninth Circuit case law was ever made and Plaintiffs/Appellants should be allowed to amend their Complaint for the first time according to the guidance of Ninth Circuit precedent. The earlier "iterations" that were used by the District Court to reach its incorrect conclusion were filed in different jurisdictions (a fact acknowledged by the District Court), and not just in a different federal district, but completely different federal circuits.

None of the past "iterations" should have had any bearing on the decision to grant leave to amend in this case. The Complaint here was the first time that these specific plaintiffs brought these claims against Apple in the Ninth Circuit without jurisdictional issues. The Complaint here was only amended once as a matter of course before a responsive pleading was filed. Plaintiffs/Appellants were never afforded the opportunity to amend their Complaint after a responsive pleading was filed under the guidance of a Ninth Circuit court, so it was an abuse of discretion to decide that an amendment would be futile.

## CONCLUSION

A potentially landmark preliminary injunction needed to mitigate digital censorship was improperly pushed out of District Court as a result of multiple manifest errors of law and a breathtaking abuse of discretion. *Coronavirus Reporter* and all other represented parties hereby request the Ninth Circuit reverse the Judgment and Order and direct the District Court to issue the proposed preliminary injunction without delay.

## STATEMENT REGARDING ORAL ARGUMENT

Undersigned counsel respectfully requests oral argument to assist the Court in deciding the multiple complex issues that arose in the dismissal of a Sherman Act case concerning the censorship of free digital products.

Date: August 12, 2022

ASSOCIATED ATTORNEYS OF NEW ENGLAND

/s/ Keith Mathews
KEITH MATHEWS
1000 Elm Street #800
Manchester, NH 03101
(603) 622-8100
*Attorneys for Appellants*
    *Coronavirus Reporter, Calid Inc.,*
    *Primary Productions LLC*

**UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

**Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6**

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** _____22-15166_____

The undersigned attorney or self-represented party states the following:

[  ]  I am unaware of any related cases currently pending in this court.

[  ]  I am unaware of any related cases currently pending in this court other than

the case(s) identified in the initial brief(s) filed by the other party or parties.

[X]  I am aware of one or more related cases currently pending in this court. The

case number and name of each related case and its relationship to this case

are:

22-15167

**Signature** _____/s/ Keith Mathews_____ **Date** ___8/12/22_____

**UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** _____22-15166_____

I am the attorney or self-represented party.

**This brief contains __12,997__ words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X]  complies with the word limit of Cir. R. 32-1.

[  ]  is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ]  is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ]  is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ]  complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [  ]  it is a joint brief submitted by separately represented parties;

    [  ]  a party or parties are filing a single brief in response to multiple briefs; or

    [  ]  a party or parties are filing a single brief in response to a longer joint brief.

[  ]  complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** ____/s/ Keith Matthews_____ **Date** _____8/12/22_____

## SECTION 1 OF THE SHERMAN ACT 15 U.S.C. § 1 (2018)

§ 1. Trusts, etc., in restraint of trade illegal; penalty

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

## SECTION 2 OF THE SHERMAN ACT 15 U.S.C. § 2 (2018)

§ 2. Monopolizing trade a felony; penalty

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

## HICKS V. PGA TOUR, INC.

*Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1124 (2018),

"While we agree with the district court that the Caddies failed to plead a plausible product market, we vacate the dismissal with prejudice of the antitrust and California unfair competition law claims. "Dismissal with prejudice and without leave to amend is not appropriate unless it is clear on de novo review that the complaint could not be saved by amendment." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). "A simple denial of leave to amend without any explanation by the district court is subject to reversal." *Id.* "Such a judgment is 'not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.' " *Id.* (quoting *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)).

The district court made a "simple denial of leave to amend" here without adequate explanation. *Id.* It only noted that the Caddies were not "able to explain how they could state an antitrust claim using a plausible product market definition." This insufficient consideration of the factors discussed in *Foman* constitutes an abuse of discretion considering that the district court only dismissed the complaint once, the Tour fails to identify any specific prejudice it would experience, and we cannot conclude that amendment would be futile. See, e.g., *id.* ("[P]rejudice to the opposing party ... carries the greatest weight" when deciding whether to grant leave

to amend.). Therefore, we remand this issue for the district court to reconsider its decision to deny the Caddies leave to amend the antitrust and unfair competition claims."

## ZERO PRICE MARKETS

"[Antitrust experts] maintain that antitrust law has an important role to play in zero-price markets. Some of these commentators have argued that zero-price transactions are not in fact "free" to consumers, and that consumers ultimately "pay" for putatively "free" goods and services with both their attention and personal data. According to this line of argument, many of these consumers may actually be overpaying. That is, some observers have argued that certain "free" products and services may have negative equilibrium prices under competitive conditions, meaning that firms in the relevant markets would pay consumers for their attention and the use of their data if faced with sufficiently robust competition.

Other commentators have argued that firms offering zero-price products and services can compete on a variety of nonprice dimensions such as quality and privacy, and that antitrust law can promote consumer welfare in zero-price markets by ensuring that companies engage in these types of nonprice competition. This argument appears to have persuaded regulators at the DOJ. In a February 2019 speech, Makan Delrahim—the head of the Justice Department's Antitrust Division—contended that antitrust law applies "in full" to zero-price markets

because firms offering "free" products and services compete on a variety of dimensions other than price.

While many observers accordingly agree that zero-price markets are not categorically immune from antitrust scrutiny, the optimal approach to defining the scope of such markets remains open to debate.

## SSNDQ TEST

Some commentators have argued that regulators should modify the SSNIP test to account for quality-adjusted prices, creating a new methodology called the "small but significant and non-transitory decrease in quality" (SSNDQ) test. According to these academics, decreases in the quality of "free" services (e.g., a decline in the privacy protections offered by a social network) are tantamount to increases in the quality-adjusted prices of those services. Under the SSNDQ test, then, a firm offering "free" goods or services would possess monopoly power if it had the ability to profitably raise its quality-adjusted prices significantly above competitive levels… The SSNIP test as traditionally administered is accordingly "inoperable" in a number of zero-price technology markets."