Nos. 22-15166 & 22-15167

———————————

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

———————————

CORONAVIRUS REPORTER et al.,

*Appellants*,

*v.*

APPLE INC.,

*Appellee.*

———————————

On Appeal from the United States District Court
for the Northern District of California (Hon. Edward M. Chen)
No. 3:21-cv-05567-EMC

———————————

## APPLE'S SUPPLEMENTAL EXCERPTS OF RECORD
## VOLUME 1 OF 1

———————————

Cynthia Richman
Zachary B. Copeland
Harry R. S. Phillips
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036

Rachel S. Brass
Julian W. Kleinbrodt
GIBSON, DUNN & CRUTCHER LLP
555 Mission St., Suite 3000
San Francisco, CA 94105
(415) 393-8293
RBrass@gibsondunn.com

*Attorneys for Apple Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORONAVIRUS REPORTER, et al., | Case No.  21-cv-05567-EMC |
| Plaintiffs, | **ORDER GRANTING DEFENDANT APPLE INC.'S MOTION FOR AN ORDER SUMMARILY DENYING PLAINTIFF JEFFREY D. ISAACS' MOTIONS FOR SANCTIONS** |
| v. | |
| APPLE INC., et al., | |
| Defendants. | Docket Nos. 96-98 |

Having considered Defendant Apple Inc.'s ("Apple") Administrative Motion For An Order Summarily Denying Plaintiff Jeffrey D. Isaacs' Motions For Sanctions Or, In the Alternative, Setting a Deadline For a Single Response, as well as the supporting documents thereto and all other matters properly before the Court, being fully advised on the proceedings, and for good cause appearing, **IT IS HEREBY ORDERED** that Apple's Motion is **GRANTED**.  The Motions for Sanctions at Docket Nos. 96 and 97 are **DENIED** as untimely under Local Rule 7-8(d).

This order disposes of Docket Nos. 96, 97 and 98.

**IT IS SO ORDERED**.

Dated: January 26, 2022

_____
EDWARD M. CHEN
United States District Judge

1    GIBSON, DUNN & CRUTCHER LLP
     MARK A. PERRY (SBN 212532)
2     mperry@gibsondunn.com
     RACHEL S. BRASS (SBN 219301)
3     rbrass@gibsondunn.com
     JULIAN W. KLEINBRODT (SBN 302085)
4     jkleinbrodt@gibsondunn.com
     555 Mission Street, Suite 3000
5    San Francisco, CA 94105-0921
     Telephone: (415) 393-8200
6    Facsimile:  (415) 374-8429

7    *Attorneys for Apple Inc.*

8                    **UNITED STATES DISTRICT COURT**

9                   **NORTHERN DISTRICT OF CALIFORNIA**

10                       **SAN FRANCISCO DIVISION**

11

12   CORONAVIRUS REPORTER, CALID INC.,          Case No. 3:21-CV-05567-EMC
     PRIMARY PRODUCTIONS LLC, DR.
13   JEFFREY D. ISAACS, on behalf of            **DEFENDANT APPLE INC.'S**
     themselves and all others similarly situated  **ADMINISTRATIVE MOTION FOR AN**
14                                              **ORDER SUMMARILY DENYING**
                      Plaintiffs,               **PLAINTIFF JEFFREY D. ISAACS'**
15                                              **MOTIONS FOR SANCTIONS OR, IN THE**
             v.                                 **ALTERNATIVE, SETTING A DEADLINE**
16                                              **FOR A SINGLE RESPONSE**
     APPLE INC., FEDERAL TRADE
17   COMMISSION,

18                    Defendants.               The Honorable Edward M. Chen

19

20

21

22

23

24

25

26

27

28

---

DEFENDANT APPLE INC.'S ADMIN. MOT. FOR ORDER SUMMARILY DENYING MOTIONS FOR SANCTIONS
CASE NO. 3:21-CV-05567-EMC

SER003

1    Pursuant to Civil L.R. 7-11, Defendant Apple Inc. ("Apple") respectfully seeks an order

2    summarily denying Plaintiff Jeffrey D. Isaacs' two motions for sanctions (Dkts. 96 & 97) or, in the

3    alternative, an order setting the deadline for a single response to both motions for fourteen days after

4    any order denying Apple's request for summary denial of the motions.

5    The Court entered final judgment in this case on November 30, 2021 and ordered the Clerk of

6    Court to "close the file in this matter." Dkt. 86. Local Rule 7-8(d) provides that "[u]nless otherwise

7    ordered by the Court, no motion for sanctions may be served and filed more than 14 days after entry of

8    judgment by the District Court." The deadline for any motions for sanctions in this case, therefore,

9    was December 14, 2021.

10   On January 19, 2022, *fifty days* after judgment was entered, Isaacs filed an untimely motion for

11   sanctions against Apple and its counsel on plainly frivolous grounds—largely, that they have referred

12   to him as "Mr. Isaacs" in court filings. Dkt. 96 at 3. Isaacs also complains, citing no evidence or legal

13   authority, that Apple and its counsel "engaged in fraud on the Court" by "blocking" him "from

14   communicating with" counsel. Dkt. 96 at 3. The Court set the due date for Apple's response to Isaacs'

15   motion for February 2, 2022. Yesterday, January 24, Isaacs filed yet another untimely motion for

16   sanctions against Apple, which contains more pages but the same complaints as the January 19

17   motion—including, again, that Apple has referred to him as "Mr. Isaacs" and engaged in purported

18   "witness tampering" or "fraud on the court." Dkt. 97 at 16 n.5, 17. The Court set the due date for

19   Apple's response to that motion for February 7, 2022.

20   The Court should summarily deny these motions as time-barred under Local Rule 7-8(d). The

21   deadline for any such motion has passed. Isaacs has sought no court order permitting him to file a

22   motion for sanctions. The Court has not entered any order permitting such a motion—nor would there

23   be any basis to do so. The motions that Isaacs *has* filed are frivolous. For instance, Isaacs' chief

24   complaint is that Apple's filings have not referred to him as "Dr." To start, Isaacs is not a medical

25   doctor—he is a former doctor-in-residency whose license was revoked for unethical behavior. *See* Dkt.

26   62 at 6 (detailing prior proceedings relating to Isaacs' medical license). In any event, the honorific

27   given to him bears no relation to any of his purported bases for sanctions. *See* Fed. R. Civ. P. 11(c);

28   37(b). Indeed, standard convention is to simply refer to a party by their last name. And the Court itself

referred to Isaacs as "Mr. Isaacs" during a hearing on Apple's motion to dismiss the amended complaint on November 4, 2021, demonstrating that doing so is not a breach of decorum. *See* Dkt. 82 at 12:8; 18:22.

Isaacs' "fraud on the court" and "witness intimidation" assertions are equally meritless, as Apple has previously explained to both Isaacs and the Court. Dkt. 94 at 9 n.6 (explaining that Isaacs' "attempt to proceed pro se . . . while simultaneously serving as the principal of the plaintiff entities" represented by counsel is impermissible under 28 U.S.C. § 1654 and puts "Apple's counsel in [an] ethical dilemma"). Likewise, any argument about evidence "spoliation," Dkt. 96 at 3, is both meritless—Apple has complied with all document retention obligations—and moot, because the Court has dismissed the complaint with prejudice, Dkt. 86, and thus this case will not proceed to discovery. There is absolutely no merit to any of Isaacs' other allegations of misconduct, as Apple will explain if the Court desires a response.

If the Court does not summarily deny the motions under Local Rule 7-8(d), Apple respectfully requests that the Court allow Apple to file a single opposition to both motions no later than fourteen days after any order denying Apple's request for summary denial. Granting this relief would not prejudice Isaacs in any way. It would, by contrast, streamline the presentation of issues by allowing Apple to file a single brief. This in turn would economize the parties' resources and also conserve the Court's time.

Counsel for Apple has conferred with counsel for Plaintiffs. *See* Decl. of Rachel S. Brass ¶ 2. As explained in the accompanying declaration, Plaintiffs would not respond as to whether they would stipulate to any of the relief requested herein. *Id.*

Dated:     January 25, 2022                    Respectfully submitted,

                                               By:     */s/ Rachel S. Brass*
                                                       Rachel S. Brass

                                               GIBSON, DUNN & CRUTCHER LLP
                                               MARK A. PERRY (SBN 212532)
                                                 mperry@gibsondunn.com
                                               RACHEL S. BRASS (SBN 219301)
                                                 rbrass@gibsondunn.com
                                               JULIAN W. KLEINBRODT (SBN 302085)
                                                 jkleinbrodt@gibsondunn.com

2

DEFENDANT APPLE INC.'S ADMIN. MOT. FOR ORDER SUMMARILY DENYING MOTIONS FOR SANCTIONS
CASE NO. 3:21-CV-05567-EMC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: (415) 393-8200
Facsimile:  (415) 374-8429

*Attorneys for Apple Inc.*

3

DEFENDANT APPLE INC.'S ADMIN. MOT. FOR ORDER SUMMARILY DENYING MOTIONS FOR SANCTIONS
CASE NO. 3:21-CV-05567-EMC

Pages 1 - 22

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

| | |
|---|---|
| CORONAVIRUS REPORTER, CALID, INC.; )<br>PRIMARY PRODUCTIONS, LLC;          )<br>DR. JEFFREY D. ISAACS, on behalf   )<br>of themselves and all others       )<br>similarly situated,                )<br>                                   )<br>           Plaintiffs,             )<br>                                   )<br>   VS.                             )<br>                                   )<br>APPLE, INC.; and FEDERAL TRADE     )<br>COMMISSION,                        )<br>                                   )<br>           Defendants.             )<br>_____)| NO. 21-cv-05567-EMC<br><br>San Francisco, California |

Thursday, November 4, 2021

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:  (By Zoom Webinar)

For Plaintiffs:

ASSOCIATED ATTORNEYS OF NEW ENGLAND
Post Office Box 278
Manchester, New Hampshire  03105
**BY:  KEITH MATHEWS, ESQ.**

For Defendant Apple, Inc.:

GIBSON DUNN & CRUTCHER LLP
555 Mission Street
Suite 3000
San Francisco, California  94105-0921
**BY:  RACHEL S. BRASS, ESQ.**
**JULIAN W. KLEINBRODT, ESQ.**

Also Present:

**DR. JEFFREY D. ISAACS**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
Official Reporter, U.S. District Court

| | |
|---|---|
| 1 | **Thursday - November 4, 2021** **2:50 p.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | **THE COURTROOM DEPUTY:**  Calling Civil Action 21-5567, |
| 4 | Coronavirus Reporter, et al. versus Apple, Inc., et al. |
| 5 | Counsel, please state your appearances for the record, |
| 6 | beginning with counsel for plaintiffs. |
| 7 | **THE COURT:**  Um, are we frozen? |
| 8 | **DR. ISAACS:**  I'm sorry. |
| 9 | Good afternoon. I'm Jeffrey Isaacs.  And I'm representing |
| 10 | myself and my apps. |
| 11 | **THE COURT:**  Okay. |
| 12 | You're muted, Angie. |
| 13 | **THE COURTROOM DEPUTY:**  All right. |
| 14 | **MS. BRASS:**  Rachel Brass for Apple, Inc. |
| 15 | **THE COURT:**  Thank you, Ms. Brass. |
| 16 | **MR. CLINE:**  Julian Kleinbrodt for Apple, Inc. |
| 17 | **THE COURT:**  Thank you, Mr. Kleinbrodt. |
| 18 | And Mr. Mathews? |
| 19 | **MR. MATHEWS:**  Yes.  My apologies.  I'm not sure what |
| 20 | happened there.  I just got disconnected. |
| 21 | **THE COURT:**  All right.  And you are appearing on |
| 22 | behalf of? |
| 23 | **THE COURTROOM DEPUTY:**  I believe he's frozen, |
| 24 | Your Honor. |
| 25 | **THE COURT:**  Oh.  Okay. |

Case: 22-15166, 10/14/2022, ID: 12564184, DktEntry: 39-2, Page 9 of 61
Case 3:21-cv-05567-EMC   Document 82   Filed 11/15/21   Page 3 of 23

3

1      **THE COURTROOM DEPUTY:**  Must not be --

2      **THE COURT:**  Problematic.  He's appearing on behalf of

3   Apple as well, or who --

4      **MS. BRASS:**  No, Your Honor, Mr. Mathews is counsel

5   for Ms. -- Coronavirus Reporter and Primary Productions, as

6   the plaintiffs.

7      **THE COURT:**  Okay, all right.  Well, we've got a

8   little problem if he's frozen.

9      **THE COURTROOM DEPUTY:**  He may need to exit and --

10   okay.

11      Mr. Mathews?

12      **MR. MATHEWS:**  Yes.  I apologize.  I'm not sure what

13   happened there.

14      **THE COURT:**  Your connection is weak.  You froze

15   completely.  It might help if you turn off your video and just

16   go with audio.  You might just shut your video down.

17      **MR. MATHEWS:**  Sure.

18      **THE COURT:**  Sometimes that helps connectivity.  If

19   for some reason we can't hear you, then we will have to try

20   something else, maybe phone in or something.

21      **MR. MATHEWS:**  My apologies, Your Honor.  My wifi is

22   usually pretty good.

23      **THE COURT:**  Yeah, okay.  Well, there are a lot of

24   issues here, and I'm not going to cover everything, but I do

25   want to cover a couple major issues here.  And the first one,

1    of course, is the question of relevant market, and market

2    definition.

3         And as I understand it, as this has evolved -- and correct

4    me if I'm wrong, plaintiffs -- that the principal markets on

5    which your antitrust claims are predicated consists of what

6    might be deemed two fore-markets, U.S. smartphones or U.S. iOS

7    smartphones, as kind of an alternative single-brand

8    fore-market.  And then the downstream markets, which are iOS

9    institutional app market, iOS notary stamp market, and iOS

10   application for loader market (Phonetic), and iOS user base

11   market.

12        When you put all that together, that speaks to a

13   single-brand market.  Which, as you know, is rarely recognized

14   in antitrust law.  And, and I have a problem understanding why

15   that would be so here.

16        So, for instance, the Coronavirus app -- Reporter app, I

17   mean, that's something that could benefit or could be used with

18   the proper licensing, et cetera, et cetera, on Android devices,

19   could it not?

20        **DR. ISAACS:**  Yeah, that's right, Your Honor.  I would

21   like to say you're spot-on as to the different marketplaces,

22   except that we state that, as you said, as an alternate

23   theory, as a single market.

24        So the main theory we rely upon for all the apps here -- I

25   speak for myself, but it's for Coronavirus and everybody -- is

Case: 22-15166, 10/14/2022, ID: 12564184, DktEntry: 39-2, Page 11 of 61
Case 3:21-cv-05567-EMC   Document 82   Filed 11/15/21   Page 5 of 23

5

1   the U.S. smartphone market.  Which is a not a single product

2   marketplace.  And that's where there's a discrepancy to the

3   market share.

4        Apple, we state they have 64 to 80 percent market share

5   there.  So they certainly market power and, we would say,

6   monopoly.

7        So we really bring in the Kodak single-market theory for

8   all the apps as an alternate theory.  And we don't think we

9   need that to prevail here.  We just state it in the case, that

10  that law does apply after all the fact-finding is done.  So we

11  state it as an alternate theory.

12       Now, some of the downstream markets are definitely

13  single-product.  And we can go into that.  But for the main

14  fore-market, it's definitely not a single-product marketplace.

15            **THE COURT:**  Well, given this is really, I think, a

16   two-sided market, I don't think we can ignore the downstream

17   market.  So don't we have to account for the fact that your

18   antitrust theories look to the downstream side, as well as the

19   fore side?

20        And to the extent that the downstream side is a singular

21   tie to a single brand, isn't that problematic?

22            **DR. ISAACS:**  No.  I would again say that it's not a

23   sin- -- it's not a two-sided marketplace here.  I'm not sure

24   which marketplace you're referring to, but I assume you're

25   speaking about the app marketplace being two-sided, because

1    that seems to be the main debate we've had in the pleadings

2    with Apple.  Because Judge Gonzalez Rogers did, of course,

3    find the app store to be a two-sided transactional platform.

4         We believe that is different in this case.  The way we've

5    set out the facts, it's really the app marketplace monopsony.

6    Like a book publisher.  In fact, today's news, FTC and DOJ are

7    looking at Penguin Books and Simon and Schuster with a

8    monopsony theory, which really -- which has really been

9    reinvigorated in our media age, in the last few years.  That's

10   why it took us a while, frankly, to come up with this monopsony

11   theory over the last few amendments we've done.

12        So we're looking at Apple is the only buyer of apps, just

13   like Penguin Books and Simon and Schuster would be the only

14   buyer of books from authors.  Or if Sony Video is the only

15   buyer of movies.  So we're saying it's not two-sided.

16        And, just one last point.  For free apps, it's especially

17   not two-sided, because there's no equal transaction, like *Epic*,

18   that Judge Gonzalez Rogers looked at.

19        A free app doesn't have a price.  So it's actually very

20   hard for us -- it took quite a while to develop a monopoly or

21   monopsony theory for a free app.  And there is no symmetric

22   opponent in size to the App Store for free apps.

23        So we would say -- the long -- long story short, the

24   answer is definitely no, we believe, for that -- for your

25   question.

1      **THE COURT:**  Well, but your -- your market, your

2  theory and your analogy to book publishers hinges on Apple

3  really being the buyer of apps, and then ultimately, you know,

4  buying it at one level, and then selling it at another level.

5      Here, that model doesn't seem to work.  They're not

6  buying -- Apple's not really buying it.  It's serving as an

7  intermediary, um --

8      **DR. ISAACS:**  Well, that's why -- (inaudible) almost a

9  hypothetical market --

10      (Reporter interruption)

11      **DR. ISAACS:**  Myself -- I'm sorry.

12      I would say we do have a footnote that it's almost a

13  hypothetical market.

14      And, again, this is difficult.  We don't know any other

15  case that brings -- protects free apps from censorship.  So

16  some of this is a bit hypothetical, in that if there was no App

17  Store monopoly, and every developer could sell within the

18  shopping mall their apps, then you wouldn't have this

19  monopsony.  And you wouldn't have it where the only buyer is

20  Apple.

21      But the FAC does cite that Apple bought a weather app that

22  they distributed as free, and they bought it for tens of

23  millions of dollars.  So there are instances where Apple

24  purchases free apps from developers.

25      And we would say, here, they are effectively purchasing

1    it.  They could bundle it with the iPhone; they could give it

2    away for free.  But that's not our only theory, because we

3    recognize that's a novel theory, and we believe it will

4    prevail.  But we do have four other downstream theories if that

5    were to not proceed.

6         But we believe that is our best theory, that they are a

7    monopsony buyer, even though it's largely free and

8    hypothetical.

9         **THE COURT:**  All right.  Let me hear from Apple.

10        Why -- why isn't there a potential claim, given Apple's

11   dominance in the distribution chain here?

12        **MS. BRASS:**  Yes, Your Honor.

13        Well, to start with, your answer on the distribution

14   chain.  And again, this is Rachel Brass for Apple.

15   Distribution chain is not a market.

16        I think the problem with this case is best stated by what

17   Mr. Isaacs just said.  He's arguing a hypothetical market.  But

18   the law is clear.  You need to look at referents to reasonable

19   interchangeability of use and cross elasticity of demand.

20   Which you cannot do in a hypothetical market.

21        You have to ask:  What is the product?  Single-brand

22   markets, as you say, are disfavored.

23        And you have to ask:  Is the market alleged something that

24   bears some relationship to the claim alleged?

25        So take, for example, the single-phone -- sorry.  The

```
 1   smartphone market that's not a single-phone market -- a
 2   single-brand market.  None of Mr. Isaacs' claims allege injury
 3   to competition in that market.  If it is a market in theory, it
 4   has nothing to do with the claims and injuries asserted here.
 5        To the extent Apple might be a buyer for some apps, for
 6   example, that also has nothing to do with the claims alleged
 7   here.  Here, the claims are about apps on the App Store.  That
 8   is a two-sided market.
 9        And as the Supreme Court has explained in AMEX, where
10   something is a two-sided market, you need to define the market
11   with reference to that two-sided platform.
12        Coronavirus Reporter, Mr. Isaacs, the plaintiffs here,
13   they don't allege that they went and sought a sale of an app to
14   Apple, like the weather app he identified as an analogy.  They
15   allege that they participated in the app review process, and
16   with respect to Coronavirus Reporter and Primary Productions,
17   were rejected.  And they allege that for certain apps that were
18   on the App Store, they were dissatisfied with search ranking.
19        Those are the injuries that are alleged.  And those have
20   nothing to do with any of the markets Mr. Isaacs just
21   described.
22        And then, importantly, none of the factors that a court
23   looks to to determine whether facts are alleged that help you
24   identify the outer bounds of a market are in the complaint
25   here.  That's true if you look under the test from the Ninth
```

1   Circuit in *Hicks* on interchangeability of use and cross

2   elasticity of demand; that's true if you look at the *Brown Shoe*

3   factor.

4        You can use either of those tests to determine if a

5   relevant products market is alleged.  Not just a product

6   market, but one that is relevant to the claims asserted, and

7   under any standard.  That's not done here.

8        And I think, you know, the most direct case you might look

9   at for this is Judge Gonzalez Rogers' decision in the pistachio

10  case, which we cite in our brief, where she looks at similarly

11  scant allegations of fact and finds in the absence of

12  evidentiary fact, meeting the *Hicks* standard, there is no

13  relevant market alleged.

14        **THE COURT:**  Well, if -- if the market alleged here

15   were U.S. smartphones generally, which would include both iOS

16   as well as Android, would that be sufficiently defined?

17        **MS. BRASS:**  No, Your Honor.  Because the outer

18   boundaries of what constitutes a smartphone would not be

19   established.

20        But even if that were a market, it's not a relevant market

21   for any of the claims alleged.  It's not simply enough to say

22   something is a market, if it has no relationship to the claims

23   that are asserted.

24        Finally --

25        **THE COURT:**  If the claim asserted is -- is trying to

1    get an open market and have access to all smartphones, why

2    isn't that a sufficient relationship?  And that Apple is

3    impairing that access?

4        Why isn't that at least, quote, relevant?

5        **MS. BRASS:**  Well, one, Your Honor, several of the

6    plaintiffs here were on the App Store, suggesting that there

7    would not be an injury for impairing access to that market.

8        And two, I don't think that is the claim alleged here.

9    The claim alleged here is -- you know, unless it is that Apple

10   -- I'll -- to start with, I don't think that is the claim

11   alleged here.  That Apple controls the market for all

12   smartphones, such that applying standards to the App Store is

13   an abuse of monopoly power in that market.

14       **THE COURT:**  Well, it's Apple controls access to a

15   large portion of that market.  It may not be 100 percent, may

16   not be a monopoly, but it's got market power relative to even

17   that broader market of all U.S. smartphones.

18       And if it controls access of these app developers to that,

19   why -- explain to me again, why isn't that a, quote, relevant

20   market?

21       **MS. BRASS:**  Well, Your Honor, I don't think there are

22   facts in the complaint from which one can determine that there

23   is market power.

24       Mr. Isaacs -- sorry -- the complaint alleges that the

25   market is below 65 percent to Apple's share.  And as a matter

1    of law, that's insufficient standing, alone, to establish

2    market power.

3        Also, developers aren't accessing devices.  They're trying

4    to get into the store.  And so again, if it's a complaint about

5    access to the store, then smartphones are not the relevant

6    market.

7             **THE COURT:**  Well, so let me ask you, then, either

8    Mr. Mathews or Mr. Isaacs, is the claim access to the store?

9    Or access to the devices?

10            **DR. ISAACS:**  I believe the FAC is clear there.  We

11   talked about the network effect of some 180 million smartphone

12   or iPhone users, so -- and then the user-based access

13   downmarket, certainly, that Apple is selling for $99 for a

14   year to developers, access to that network affect.

15       So whether you look at under *Aspen* as an essential

16   facility, or an obligation or duty to deal under the MCI,

17   essential facility, just, we --

18            **THE COURT:**  Wait.  I'm not talking about the theory

19   yet.  You're jumping ahead of me.

20            **DR. ISAACS:**  Sorry.

21            **THE COURT:**  I asked a simple question.  What is the

22   access denial -- what is the access issue here?  Is it to the

23   devices, themselves?  Smartphones?  Or is it to the store?

24            **DR. ISAACS:**  Yeah, I would say the devices,

25   themselves, Apple blocks access to that by the user-based

```
 1    access right, downmarket.  They select who gets access to that
 2    network effect of smartphones.  And there's different ways we
 3    plead that, theoretically.
 4         But the fact is it's that network of 180 million devices
 5    that we -- we think it's important.  People pay for those
 6    devices, and the government pays for how they're connected,
 7    through the origin of the internet.  So we're talking about the
 8    physical.
 9         I mean, to answer your question, we're talking about
10    180 million physical devices, and how they're connected.  And
11    Apple controls access to that, that they sell for $99 a year to
12    developers.
13              THE COURT:  All right.
14         So Ms. Brass, what about that?  If that's the theory, that
15    Apple stands in the way of using its market power to control
16    access to the ultimate devices, what's your comment with that?
17              MS. BRASS:  Um, Judge Chen, it's the same argument.
18     The facts, as alleged, for Apple's market share are
19     insufficient to establish market power as a matter of law.
20         And there are no other facts in the complaint that allege
21    that Apple has market share, other than assertions -- I mean,
22    has market power, other than assertions about market share.
23         And to the extent that Mr. Isaacs is arguing about network
24    effect, network effects are not a product.
25              THE COURT:  All right.  But if -- if it's just about
```

```
 1    access to devices and if -- if there were sufficient
 2    allegations to show enough market share to imply market power,
 3    would that be enough to state a relevant market?
 4              MS. BRASS:  I'm sorry, Your Honor, I think I lost
 5    that question.  I'm sorry.  Can you --
 6              THE COURT:  I guess it's the only -- you identified
 7    as one of the problems with their theory, there are not enough
 8    facts to establish the requisite market share.
 9       Right?
10              MS. BRASS:  There's not facts to establish market
11    power.  The market share --
12              THE COURT:  Market power.
13              MS. BRASS:  -- is too low to establish market power.
14              THE COURT:  All right.
15              MS. BRASS:  And he's not in the smartphone market,
16    Your Honor.  And for most of the theories he's alleged -- this
17    goes back to my core argument -- it's still not a relevant
18    market.
19       For example, for the essential facilities argument that
20    Mr. Isaacs was arguing, you have to be a competitor in the
21    relevant market.
22       So, none of the plaintiffs here are smartphone
23    manufacturers.  And so, again, it may be a market, but it's not
24    the relevant market for any of the claims asserted.
25              THE COURT:  All right.  Well, that gets to the other
```

1   issue about -- that you have raised about lack of competitive

2   injury here.

3       Right?

4           MS. BRASS:  (Nods head)

5           THE COURT:  That the injury here is not to Apple's

6   competitors; it's not like Apple is trying to sell a competing

7   app, and icing people out.  It is unhappiness with getting

8   access to the store.

9       How is that an antitrust injury?

10      How is there injury to the general competition, and

11  reduction, for instance, of general output?

12      There's individual grievances.  But, how is that

13  anti-competitive injury?

14          DR. ISAACS:  Um, can I answer that question,

15  Your Honor?

16          THE COURT:  Yeah, yeah.

17          DR. ISAACS:  Well, I would say we compete with Apple

18  in two respects here.  One, we are competing app developers,

19  Apple has a lot of apps they publish, they make money off of.

20  So we are competitors there.

21      And then we're also competitors --

22          THE COURT:  Have you identified any one of the

23  plaintiff products that are in competition with an Apple-owned

24  app?

25          DR. ISAACS:  Sure.  Like Web Collar (Phonetic) that I

 1    designed, and Facetime 15.  They have a Covid app that they

 2    would say is part of the operating system; we would say it's

 3    an app, and that's for fact-finding.  And then, of course,

 4    Dr. Roberts had a COVID-19 app.  So those are two, right

 5    there.

 6        I think we got into more with Apple Arcade in the

 7    complaint.  I don't represent -- again, I believe they're in

 8    there.

 9        So in addition to being competitors of apps, we are also

10    competitors or would-be competitors as app distributors.

11    Because as the complaint says, any distributor could put up a

12    shop on the internet, and in five minutes -- "trivally"

13    (Phonetic) is the word used in the FAC, so we -- or a shopping

14    mall in a brick-and-mortar store.

15        So we'd like to be distributor of apps, we'd like -- we

16    are competitors of Apple.  But we're being disallowed from

17    competing with Apple there.  So, again, Apple's policies and

18    market power or market influence prevents us from being a

19    competitor.

20        Where we actually are competitors is app distributors.

21    The only way to distribute an iPhone app is the App Store.  And

22    it should be that -- you know, openly.  Every other computing

23    platform in history -- and that's emphasized throughout the

24    pleadings -- every other major computer platform in history --

25    Android, you know, the Mac, Mac operating system, Windows --

1    they allow competing distribution points.

2         So we're a competitor as a distributor, and a competitor

3    as an app -- as a competing app, you know, like the COVID-19 or

4    Facetime app.

5              THE COURT:  All right.  What about that argument,

6    Ms. Brass?  That there is antitrust competition in terms of

7    the distribution.  Maybe a small self-distribution, but

8    distribution, nonetheless.

9              MS. BRASS:  First, Your Honor, there are no

10   allegations in the complaint that any of the plaintiffs here

11   have ever attempted to open or build or program a store.  The

12   fact that one could theoretically do it as an app is not

13   antitrust injury.

14        Second, nothing he's talking about is injury to

15   competition.  It's injury, perhaps, to specific apps.  It's not

16   sure how -- clear how the apps that were allowed on the store

17   were denied access to the store.

18        And those that were on the store, where he com- -- the

19   plaintiff's complaining that there is unfair competition on the

20   store from other apps, that, again, doesn't have anything to do

21   with the market that has been argued.  The smartphone market.

22   You have to look --

23              THE COURT:  I thought there were allegations about

24   denial of access to the App Store because of the, you know,

25   health implications of what the criteria are, or blockchain

1    apps not being permitted.

2         **MS. BRASS:**  That's correct, Your Honor.  But those

3    complaints -- we have two sets of complaints here.  One is

4    complaints about people who were denied access under Apple

5    policy.  And we have other complaints about apps that

6    allegedly compete against certain Apple apps.  And we can't

7    conflate those in thinking about which market the injuries

8    arise in.

9         We also -- he can't show there's insufficient competition

10   for these apps in the allegations.  That's what he needs to

11   allege.

12        For example, for the COVID-19 app, the plaintiff alleges

13   that there are thousands of apps for COVID-19 that have been

14   allowed on to the App Store.  So that is not an injury to

15   competition.  That's an injury to Coronavirus Reporter.

16        There is an allegation that there is an Apple app that

17   competes with one of plaintiff's apps.  But that is not an

18   injury to competition in an alleged market.  That's competition

19   that the plaintiff doesn't like facing.  None of those are

20   cognizable antitrust injuries.

21        **THE COURT:**  All right.

22        Response to that, Mr. Isaacs?  Where's the -- the

23   aggregate market impairment, as opposed to injury to a specific

24   app?

25        **DR. ISAACS:**  Sure.  And that goes back to the

1    marketplace here for apps.  What we call the national app

2    market or national institutional app market.

3         And that really -- institutional could be -- you could say

4    a creators' market.  It's buying from authors.  Just like

5    Penguin Books or Sony Film, there's a market for films in this

6    country; we all know it.  There's a market for books in this

7    country; we all know it.  They're interchangeable; there's

8    elasticity of demand.  And there are -- similarly, apps are no

9    different.  They're created by authors, developers,

10   programmers, film producers.  It's all just creative works.

11        But this country has a Sherman law.  You know, to not have

12   one monopoly, one bottleneck.  And again, it's not

13   hypothetical.  We say it's kind of hypothetical.  But the

14   marketplace, it's real.  It's bottlenecked.  Creators' works,

15   the apps, just like books or films, are being bottlenecked.

16        And that's about as big of a competitive injury --

17           **THE COURT:**  What's the evidence --

18           **DR. ISAACS:**  (Inaudible)

19           **THE COURT:**  Excuse me.  What's the evidence of an

20   aggregative bottleneck?

21           **DR. ISAACS:**  The -- Apple introduced it, themselves.

22   China's free markets are four times the size of ours.  And an

23   entire -- every Corona smartphone app was not allowed -- or

24   startup was not allowed.  That's not just Coronavirus

25   Reporter.  That's every startup that wanted to contribute to

1    the pandemic was not allowed, because Apple set criteria.

2        So just in that submarket of apps, there's a massive

3    bottleneck.

4        **THE COURT:**  What's the evidence that you've alleged

5    that shows how many apps were denied versus how many apps that

6    actually have made it, to show some aggregative effect?

7        **DR. ISAACS:**  We would need that in discovery.  We

8    think that China -- the end result is the Chinese data, that

9    it's four times the size of the App Store.  So we have the end

10   result there.  We don't have the actual procedural or

11   statistics you are asking for.  We just don't have that at

12   this time.

13       But with 40,000 app rejections a week by Apple -- I think

14   that's the last count -- I would say the answer is probably,

15   probably strong evidence, Your Honor, is what I would surmise.

16   But I don't have that data.

17       **THE COURT:**  All right.

18       Ms. Brass, what about that?  There's 40,000 rejections a

19   week.  Doesn't that -- does that show some potential

20   aggregative impact?

21       **MS. BRASS:**  Two things, Your Honor.

22       First, as Mr. Isaacs has argued just now extensively, that

23   there is an app market.  And if that's correct, as we posit it

24   is, then that would be a single-brand market.  It is, for the

25   purpose of these claims.  And a single-brand market would be

1   disfavored.

2       It's not clear what the outer boundaries of that are.  But

3   if there is an app market, then the phones are not the basis of

4   competition; that's not the relevant market.

5       Second, there's no evidence that U.S. consumers don't have

6   sufficient choice, even if 40,000 apps are rejected.  And, of

7   course, there are competitor smartphones, and there are web

8   apps, and there are the internet -- is the internet, all of

9   which are, for example, with respect to COVID-19, alternative

10  places consumers could have gotten information about their

11  apps.

12      The mere fact that apps are allegedly rejected at an

13  alleged number doesn't tell you whether the Apple single-brand

14  App Store is a relevant market, or a market, at all.  Nor does

15  it, again, connect back to the claims that are asserted here.

16  Nor could it ever be an injury for the three apps that were

17  allowed to compete on the App Store.

18          **THE COURT:**  All right.  Well, those are the issues.

19   I understand there's questions about, under 12(b)(6), what the

20   requisite elements of antitrust claim are made.

21      But it seems to me there are these threshold questions

22  about definition, sufficient definition, identification of

23  relevant markets, and the existence or not of antitrust injury.

24      So I will take the matter under submission.  Thank you,

25  counsel.

1          **DR. ISAACS:**  Thank you.

2          **MR. MATHEWS:**  Thank Your Honor.

3          **MS. BRASS:**  Thank Your Honor.

4          **THE COURT:**  Thank you.

5       (Proceedings concluded)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States

Court, Northern District of California, hereby certify that the

foregoing is a correct transcript from the record of

proceedings in the above-entitled matter.

*Belle Ball*

/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Monday, November 15, 2021

Keith Mathews
Associated Attorneys of New England
PO Box 278
Manchester, NH 03105
Ph. 603-622-8100
keith@aaone.law

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORONAVIRUS REPORTER,<br>CALID INC,<br>PRIMARY PRODUCTIONS LLC,<br>DR. JEFFREY D. ISAACS,<br>on behalf of themselves and all others similarly situated<br><br>          Plaintiffs,<br><br>vs.<br><br>APPLE INC.,<br>FEDERAL TRADE COMMISSION<br><br>          Defendants. | Case No. 3:21-cv-05567-EMC<br><br>**PLAINTIFFS' NOTICE OF MOTION & MOTION FOR PRELIMINARY INJUNCTION AND TO APPEND UCL COUNT**<br><br>**Hearing**<br><br>Date:     November 4, 2021<br>Time:     1:30PM<br>Place:    Courtroom 5, 17th Floor<br>             (videoconference)<br><br>The Honorable Edward M. Chen |

**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION AND TO APPEND CALIFORNIA UNFAIR COMPETITION LAW CAUSE OF ACTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that at 1:30PM on Thursday November 4, 2021, or as soon thereafter as possible, in Courtroom 5 of the United States District Court for the Northern District of California at 450 Golden Gate Avenue, San Francisco, and/or by videoconference, Plaintiffs will and hereby do move the Court to issue a Preliminary Injunction preventing Defendant Apple Inc from restricting public access to competing apps, including lifesaving Coronavirus Reporter, in violation of Sherman Act, RICO, and California Unfair Competition Law. To accomplish this, Apple shall be restrained from denying third-party apps as ordered in the proposed injunction.

The Plaintiff now moves the United States District Court for the Northern District of California to issue a Preliminary Injunction restraining Defendant Apple from restricting public access to competing apps, in violation of Sherman Act, RICO, and California Unfair Competition Law.

On August 8, 2021, a motion for preliminary injunction was filed before this Court. That motion is scheduled for hearing on November 4, 2021. Since the motion was filed, a number of important events have transpired. First and foremost, Apple was found guilty of violating the California Unfair Competition Law, in the highly publicized *Epic* case. Second, a POLITICO article exposed what is believed to be the worst scandal in Apple's forty-year history, involving a shameful *quid pro quo* to pull HBCU funding in exchange for dropping antitrust state legislation in Georgia. Third, Apple and *Cameron* developers reached a proposed settlement for developers of non-zero priced apps, and similarly, Judge Yvonne Gonzalez-Rogers declared this case (pertaining to zero-priced apps primarily) to be adjudicated separately from *Cameron*. As a result, Plaintiffs filed an FAC removing all *Cameron* language to this lawsuit's auxiliary. Additionally, Plaintiff's FAC introduced novel Sherman Act marketplaces for iOS userbase access, iOS notary stamps, iOS application loaders, to complement the institutional app monopsony definitions.

In light of the foregoing events, Plaintiffs sought Apple's assent to streamline motion practice and stipulate that the already pending motion for PI be amended to incorporate the above issues. Because that hearing is over six weeks away, there was ample time for Apple to respond to the

Amended Preliminary Injunction motion. Apple declined to meet & confer on this issue, which necessitates this re-filing of the injunction, along with a proposed addendum to the FAC. The proposed addendum is two-pages in length and succinctly raises the above UCL and RICO developments, which were simply unavailable to Plaintiffs at time of filing the FAC. As such, under appropriate guidelines leave shall be freely granted to append this two-page addendum to the FAC. Likewise, the Amended Preliminary Injunction is hereby filed, based upon the assumption that the operative complaint for the motion is now the "FAC + UCL Addendum." Under this Court's inherent authority, a two-page addendum to the FAC is permissible, because Apple has not yet answered the FAC, and a simultaneously filed Motion to Strike would allow Apple to respond on any issues raised by the UCL claim.

There exist compelling judicial economy interests to add the UCL claims to this case. We have learned that *Cameron Plaintiffs* spent over $30 million to prosecute discovery in that case. By conservative estimates, *Epic* must have spent over $60 million to prosecute an entire bench trial of their Sherman and UCL case. Likewise, Apple must have spent an equal amount. As such, the *Epic* Court spent nearly five months reaching a UCL verdict, after the parties spent over $120 million on the bench trial. It would be entirely wasteful not to allow the Plaintiffs' injunction to include a claim (and verdict) that warranted such considerable corporate and tax-payer funded debate. The UCL claim is directly analogous to this case in that both cases concern the "open flow of information" that is restricted by Apple's "incipient monopoly." In Epic's case, the information pertained to payments; in Plaintiffs' case, the information pertained to the availability of free-app platforms for information exchange regarding COVID-19 and other fundamental issues.

To clarify, Plaintiffs assert the UCL claim should assist the Court in determining that "probably of success" injunction threshold is almost certain in this case, as it was in *Epic*. Plaintiffs also assert that new information makes clear that their Sherman Act and RICO claims are likely to succeed even under their higher standard. There seem to be erroneous reports in the press that the *Epic* verdict absolved Apple of all Sherman Act claims and liability, as some sort of *res judicata*. To the contrary, Plaintiffs Sherman claims are distinct from those adjudicated in Epic. To the best of Plaintiffs' knowledge, this case is the last remaining Sherman Act case against Apple with subject

matter that has not yet been adjudicated. As a result, Apple bombards Plaintiffs and counsel with similar threats the monopoly employed against state legislators faced – accusations that our claims are "in disregard for the law" and Constitution (see Politico Exhibit). It is time Apple's bullying and threats be curtailed by the Court.

Generally, our case is differentiated from *Epic* because in that case, the Court determined that the relevant market was the global market for digital mobile gaming transactions. In that market, Apple only less than 55% market share, and *Epic* failed to meet its burden to demonstrate Apple's monopoly. In our case, Apple holds a 60% share of the US Smartphone Market by volume, and a 75%-80% share by revenue and/or profit. There can be little question Apple holds a 100% monopsony as the only buyer of free apps, which is exactly why Apple opposed the separate-track of Plaintiffs' consolidated claims from *Cameron*. Similarly, Apple holds a 100% share on iOS notary stamps, application loaders, and iOS userbase access. Hence, as the Honorable Yvonne Gonzalez-Rogers stated, Epic's failure to demonstrate "reduced output" and other "factually intensive" monopolistic evidence is "not impossible" in another case. Plaintiffs submit that their case just might be that case; there is no debate on "reduced output" of free apps such as Dr. Roberts' Coronavirus Reporter, and with Apple's 75%-100% market shares in our relevant markets, the facts of this case don't succumb to the pitfalls of *Epic*.

Specifically, the *Epic* court found that a notarization model such as that sought in our injunction is "particularly compelling." (Id. at page 113).  Plaintiffs' core assertion is that the Mac is a safe architecture, and their apps should be allowed using an open notarization model on an iPhone, like on a Mac. It is noteworthy that the *Epic* court "affords [Apple's] Federighi testimony little weight" as to said Mac notarization model being unsafe. As such, evidence gleaned from the *Epic* verdict supports an early injunction in this case.

Respectfully submitted, this 24th day of September, 2021.

/s/ Keith Mathews
Keith Mathews, *Pro Hac Vice*

## MEMORANDOM OF POINTS & AUTHORITIES IN SUPPORT OF MOTION
## FOR PRELIMINARY INJUNCTION

### FACTUAL BACKGROUND

1. Everybody knows a loved one or a friend whose life was touched by Dr. Roberts, Plaintiff Coronavirus Reporter's Chief Physician. Anyone who ever had a cardiac bypass, stenting procedure, or was admitted to an Emergency Department on concern of myocardial infarction ("heart attack") almost certainly had laboratory blood analysis to detect damaged cardiac muscle tissue. In the 1980s, Dr. Roberts pioneered the MBCK blood test used for two decades as a "gold standard," and which directly laid the foundation for the subsequent troponin test widely used today. Dr. Roberts' CV, Exhibit A in this lawsuit, narrates a career of saving lives. Notably absent from this CV is the Coronavirus Reporter app, the lives it could have saved, and could still save, because Apple improperly blocked this app in February 2020 to develop their own.

2. Apple's own SARS-CoV-2 tracing system is still widely unavailable in the United States, some eighteen months later. In England, it is derided as "Pingdemic" and many British citizens have deleted the app in some sort of digital revolt.

3. Dr. Roberts' voluntary symptom "situational reference" app was exactly the app needed a year and a half ago. At the very least, there was room to allow the presence of such a critically important app; instead Apple blocked the entire class of startup COVID apps.

4. As Dr. Roberts declared during his CNBC interview with Kif Leswing, startups – i.e., individual or small groups of scientists, changed the course of human history through their medical discoveries and other contributions to mankind. Imagine, as Dr. Roberts suggested, Apple had been around to block the discovery of penicillin by a startup. Fortunately this is

inconceivable, and is precisely why this injunction – and perhaps a TRO – should immediately issue.

5.  Today, Apple wields authoritarian control over the vast network of interconnected smartphones that, combined, represent an extraordinary computational-communications capability ("network effect"). Our FAC calls this the smartphone enhanced national Internet backbone. The United States government spent decades building what is now known as the Internet. Subsequently, we as a nation collectively invested in putting a smartphone, an amalgamation of sensors, software, and communication devices, in the hands of nearly every citizen, forming a network with capabilities amounting to fantasy of science-fiction of prior generations.

6.  We, the Plaintiffs, assert that these vast network capabilities are the property of the citizens – the end users of Apple's iPhone. These users should enjoy unrestricted use of their smartphones to run the innovative applications, written by third party developers, that ultimately are the raison d'être of this network.

7.  Two decades ago, the United States Department of Justice expended considerable resources to prosecute the Microsoft Corporation for alleged anti-competitive activity that amounted to bundling the Explorer web browser too prominently with the Windows operating system. Notably, Microsoft did not restrict each and every software developer from directly selling software to PC consumers. Microsoft did not require programmers to submit their applications for approval, in order to distribute software in a brick-and-mortar store. Microsoft did not reject 40,000 software applications per week, wasting millions of person-hours of labor. Microsoft did not demand an economically inefficient 33% tax on all PC software. And Microsoft did not charge $99/year to every aspiring computer programmer, many of whom

are students or entrepreneurs with no income or benefits, simply to access the Windows SDK. There seems to be little question that had Microsoft committed the above antitrust violations, public outrage would have ensued, the company would have been broken up, and likely, faced criminal charges.

8.  Apple, by breathtaking comparison, has secured its position as the wealthiest company in the world by committing all of those enumerated crimes under the guise of popularity and commitment to quality. There can be little doubt that Tim Cook sought to compensate for the tragic loss of Steve Jobs – and his gift for innovation – by seeking reckless profits on the heels of the success that Apple enjoyed with the iPhone. This stealth transition occurred relatively quickly, over the last ten years. As NPR coined it, Apple enjoys a "good guy" reputation that has been placed under scrutiny.

9.  There exists rapidly growing public concern over Apple's grip over our daily lives. International consensus exists that the App Store engages in the monopolistic practices described in the Amended Complaint. Senior Senator Blumenthal declared that it is "most offensive how [Apple] strangles new app development." The Congressional Subcommittee called the practices "tyranny," and calls on the courts to "better enforce the intent of the Sherman Act legislators." South Korea passed legislation just last week to terminate Apple's anticompetitive practices, and Russian Federation fined Apple earlier this summer. Thirty other countries, in the EU, UK, and elsewhere, have announced legislation to curtail App Store abuses. Apple's silence on this international consensus must be viewed as an admission of guilt. Since Apple did not, and cannot, deny international consensus to the injunction, their public interest defense is estopped.

10. Moreover, as discussed the *Epic* verdict found Apple to be guilty of UCL unfair practices. Even if for some reason the Court was not convinced on the international Sherman Act (and equivalent) consensus, the UCL holding is binding that Apple's "incipient monopoly" squelches information flow – such as Coronavirus Reporter.

11. The matter of commissions was raised over eight years ago in the *Pepper* lawsuit, and most other cases challenging Apple's anticompetitive behavior focus on these fees. Notably differentiated, we assert first-to-file class action claims that Apple's censorship of free apps, such as Dr. Roberts', constitutes Sherman Act and RICO violations directed against the institutional application software marketplace. These claims are long overdue. Apple's dictatorship like control over free apps – from Coronavirus Reporter to Parler, where Apple notoriously squelched an entire political party's open information flow[1], must come to an end.

12. The world cannot wait eight more years, the time *Pepper* has taken to challenge de facto taxation fees, to address application software censorship. This is a matter of life-or-death, in the case of Coronavirus Reporter, and freedom of speech, in the case of Parler. The injunction we seek can and must be granted to immediately end Apple's authoritarian control that so clearly violates antitrust and racketeering laws.

INJUNCTIVE RELIEF SOUGHT

13. The proposed injunction immediately and unambiguously ends Apple's unilateral control over the software permitted to run on its user's devices. To be clear, this effectively ends Apple's exclusive monopoly, and monopsony, over access to the institutional app marketplaces defined in the FAC, and respective markets for iOS userbase access, notary stamps, and

---

[1] Apple pretextually claims they blocked Parler due to violence incitement. But Facebook, Twitter, and other platforms (all legally exempt from liability for such acts, even if true) foster illegal activity every day, and Apple doesn't shut them down. Apple is on a power-grab to advance their own causes, make no mistake.

Coronavirus Reporter *et al v.* Apple Inc. *et al*
Case No. 21-CV-5567-EMC

application loaders. No longer will Apple reject apps by the hundreds of thousands weekly. After this injunction is granted, the increased selection of innovative apps brought on by this newfound freedom will be truly breathtaking. In China, the App Store is 1/10 the size of competing open markets. Our citizens deserve the same openness that exists in China, with respect to digital goods. The incremental network effect, i.e. the improved utility of the smartphone enhanced Internet, will substantially contribute to the economy, and moreover, quality of experience of smartphone owners. They will finally derive the full benefit of the global device infrastructure they paid for. Apple's "walled garden" will finally be allowed to flourish.

14. From a technical perspective, the injunctive redress is accomplished by restraining and enjoining Apple from disabling software app installation on end-user iOS devices and refusal to grant notary stamps. Apple currently exerts their control over each and every iPhone by adding software code into the iOS Operating System ("kernel") that requires "signing" with Apple's encryption key for an application to launch. Generally, that signature occurs on the App Store once the App Review team approves an app for distribution.

15. There are several mechanisms by which Apple would therefore comply with the proposed injunction. First, the operating system must remove the signing requirement that censors/disables third-party apps from launching. After the signature requirement is removed, an iPhone user could download any app via their web browser, or receive an app via AirDrop, email, or other communication transfer techniques. In other words, the App Store would no longer be required to download and run an app, because iOS no longer mandates signing from the App Store.

Coronavirus Reporter *et al v.* Apple Inc. *et al*
Case No. 21-CV-5567-EMC

SER038

16. Additionally, the App Store itself would be modified to comply with the injunction. Presently, a developer must pay $99 fee to access the App Store and upload an app for approval, or denial, by the App Review team. Under the terms of the injunction, Apple would be enjoined from denying any app submitted to the App Store platform. Apple would also be enjoined from charging the excessive $99 fee, as determined by the Congressional Subcommittee, to upload proposed apps.

17. The proposed injunctive relief would have vast, instantaneous observable benefits to the consumer. The App Store would immediately benefit from improved selection, as it would include apps, such as Dr. Roberts' Coronavirus Reporter, and many others limited only by the imagination of creative developers.

18. Moreover, these developers could market their apps in venues other than the App Store, which would result in more efficient distribution of novel applications. As stated, a user could interact directly with a developer's own store on the web, for example, and directly install their app, bypassing any need to use the App Store.

19. This, of course, is how software programs were sold for decades until the App Store launched in 2008. Prior to that, end users could go to a brick-and-mortar software store, or online forums dedicated to different niches, and discover useful software – all without Apple's excessive policing, curating, and censorship.

20. It is rather striking that over the last decade we, as a society, let Apple take away these rights for us to choose what sorts of programs we could run on computers (i.e. smartphones) that we paid for. This is analogous to purchasing a TV and only being allowed to watch films approved by that TV manufacturer. Or buying a car and being told by the car manufacturer what neighborhoods it can be driven to. We trusted Apple because we trusted the genius of

Steve Jobs and Wozniak. Enthralled by the great power of the "smartphone enhanced Internet," we assumed dedication to technological progress and American freedom was an inherent a goal of Apple. Unfortunately, Apple today has become the single greatest threat to free enterprise and technological progress. Lives were lost by the now eighteen-month delay in rolling out critically needed COVID-19 software. This is the right time and place to end Apple's practices with this proposed preliminary, and ultimately, permanent injunction.

### Marketplace Overview and Definitions

21. The FAC describes a relevant national foremarket of the US smartphone internet access device (i.e. smartphone), and an alternative single-product marketplace for iOS smartphones (60% by volume, 80% by revenue/profit of the entire US smartphone market). Downstream from those markets, the FAC describes the National Institutional App marketplace, and respective single-product iOS National Institutional App marketplace. The FAC describes the iOS National Institutional App marketplace as a tied product to the iOS smartphone. Also tied to the iPhone are three other markets, the iOS userbase access market, the iOS notary stamps market, and the iOS application loader market.

22. The foremarket for US smartphone internet access devices represents the ubiquitous handheld, portable electronic devices that allow users to perform myriad communications and computing functions, such as browsing the internet, navigating traffic, paying bills, accessing social media, playing games, and streaming videos and music. For many consumers, smartphones have largely replaced laptop and desktop computers for a wide variety of computing tasks. To be useful, a smartphone requires an FCC licensed telephone modem (i.e 5G radio) and an operating system which facilitates the use of apps through code, such as application programming interfaces ("APIs"), which app developers use to create apps that

are compatible with the device. Smartphones in the US are made by companies like Apple, Samsung, LG, and Motorola. Apple's products are unique in that they don't have a licensable operating system, rather, they use the proprietary iOS. Smartphones are designed to work on specific frequencies, which vary by country, and hence require regulatory (i.e. FCC) approval.

23. Therefore, there is a relevant market for licensed, United States smartphones that operate using carrier frequencies that have been commissioned in this Country. Apple iPhones sold in the US have different product SKUs than those sold in China, or Europe, evidencing the different markets for different country-products. The US smartphone market excludes simple cell phones, "flip phones," or feature phones, or other electronic devices (such as laptop computers, desktop computers, and gaming consoles, e.g., Nintendo DS, Xbox, PlayStation) that are not mobile smartphones.  As such, Apple and several Android OEMs (LG, Samsung, Motorola) comprise the bulk of the substitutable products in this market.

24. However, for the reasons expounded in the FAC, such as work/family compatibility, financial constraints, and others to be revealed in discovery, the smartphone market has high barriers to user switching and to market entry. Large companies such as Microsoft and Amazon have attempted to enter and gain viable scale in the market, with only very limited success. As such, Apple currently possesses durable monopoly power in the market for US smartphones, estimated at over 75% by revenue.

25. In the face of a small price increase (or a small reduction of quality) in smartphone prices, a consumer would be highly unlikely to switch from an Apple device to a substitute for the following reasons. First, the consumer who would switch would lose much of her financial investment in the previously purchased devices—often hundreds of dollars—as well as digital content consumable only through iOS apps. The consumer may also lose efficient, or any,

access to many kinds of data on that device or data associated with those apps. Because of the functional and data integration between devices within the same ecosystem many consumers owning multiple Apple devices would be reluctant to switch to an Apple device unless committing to switching all devices—a significant financial commitment. Third, as the FAC states many Americans pay for their devices under installment contracts, limiting their ability to switch mobile ecosystems. These and other costs of switching smartphones cause "lock-in" to the Apple ecosystem, and this leverage is used to exploit further downstream markets.

26. Because of this leverage, Apple likewise has monopoly power in all of the downstream and tied product markets, such as the Institutional App Market, notary stamps market, and userbase market. As the sole buyer/seller in these markets, and with a substantial portion of the US population locked in (see above), there are simply no substitutes for these products.

27. In all of the above markets, the United States is a relevant geographic market. As stated, FCC approves a US-version of the iPhone. In the downstream app markets, the apps available, and desirable, to consumers vary on a country-by-country basis. For instance, app stores frequently have country-specific "storefronts," and U.S. consumers cannot access the storefront available to users in another country. Language barriers are another obvious difference. Cultural norms and legal regulations for medical treatment (in the case of Coronavirus Reporter) likewise apply. Apple sets certain app distribution and payment requirements for developers on a country-by-country basis, including in-app sales currency and price range requirements. Institutional app markets available in other countries are not reasonable substitutes for app markets in the United States. Likewise, notary stamps, application loaders, and iOS userbase are downstream from the US smartphone market, and therefore only apply to that geography.

28. In short, our claim theory definitions cover the Sherman Act marketplace for US smartphones, the single product iOS device(iPhone) market, and downstream markets for Institutional App purchases, notary stamps, application loaders, and userbase access. The resulting disturbance in all of these markets stems from crafty DPLA agreements and other political lobbying tactics. In sum, Apple has thus far pulled off what is the most profitable business model in history – albeit an illegal one under Sherman.

## MEMORANDUM OF LAW

29. A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). Alternatively, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cotrell,* 632 F.3d 1127, 1135 (9th Cir. 2011). Plaintiffs qualify pursuant to either standard, as discussed herein.

30. Underlying Plaintiffs' allegations in this case are Apple's anticompetitive and exclusionary efforts to hinder opportunities of independent developers as a way to maintain and extend its monopoly over smartphone enhanced internet access devices, and the related monopsony over the institutional app marketplace. Apple's anticompetitive agreements violate Section 1 of the Sherman Act; and its conduct, viewed both individually and in the aggregate, also violates Section 2 of the Sherman Act.

31. To establish monopolization in violation of Section 2, the Plaintiffs must show two elements: (1) the possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power, as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *Plaintiffs v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966); see also *Southern Pacific Comm. Co. v. AT&T*, 740 F.2d 980, 1000 (D.C. Cir. 1984).

32. The first element of a monopolization claim – monopoly power –  is "the power to control market prices or exclude competition." *United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 391 (1956). "[T]he material consideration in determining whether a monopoly exists is not that prices are raised and that competition actually is excluded, but that power exists to raise prices or to exclude competition when it is desired to do so." *American Tobacco Co. v. United States*, 328 U.S. 781, 811 (1946).

33. The second element of a monopolization action is "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Grinnell*, 384 U.S. at 570-71. This requires the Court to determine whether the monopolist "impaired competition in an unnecessarily restrictive way." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985). "If a firm has been attempting to exclude rivals on some basis other than efficiency, it is fair to characterize its behavior as predatory." *Ibid*. Furthermore, "[w]here a defendant maintains substantial market power, his activities are examined through a special lens: Behavior that might otherwise not be of concern to the antitrust laws -- or that might even be viewed as procompetitive -- can take on exclusionary connotations when practiced by a monopolist." *Eastman Kodak Co. v. Image Tech. Servs, Inc.,* 504 U.S. 451, 488 (1992)

(Scalia, J., dissenting) (citing 3 P. Areeda & D. Turner, Antitrust Law ¶ 813, at 300-02 (1978)).

34. A monopolist also violates Section 2 when it enters into anticompetitive agreements that serve to maintain its market power. Such agreements also violate Section 1 of the Sherman Act, and it is settled that a monopolist violates Section 2 if the monopolist has "maintained his strategic position, or sought to expand his monopoly, or expanded it by means of those restraints of trade which are cognizable under [Sherman Act] § 1." *United States v. Griffith*, 334 U.S. 100, 106 (1948).

35. Here, Apple's DPLA agreements requiring any developer to submit an app to Apple before it can be approved to run on end-user devices plainly and unlawfully maintain Apple's monopoly power in violation of Section 2 on both grounds: They draw on Apple's monopoly power to exclude competition on a basis other than efficiency, thereby tightening Apple's grasp on the institutional application software market; and they violate Section 1's proscription on employing anticompetitive agreements to maintain monopoly power.

36. There is no reasonable dispute that Apple has monopsony power in the institutional app market. Under the Epic/Kodak single-market theory, Apple exerts 100% control over the iOS institutional app market. Under Plaintiffs' US smartphone enhanced access device definition, Apple's market share is approximated to be 80%. (See *Congressional Subcommittee Report, Epic Findings of Fact).*

37. Apple's monopoly creates barriers to competitors that are magnified and reinforced by network effects and increasing returns in consumption which result from the fact that the value to users of a particular good or service increases with the use of that good or service by others. In other words, the vast benefits that end-users should receive by investing in the

smartphone enhanced Internet backbone accrue to Apple, rather than the economy as a whole.
For this reason, an injunction is appropriate to maintain the *status quo* and prevent irreparable
harm to the competitive economy that is being siphoned to Apple's advantage.

Apple's Anticompetitive Conduct Violates Sections 1 And 2

38. Apple has engaged, and plans to continue to engage, in a variety of exclusionary and
predatory practices to protect its operating system monopoly.  Section 2 prohibits a firm from
"wield[ing]" its monopoly power "to tighten its hold on the market." *Berkey Photo, Inc. v.
Eastman Kodak Co.*, 603 F.2d 263, 275 (2d Cir. 1979), *cert.denied*, 449 U.S. 1093 (1980). "A
variety of techniques may be employed to achieve this end -- predatory pricing, lease-only
policies, and exclusive buying arrangements, to list a few." *Id.* at 274. Tying arrangements
are another. By using monopoly power to compel a customer to purchase a product it might
prefer to purchase elsewhere, a monopolist "forecloses competition on the merits in a product
market distinct from the market for the tying item."  Tying is *per se* evidenced herein, and
Plaintiffs are likely to prevail. Apple's only defense to tying appears to be the argument that
the App Store is not a distinct digital product. But it is.

39. Relevant here, Apple has tied the App Store, i.e. exclusive control over institutional
application purchasing and distribution, to the smartphone. This tying is plainly forbidden
under Section 2, and is a narrow target of the proposed injunctive relief. Also pleaded herein
are the ties to the related notary stamp, application, and iOS userbase access, all completely
controlled by Apple as a result of their US monopoly in the smartphone market.

40. The economic consequences of the illegal DPLA agreement and the end-user App Store tying
arrangement are straightforward. Customers are presented with less selection and competition
amongst third-party applications, such as Dr. Roberts' Coronavirus Reporter. In this particular

case, an application serving as a pandemic emergency response was blocked from consumer choice, which according to Apple's own research, cost lives. Hence, there are ramifications beyond the economic scope of Sherman; restricting innovation can cost lives, in addition to economic loss.

41. Apple's App Store restrains trade by creating a bottleneck on the institutional smartphone app market, plain and simple. No other major computing platform in history has attempted such monopolization; this unequivocally violates Sherman by "restraining interstate trade." Apple simply cannot deny that they restrain interstate trade in this market, and hence, there is no reason to wait for conclusion of this trial to "open up" the App Store to third-parties.

42. Under UCL and RICO, Plaintiffs' claims are equally likely to prevail and warrant injunctive relief. The *Epic* Court (see introduction) ruled that open information flow was blocked by Apple's "unfair" practices that create an "incipient monopoly." This ruling is directly applicable to apps such as Coronavirus Reporter, where Apple has absolutely no justification in disallowing them. These are competing apps "unfairly" withheld – they are not spamware, malware, offensive material, or other such "uncontroversial" categories determined by the *Epic* court. There is international consensus that Apple "strangles" competing apps as a monopolist, and this Court has ample and compelling evidence under UCL or RICO to grant the injunction.

Apple's Exclusionary Conduct Lacks Legitimate Business Justification

43. Conduct that excludes rivals and lacks legitimate business justification -- either because it does not advance competition on the merits or because it excludes competitors in an unnecessarily restrictive way -- violates Section 2. See, e.g., *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 502 U.S. 452 (1992); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*

472 U.S. 587 (1985). Apple's total bottleneck control over the institutional app marketplace lacks any legitimate business justification.

44. For starters, Apple's own Mac line does not restrict third-party applications. Android devices do not require signing by Google – an end-user may download an app from the web, beam an app to a friend over Bluetooth, etc. Nearly every computer platform in history, with the exception of iOS, permitted direct purchase of software from independent developers. There is no legitimate reason for Apple to exclude rivals.

45. Apple, by way of Mr. Cook, has defended its practice in the PR world in recent days by claiming it excludes rivals in the name of safety. But this dishonest argument falls flat on its face for multiple reasons. There is no plague of safety issues on the Mac, or Android – user satisfaction ratings for those platforms are statistically in line with Apple's iOS users. We simply do not see harmful effects that could be ascribed to Mac and Android users, absent from iOS users. Craig Federighi's testimony to the *Epic* court was afforded "little weight," and as such, Plaintiff's argument on exclusionary behavior is almost certain to meet the four elements of the MCI test. There is simply no valid, non-pretextual argument for excluding a doctor such as Dr. Roberts' from attempting to help with COVID-19 – even if Apple could somehow refute the app was likely to save lives.

46. Amnesty International reported about Pegasys Software, an Israeli iPhone surveillance program. Pegasys completely opens up any iPhone device and turns it into a full-fledged spy machine, relaying sound, video, and private data back to the spy. As reported, the software does not require any user intervention to infect an iPhone, which it does apparently through a simple text message. While many malware/spyware and foreign surveillance threats require

"human intelligence vulnerability" i.e. tricking an end-user into installing the code, Pegasys infects even the most cautious end-users.

47. What this means is that, as of August 2021, the iPhone was completely vulnerable to malicious safety threats. Logically, Apple cannot claim their exclusionary practices enhance security, when the platform is routinely completely exposed and vulnerable to the most aggressive forms of spyware.

48. In short, the safety argument is pretextual at best, and at worst, forms the substance of Plaintiffs' wire fraud RICO causes of action in their dealings with Apple. While the *Epic* court found some safety arguments to be valid, the Court was clear that there were "noncontroversial" areas such as malware, spam, "bandwidth hogs," none of which apply to Plaintiffs' competing apps. In other words, the *Epic* ruling left open for factual determination as to how far Apple can take their safety defense. This injunction allocated the majority of its twenty-five page on a *prima facie* Sherman 1 and Sherman 2 antitrust claims, which is typically the burden of proof for a Plaintiff's motion for preliminary injunction to succeed (See *United States v. Shine Chain Theaters*). Nonetheless, Plaintiffs reserve the right to argue at the scheduled hearing that this injunction is equally indicated under RICO statutory law and UCL. In brief, multiple Plaintiffs here observed and report the same wire fraud directed at them by the App Store team as Dr Roberts faced: he was told his app was disallowed because end users couldn't be trusted in a pandemic to share self-reported symptoms. Several months later, Apple allowed a crony to publish an app that shared self-reported symptoms. Plaintiffs also suffered similar threats as reported by POLITICO made to state legislators: 'cease with your antitrust enforcement because it is in "disregard for the law" and Constitution.' This abhorrent mistreatment of Plaintiffs, legislators, and the general public must come to an end

with this injunction. The Congressional Subcommittee is clear that digital goods cannot evade Sherman's intent, simply because of their novelty. Left unchecked, there can be little doubt that Apple will spend decades (i.e. Pepper) trying to subvert Sherman with endless attacks on "non-existent' digital goods like the App Store and mind-numbing marketplace contour disputes. Enough is enough – Plaintiffs' claims are no more complex than a TV manufacturer (see FAC) claiming their "patents" and "economic miracle" somehow bestow upon them "Big Brother" status to dictate what TV owners can, and cannot, watch on their TV. The  pretextual and unethical wire fraud directed at app developers is the entire basis upon which Apple enforces the DPLA and end-user App Store tying, and must be enjoined under RICO.

<u>The Balance of The Equities Warrants Granting The Requested Preliminary Relief</u>

49. The evidence and analysis set forth above and in our Complaint amply demonstrates that the Plaintiffs have shown a clear likelihood that Apple's ongoing and impending conduct violates Sections 1 and 2 of the Sherman Act, as well as RICO predicate acts including wire fraud. Accordingly, irreparable harm to the public interest in competition may be presumed. *See United States v. Siemens Corp.*, 621 F.2d 499, 506 (2d Cir. 1980); *cf. FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1082 & n.22 (D.C. Cir. 1981). But this Court need not rest on the presumption. Apple's anticompetitive conduct, and racketeering practices directed against small developers threatens to work significant and irreparable harm to competition. Plaintiffs, small developers, have standing here to protect not just COVID apps, but the health and competition of the entire institutional app marketplace. Without it, their career as developers will be permanently damaged. As citizens, they have standing to enjoin Apple from behavior that inflicts macroeconomic and public health harm. The imposition of preliminary relief will eliminate the threats of ongoing harm; the requested relief will not

impose a significant burden on Apple and will benefit, rather than harm, third parties; and granting such relief is in the public interest. Accordingly, the Court should enter the requested preliminary injunction.

<u>Apple's Conduct Threatens Irreparable Harm to Plaintiffs, Competition, Public Health, National Innovation & Growth</u>

50. Apple's unlawful conduct threatens irreparable harm to the Plaintiffs, marketplace competition, and in this case, public health and overall macroeconomic wellbeing. Apple's forced DPLA and App Store exclusivity inhibits competing software applications ("apps") from developing into full-fledged competitors to Apple's own competing apps, or in some cases, Apple's cronies. The durability of Apple's monopoly is in large measure due to network effects that cause users to demand a ubiquitous smartphone platform and its bundled apps, often referred to as the "Apple ecosystem." By way of example, Plaintiffs in this case had coronavirus prevention apps, videoconference apps, telecommunications references, and games, that were respectively disallowed and/or demoted by Apple's own Covid SDK, FaceTime, Whitepages, and Apple Arcade, respectively. By foreclosing the channels through which consumers obtain competing applications, Apple substantially reduces the probability that competing apps can obtain sufficient market share, or any market share. Left unchecked, i.e. without injunctive relief, any competition left in this marketplace is likely to suffer imminent harm as the "Apple ecosystem" – and record $80 billion quarterly profits (at 44% usury margin) eat into the overall economy.

51. Given the difficulty in overcoming the network effects that secure Apple's monopoly, the lack of direct competitive threats, and the extent to which Apple's ongoing and impending

practices threaten to foreclose the major indirect competitive challenge to its monopoly, the threat to the public interest in competition is acute.

52. Significantly, as mentioned earlier, in the case of Coronavirus Reporter, economic effects are just part of the problem. Lives have been lost by Apple's blanket ban on "startups" from contributing to COVID-19 relief. Judicial notice can observe from Apple's own research – publications where Apple touted the lives saved by its own COVID SDK. While Dr. Roberts' app was ready for launch in February 2020, Apple's SDK is unavailable to much of the United States population as of today's filing for injunction. This is unacceptable. If a COVID awareness tool such as Apple's saves lives, by their own research, it is evident that blocking Dr Roberts' app for eighteen months cost lives.

53. As Dr. Roberts declared in his interview with CNBC's Kif Leswing, "epidemiological data was lost" during the time in which his app was disallowed, and no other comparable apps were available to iPhone users. This fact is incontrovertible, and would not have occurred had Apple not been allowed to exclude rival apps from the App Store. The Court needs no other expert opinion beyond Dr. Roberts' statement that epidemiological data was lost. This is already a medical travesty, and it would be a legal travesty to deny this injunction and allow Apple to recklessly endanger lives.

54. Counsel notes that this action was initially filed in January, and we have diligently engaged in discussions with Apple to remove their exclusionary restrictions. Apple only gave an answer recently, rejecting such compromise. As such, this injunction is requested at the earliest possible moment, and any delay was the result of Apple's false suggestion they were considering some sort of settlement. The injunction was refiled for good cause (see introduction), which caused no delay in the scheduled hearing.

55. Despite the fact that biostatistical data was irretrievably lost for Coronavirus Reporter 1.0, Plaintiff has an immediate need to distribute an updated app to gather critically important epidemiological data with regards to "breakthrough" cases and vaccination events. CDC admitted last week that data for breakthrough cases is extremely limited from June and beyond, the time during which the Delta variant has swept the country. Once again, Coronavirus Reporter is being actively restricted from employing innovative data collection techniques that could save lives, or at the very least, provide valuable epidemiological insight. Plaintiffs here, and related case in Maine, account for five restricted apps , a small amount of the 40,000 apps rejected weekly. It is impossible for us to conceive of all the lost innovation and economic value from these other apps, but believe our example is representative of the Class. Plaintiffs had sought expedited discovery in the New Hampshire district to identify, or at least preserve, information about these other app rejections. That motion will be re-filed in parallel with this injunction, to ultimately support a permanent injunction. Nonetheless, as developers, Plaintiffs are likely to suffer permanent harm if the overall health and competition of the institutional app marketplace is allowed to decline because of Apple's conduct.

<u>The Requested Preliminary Relief Appropriately Preserves Competition</u>

56. The traditional function of a preliminary injunction "is to prevent irreparable injury." *Ross-Whitney Corp. v. Smith Klein & French Labs.*, 207 F.2d 190, 199 (9th Cir. 1953); *see also e.g.,Toledo AA & NM Ry. v. Pennsylvania Co.*, 54 F. 730, 741 (C.C.N.D. Ohio) (Taft, J.), *appeal dismissed*, 150 U.S. 393 (1893). *See generally* 11A Charles A. Wright *et al.*, Federal Practice and Procedure § 2948, at 137-38 (2d ed. 1995). The relief proposed by the Plaintiffs is appropriately tailored to that aim. The Plaintiffs seek as preliminary relief to enjoin Apple during the pendency of this action from:

a. Executing code in the iOS kernel that, when a user requests to launch an app, checks for the presence of Apple's digital signature, and disables launch if such signature is nonexistent.

b. Executing code in the iOS kernel that prevents a user from downloading, transferring, or otherwise receiving and installing an application from sources other than the App Store, including the Safari browser, Airdrop/Bluetooth, and other routine file transfer mechanisms.

c. Blocking, rejecting, or banning any App Store third-party developer app submission for any reason. By way of exception, Apple may prohibit any app if:

  i) the submitted app clearly executes instructions or contains content that violates local, state, national, and/or global laws and treatises. Due Process must exist at the governmental level to determine such violation; Apple may not employ editorial censorship, political fact checking, and other such purported law enforcements devoid of Due Process.

  ii) the submitted app executes instructions that could reasonably likely cause device malfunction, incomplete execution, or device failure.

d. Taxing developers a $99 annual subscription fee to access App Store submission protocols.

Depending upon the Court's analysis of Apple's conduct, and Apple's forthcoming response, variations of this proposed injunction may be more appropriate or efficient than others. These variations, of which many more could be derived, are ordered from most to least intervention:

  1. Complete platform opening (App Store accepts all submissions, full sideloading, free notary stamps).

*Coronavirus Reporter et al v. Apple Inc. et al*
Case No. 21-CV-5567-EMC

2. Sideloading permitted, iOS notarization requirement eliminated.

3. Sideloading permitted, notary stamps issued at competitive cost for non-subjective reasons (malware, age rating), but App Store remains curated by Apple.

4. Sideloading permitted, but notary remains at Apple's full discretion.

5. App Store remains only "onboarding point." Independent App Court (i.e. arbitration) for app denial or ranking appeals. [Rejected by Apple August 2021]

Preliminary Relief Will Not Impose a Significant Burden on Apple and Is Beneficial To Third Parties

57. The proposed preliminary relief will not impose on Apple any significant burden, let alone inflict irreparable harm. The relief sought by the Plaintiffs principally requires Apple to cease from blocking the installation of reasonable, valid and legal third-party applications. As demonstrated, Apple's current restrictions are not supported by any efficiency justification and, therefore, prohibiting their enforcement will not cause Apple any harm.

58. Third parties – far from suffering harm from the proposed relief – will in fact greatly benefit. To the contrary, the proposed relief serves the interests of third parties, and the public generally, by creating greater consumer choice and by ensuring that competition on the merits, rather than Apple's monopoly power, determines which applications succeed. This is how every major computing platform has operated throughout history, with the exception of iOS. Not only will Apple not be harmed, but indeed their platform may become more desirable and valuable as it matures to allow greater diversity of applications. Plaintiffs concede that Apple's earnings, an historical $80 billion last quarter, are largely derived from

App Store services and their own competing apps. As such, there may be a transition period where Apple's anticompetitive rents, accrued from the aforementioned Sherman violations, cause a transient reduction in Apple's profitability. Of course, lost profitability from monopolistic rents is not a valid reason to deny this injunction. Apple's staggering 44% profitability on $80 billion quarterly is itself evidence of anticompetitive profit accrual.

The Public Interest And The Balance Of The Equities Strongly Favor Enjoining Apple's Anticompetitive Practices

59. The public interest to issue this injunction is compelling. There has been a recent national, and international mandate to reign in technological abuses such as Apple's exclusionary App Store. The "Executive Order on Promoting Competition in the American Economy" signed into law by President Biden last month specifically tasks the federal government to use its statutory rulemaking authority to address "unfair competition in Major internet marketplaces." The term 'major internet marketplaces' is effectively synonymous with Apple's App Store, and should be interpreted by this Court as a mandate to give utmost consideration to requests for relief such as this proposed injunction and the underlying Complaint.

60. Overseas recently, the South Korea, EU, Russian Federation and UK governments all issued new regulation to reign in the "App Store." The US should not lag behind foreign governments in implementing inevitable antitrust regulations against Apple; this gives the impression of bias, and harms consumers in our country and globally.

61. To be sure, threatened with an *Epic* lawsuit, a new FTC chair, and other antitrust scrutiny nationally and internationally, Apple relaxed some commission rates for small developers. But as our Complaint makes clear, these supra-competitive rents, being litigated in *Cameron* and *Pepper*, are just a fraction of the damages to our economy, small developers, and

consumers. Apple is far from abandoning its exclusionary DPLA agreements which have cost lives, in the case of our app, and threaten the whole economy and technological progress of the Internet. The world cannot wait for years as Apple delays antitrust cases. This injunction is needed today. Apple has somehow enthralled us with the iPhone, but as argued earlier, this injunction should issue as easily as one against a TV or car manufacturer that tried to tell us how to live our lives with our purchases. Preliminary relief is urgently needed to ensure that Apple's exclusionary conduct does not during the pendency of this litigation further eliminate competition and create other untold effects.

Both Serious Question and Sliding Scale thresholds met in this injunction

62. Per *Winter v. Natural Resources Defense Counsel, Inc*, 555 US 7 (2008) the granting of injunction requires the Court find irreparable harm must be likely, not just possible. Given the public concerns over digital marketplace competition voiced by the *Congressional Subcommittee* report (incorporated herein), foreign governments, and President Biden's recent order on competition, the Court is compelled to acknowledge the substantial, permanent harm that could ensue should Apple's current practices be left unchecked.

63. The Ninth Circuit has accepted both "serious question" as well as "sliding scale" approaches post- *Winter*. *Alliance for the Wild Rockies v. Cottrell*, 632 F. 3d 1127, 1131-32 (9th Cir 2011). The Court in that case found that "serious questions going to the merits" and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." Id. at 1135 citing *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003). There can be no serious objection to the fact that Plaintiffs have presented a serious question going to the merits. The hardship on Defendant Apple is close to

nil, as explained above, because the Mac is safe and no patents are violated by people simply being allowed to use the iPhones they paid for. In contrast, Apple likely will benefit in the long-term from greater utility of their devices, the market in China is 10X the size of the App Store, and Apple could actually become more competitive as a result of the proposed injunction. Hence under the serious question approach the Plaintiffs request for an injunction must be granted.

64. Because the Plaintiffs have a strong probability of success on the merits, and because the requested relief prevents irreparable harm to the public interest and imposes on Apple no significant burden, the balance of equities tilts sharply in the Plaintiffs' favor. Accordingly, the court should enter the preliminary injunction.

Inferences from Procedural Posture; Apple's Answer Not Docketed After Eight Months

65. In determining the likelihood of success, and Apple's culpability for the alleged civil and criminal conduct, the Court may consider the procedural posture of this case, which was originally filed eight months ago in the New Hampshire District.

66. Apple has filed some five frivolous 12(b)(6) motions against this case, and a related case in the Maine district, asserting that Plaintiffs failed to even state a claim. Apple, by way of counsel Gibson Dunn, has taken conflicting positions regarding these claims that raise serious questions under the doctrine of judicial estoppel, which precludes opposing counsel from taking contradictory positions.

67. First, and most egregiously, Apple's pleadings have ruthlessly attacked Dr. Roberts[2], claiming contempt and "disregard for the law" for bringing this case. To attribute wrongdoing to a

---

[2] Counsel is simultaneously filing a Notice of Possible Disqualification regarding Apple counsel Gibson Dunn, pursuant to California Bar Rules of Professional Conduct Rules 1.7 & 3.7 (conflict of interest/lawyer as witness). Gibson Dunn is currently a RICO defendant in a longstanding controversy with this Counsel and Plaintiffs' team member, pending *certiorari* petition to the Supreme Court. In brief, Gibson Dunn is alleged to have executed political retaliation against an aspiring brain surgeon, by taking a judicially estopped position to discredit said neurosurgeon, who had filed an evidence

physician who has touched the lives of so many people (see introduction) is not acceptable. As noted, Apple routinely engages in such attacks against state legislators, according to POLITICO.

68. On one hand, Apple says Dr. Roberts' contemptuous claims don't state a claim, but on the other hand, last month Apple said these claims were so similar to *Cameron, Epic, & Pepper* as to warrant full consolidation. Considering that Apple told the Supreme Court of the United States in *Pepper* that developers [such as Dr. Roberts] are the true parties with standing to bring antitrust claims, it is even more mystifying that Apple attempted to state his claims were somehow illicit – a damaging false allegation picked up by national press, unfortunately. Of course, *Epic* has reached a verdict, guilty on UCL, and *Cameron* is pending settlement, so it is unclear how Apple finds Dr. Roberts causes of action to be simultaneously in disregard for the law, and at the same time worthy of consolidation with valid, adjudicated claims.

69. Should Apple still have failed to file an Answer by the hearing date of this motion, it is submitted that the Court can draw an appropriate inference as to their likelihood to prevail, and issue the injunction accordingly without delay.

**CONCLUSION**

70. What is at stake in this case, of course, is not simply that a monopolist might continue to impose unlawful restraints on small developers, Plaintiff's renowned Chief Physician Dr. Roberts. The reinforcement and extension of Apple's monopoly power threatens the competitive vigor of one of our most dynamic industries. As our Complaint states, hundreds of thousands of person-years of our best developers are being discarded by Apple's tyrannical

---

spoliation complaint with the Trump administration that resulted in a high-profile political resignation. It is reasonably evident that Gibson Dunn shall be called as witness in this case. It is unclear whether or not Apple has been informed of this conflict. In the interest of full disclosure, we notify the Court that Apple counsels' unusual and improper attacks on Dr. Roberts, and overall procedural posture, may be subject to disqualification concerns.

greed. The consequences may not be limited to eliminating competition among third-party apps. Rather, the resulting maintenance of Apple's monopoly power is a long-term threat to the very innovation that is leading driver of productivity and national economic welfare. Ironically, this very argument was used against Microsoft; Apple's famous "1984" commercial protesting the IBM/Microsoft corporations is now downright eerie in hindsight of Apple's rise to power. Apple's anticompetitive conduct consequently should be enjoined to prevent further, and perhaps irreversible, competitive injury during the pendency of this case.

It is time to realize the smartphone, even if it was once the subject of science fiction fantasy, is not exempt from laws meant to curtail Apple's greed. For the foregoing reasons, the court should enter the requested preliminary injunction.


Respectfully submitted, this 24th day of September, 2021.


/s/ Keith Mathews
Keith Mathews, *Pro Hac Vice*
Counsel for Coronavirus Reporter, Primary Productions,
CALID Inc, and Proposed Class Members
Associated Attorneys of New England
PO Box 278
Manchester, NH 03105
Ph. 603-622-8100
keith@aaone.law

## CERTIFICATE OF SERVICE

I, Keith Mathews, do declare as follows:

I certify that a copy of the foregoing **NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION** was delivered electronically to counsel for the Defendants with counsel, and emailed to those without known counsel.

Executed on this 24th day of September, 2021.

/s/ Keith Mathews
Keith Mathews, *Pro Hac Vice*
Associated Attorneys of New England
PO Box 278
Manchester, NH 03105
Ph. 603-622-8100
keith@aaone.law