**Nos. 22-15166 & 22-15167**

# In the United States Court of Appeals for the Ninth Circuit

———————————

CORONAVIRUS REPORTER, CALID INC,
PRIMARY PRODUCTIONS LLC,

*Plaintiffs-Appellants,*

v.

APPLE INC.

*Defendant-Appellee.*

———————————

On Appeal from the United States District Court
for the Northern District of California
No. 3:21-cv-05567-EMC
Hon. Edward M. Chen

———————————

**APPELLANTS' REPLY BRIEF**

———————————

KEITH MATHEWS
ASSOCIATED ATTORNEYS OF NEW ENGLAND
1000 Elm Street #800
Manchester, NH 03101
(603) 622-8100
*Attorneys for Appellants*
*Coronavirus Reporter, Calid Inc.,*
*Primary Productions LLC*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................... ii

TABLE OF AUTHORITIES .............................................................. iii

INTRODUCTION ........................................................................... 1

ARGUMENT ................................................................................... 2

I.   THE PRELIMINARY INJUNCTION SHOULD HAVE ISSUED AND THE MOTION TO DISMISS SHOULD HAVE BEEN DENIED ................................................................................ 2

    A.  Tying the iPhone device to digital software distribution stores represents exceptional anticompetitive tying meant to invoke *per se* analysis and likelihood to prevail. This Court should issue the Preliminary Injunction without further delay....................... 3

        Sufficient Evidence is on Record for a Preliminary Injunction .......................................................... 11

        Section 1 Market Analysis Requirements Are Satisfied ............ 12

    B.  Appellants Have Sufficiently Pled Violations of Sherman Act § 2. Relevant Market Definitions, Not Entirely Mandatory Under DOJ Guidance, Have Been Pleaded via Disclosure of All Actual Economic Substitutes ......................................................... 14

        All product substitutes have been reasonably pled. .................... 17

        Apple's "Tiresome" Relevant Market Defense.......................... 19

        *Aspen, MCI* Exclusionary Conduct Are Alleged, Rather than *Blue Cross* Common Carrier. ................................................. 22

        DOJ Position on Marketplace as a Tool...................................... 23

        Censorship is Vast Antitrust Injury............................................ 24

CONCLUSION ................................................................................ 30

# TABLE OF AUTHORITIES

## Cases

*Amex, 138 S. Ct. at 2280* ........................................................ 19

*Aspen Skiing Co* (472 U.S. 585, 1985) ................................... 23

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1413 (7th Cir. 1995) .......................................................... 22

*Datagate, Inc. v. Hewlett-Packard Co.* ................................... 8

*Edward Darcy Esquire v Thomas Allin of London Haberdasher* (1602) 74 ER 1131 ........................................................................................ 1

*Golden Gate Pharm. Servs. v. Pfizer Inc* ............................... 16

*Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018) ........................... 15

*Ill. Tool Works, Inc. v. Indep. Ink, Inc*, 547 U.S. 28, 35–46 (2006) ..................... 12

*In re Insurance Brokerage Antitrust Litigation*, 618 F 3d 300 (2010) ................. 13

*In re Southeastern Milk Antitrust Litigation*, 739 F.3d 262 (2014) ...................... 13

*National Soc. of Professional Engineers v. U.S.*, 435 U.S. (1878) ....................... 13

*Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038,1044–45 (9th Cir. 2008) .. 12

*Retlaw*, 53 F.3d at 1005 n.1.) .................................................. 9

*United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956) ......... 15

## Treatises

Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*  (4th ed. 2020 supp) ................................ 15

**INTRODUCTION**

Imagine if every writer or painter throughout history had been required to obtain approval to distribute their artwork from a monopolist. It is safe to say cultural renaissance would have been hindered by such restrictive trade. Even more great works would have never seen the light of day, if the artists were levied an annual fee by typewriter or paintbrush manufacturers, for the privilege of applying for publication. In our case, a world-renowned scientist was squelched by a monopolist during a global pandemic. In what can only be described as a breathtaking Answering Brief, Apple now declares to the United States Court of Appeals that "censorship is not an antitrust injury."

Apple's censorship declaration is at odds with centuries of competition law. The earliest antitrust ruling in English Common Law, the *Case of Monopolies,* found that "a monopoly prevents persons who may be skilled in a trade from practicing their trade, and therefore promotes idleness. A monopoly damages not only tradesmen in that field, but everyone who wants to use the product, because the monopolist will raise the price, but will have no incentive to maintain the quality of the goods sold." *Edward Darcy Esquire v Thomas Allin of London Haberdasher* (1602) 74 ER 1131. From its origins, antitrust and competition law concerned injury to skilled tradesman. Whether it be a writer, painter, or a world-

renowned scientist, as in this case, censorship by a monopoly is an injury to society at large.

Apple's Answering Brief has presented no viable defense to the issuance of a preliminary injunction. It advances contradictory positions to Apple's CEO testimony. This amounts to forfeiture of key issues with respect to Sherman Act illegal *per se* tying arrangements. The public interest is served by issuing the injunction without delay. Appellants have properly invoked a tying cause of action which is the same tying scrutinized by multiple academic papers on the Apple monopoly, such as Loyola Law Review's *Epic Games v. Apple: Tech-Tying and the Future of Antitrust*. The appropriate *per se* standard permits immediate issuance by the Ninth Circuit of a long overdue injunction against the App Store. This action, after a decade of failed and stalled attempted Apple antitrust enforcements, is critically important to preventing further damage by the largest multinational trust in history.

## ARGUMENT

## I. THE PRELIMINARY INJUNCTION SHOULD HAVE ISSUED AND THE MOTION TO DISMISS SHOULD HAVE BEEN DENIED

"Apple has, remarkably, tied its smartphone to eighty percent of all [digital smartphone] software distribution stores." (EOB p.17) Applying the correct *per se* tying standard, we maintain in this Reply that all criteria have been met for the issuance of a preliminary injunction. The Opening Brief engaged in a detailed

analysis of *U.S. v. Microsoft Corp*, *Jefferson Parish*, *Datagate, Inc. v. Hewlett-Packard Co*, *Northern Pacific* to provide precedent for applying *per se* liability to Apple's conduct. Apple's tie of computing hardware to digital software distribution is forbidden even under the *Jefferson Parish "*modified *per se"* rule cited in *Eastman Kodak v. Image Technical Services, Inc*. 4-ER-698.

> **A.** **Tying the iPhone device to digital software distribution stores represents exceptional anticompetitive tying meant to invoke *per se* analysis and likelihood to prevail. This Court should issue the Preliminary Injunction without further delay.**

The record comprises a compelling instance of improper tying. Apple's Answering Brief (AAB) devotes a single-space page as counter argument to the tying allegation. (AAB p.40). The Answering Brief essentially forfeits the key issues. Likewise, Apple's Opposition to Preliminary Injunction (3-ER-464) and Motion to Dismiss each allocate about one page to tying. For convenience of the Court, Apple's three arguments are compared below. A pattern emerges whereby Apple avoided discussion on merits, instead embarking on a strategy to "create chaos in this litigation by stirring confusion and faulting Appellants for said complexity." (EOB p.29)

Starting chronologically, Apple's Opposition to the Motion to Preliminary Injunction briefly cites *Microsoft* and *Qualcomm* to argue that the rule of reason

applies for "platform software" involving "novel business practices." Apple then

enumerates five objections:

| Objection | Description | Reference |
|---|---|---|
| **Standing (#1)** | "They do not seek to offer a competing app store in the supposedly tied [app distribution] market." Hence no antitrust injury where plaintiff is not a "participant in the same market as the alleged malefactor" | 3-ER-464 |
| **Substitutes (#2)** | "Plaintiffs appear to limit the tying product market to smartphone devices," and argue that exclusion of tablets from the market represented "a failure to have "boundaries rest upon economic evidence." | 3-ER-465 |
| **Monopoly (#3)** | Apple claims that it does not enjoy monopoly power in the smartphone tying market, disputing FAC allegations they control 80% of profits and 65% of smartphone sales by volume, arguing rather they have "around 50%." | 3-ER-465 |
| **Distinct Products (#4)** | Apple states that the tying allegations don't concern separate products from distinct markets, citing notary stamps and onboarding software as platform components. Notably, the main tied product – the App Store – is not mentioned in this objection and therefore waived. | 3-ER-466 |
| **Procompetitive (#5)** | Asserting a rule of reason defense, Apple asserts that app review offers pro-competitive effects that outweigh allegations | 3-ER-466 |

| | of "less selection and competition [in the app market]." | |
| --- | --- | --- |

Apple's Motion to Dismiss, filed concurrently with the above Opposition to Preliminary Injunction, shares certain defenses but notably waives others:

| Objection | Description | Reference |
| --- | --- | --- |
| **Standing (#1)** | "Plaintiffs do not allege that they were required to purchase any of the purported tied products or would compete with Apple to provide them." | 5-ER-811 |
| **Substitutes (#2)** | Waived | NA |
| **Monopoly (#3)** | Waived | NA |
| **Distinct Products (#4)** | The MTD asserts that "nothing the FAC suggests that the purported tied products "app store" are distinct. Rather, the allegations confirm that these supposedly tied products are in fact components of a single technically integrated ecosystem." | 5-ER-811 |
| **Procompetitive (#5)** | Waived | NA |

Finally, we parse Apple's Answering Brief defenses to tying. Apple confirms tying is pursuant to Sherman Section 1, waiving their earlier Section 2 defense. [AOB p.40] Apple then raises two of the five prior defenses.

| Objection (#) | Description | Reference |
|---|---|---|
| **Standing (#1)** | "Appellants are neither purchasers who are forced to buy the tied product or competitor who is restrained from entering the market for the tied products. They are app developers. While the Entities claim standing as competitors because they 'could open their own app stores,' there is no allegation they would do so." | AAB 42 |
| **Substitutes (#2)** | Answering Brief now argues the opposite – that tablets are amongst smartphone substitutes. | NA |
| **Monopoly (#3)** | Waived | NA |
| **Distinct Products (#4)** | Notary stamps and application onboarding software are, according to Apple, alleged in the FAC to be integral components. While operating systems are mentioned as part of a smartphone "amalgamation," App stores – digital software distributors – are not mentioned and apparently forfeited by Apple. | AAB 43 |
| **Procompetitive (#5)** | Waived | NA |

In all, the Answering Brief asks the Court to reject a Sherman Act *per se* tying cause of action on the erroneous basis Appellants are not competitors of Apple, that

tied products aren't distinct (asserting notary stamps and application loaders, but forfeiting the App Store), and that the iPhone is platform software, rather than hardware. We dissect each of these arguments for the convenience of the Court.

Appellants compete with Apple and have standing to bring this tying claim. Apple incorrect asserts "the Entities claim standing as competitors because they 'could open their own app stores,' but there is no allegation they would do so." [1] Ignored is the fact Appellants "have effectively their own app store that would be trivial to launch on their website, but for Apple's EULA." (FAC ¶ 218). The only reason Appellants cannot compete with Apple is because the monopoly prevents them from doing so. Developers' inability to compete with Apple is not a plausible defense to the Sherman Act – it is the crux of the claim. In any event, it is clear Apple's COVID-19 app competes with *Coronavirus Reporter*, as do Appellants other apps.

"Nearly every computer platform in history, with the exception of iOS, permitted direct purchase of software from independent developers. There is no legitimate reason for Apple to exclude rivals." 4-ER-732. Apple never refuted this historical argument, and common sense dictates that software distribution stores –

---

[1] Apple may be referencing *Epic's* surreptitious launch of a competing app store. Appellants position is that "effectively having" a competing app store, but being prevented from launching it, grants standing. We should not need to surreptitiously launch a store to obtain standing.

including the App Store – are, past and present, distinct products from smartphone computers.

Indeed, the iPhone didn't even have an App Store for over a year after launch. *Cydia*, now proceeding with their own Ninth Circuit appeal, is widely considered "the app store before the App Store." Apple verified this during deposition in the *Epic* lawsuit:

> "The technology design of the iPhone, which was released a year prior to the App Store." (Apple Proposed Findings of Fact #530, Evans Deposition)

To comply with FRCP Rule 11 pleading integrity requirements, Apple avoided actually falsely stating app stores are a requisite part of the smartphone. Instead, they relied upon disingenuous verbiage that the FAC "confirms" the products aren't distinct.

With an abandoned argument that the smartphone and app store comprise one single product, and a failed argument that developers lack standing – squarely contradicting their representation to the Supreme Court in *Pepper ('developers have standing, not consumers')* – Apple clings to *Microsoft*, ironically enough, to convince this Court not to apply a *per se* standard.

Such reliance on Microsoft must also fail. The Opening Brief quotes the *Microsoft* court as saying "we have no present basis for finding the *per se* rule inapplicable to software markets generally." *Datagate, Inc. v. Hewlett-Packard Co.,*

as the *Microsoft* court points out, exemplifies "most tying cases in the computer industry involve bundling with hardware." The Opening Brief, with *Microsoft* in proper context, explained how in *Epic*, Apple argued the Sherman market for operating systems was "entirely litigation driven" and not based on economic reality, and that the proper market is the smartphone device itself.

Apple's Answering Brief is simply silent with regards to *Microsoft* analysis in the Opening Briefs. The reason for this silence can be found in Apple's *Proposed Findings of Fact*. Citing the *Tim Cook Deposition* and aforementioned *Evans Deposition*, Apple unequivocally states:

> "There is no foremarket for 'smartphone operating systems' in which Apple competes because Apple does not sell 'smartphone operating systems. Evans TT. Apple designs, manufactures and markets mobile communication and media devices and personal computers… In other words, Apple sells devices, which are fully integrated and include operating system and App Store (Cook TT; Schiller TT)." (CAND 20-cv5640-YGR Dkt.410 #393).

When a Reply Brief presents an underdeveloped argument, the point is forfeited. (*Retlaw*, 53 F.3d at 1005 n.1.) Apple's position in *Epic* is simply incompatible with and precludes invocation of *Microsoft* in the present instance. Apple's non-existent Answering Brief discussion of *Microsoft* is a forfeiture upon which this entire case should turn. Not only could this Court take judicial notice of the *Epic* deposition – Appellants implore the Court to judicially estop (see *infra*) such inconsistent tactics meant to evade felony antitrust statutes. Apple fails to

provide any meaningful response to the Opening Brief's assertion that tying of smartphone hardware to software app stores is subject to *per se* analysis. Neither is the iPhone device a software platform nor is the App Store a novel business practice. Proceeding with *per se* liability is in the public interest, as evident from the *Epic* appeal.[2]

The Appellee-Defendant is judicially estopped from arguing that it sells platform software operating systems, under the doctrine included in the Opening Briefs (IOB at 18). Defendant's position is clearly inconsistent with a prior position, from which the party gained a benefit in the different proceeding. Acceptance of the inconsistent position would yield a perception of bias, an unfair advantage flows to Apple Inc if not estopped, and the inconsistency was not a mistake or inadvertence.

Opposing Counsel employs pleading skill to suggest that Appellants' own FAC argues Apple sells operating systems, rather than physical devices. Shrewd pleading does not immunize them from the fact they now take a contradictory position against their own CEO's unambiguous testimony that Apple sells devices.

---

[2] During the Ninth Circuit's November 14, 2022 hearing, it was remarked that a retrial on any rule of reason determination could result in several more years of litigation. Hence, we have seen what a rule of reason analysis means for Apple – an *ad infinitum* opportunity to delay antitrust enforcement. As explained by Loyola Law Review, Apple's tying goes far beyond IAP litigated in *Epic*. Our case presents a timely, efficient enforcement of Sherman Act reinforced by multiple academic and government studies.

In any event, no reasonable interpretation of the FAC supports such claim. The LG and Samsung substitutes mentioned in the FAC simply do not sell operating systems. Even applying *Microsoft's* holding *arguendo*, the software application distribution store, hardly a novel business practice, would not qualify under *Qualcomm*.

### Sufficient Evidence is on Record for a Preliminary Injunction

All necessary evidence has been identified to issue a preliminary injunction. The Motion for Preliminary Injunction noticed that live testimony would accompany the pleading. Dr. Roberts intended to testify on behalf of *Coronavirus Reporter* on November 4, 2021 – the consolidated hearing date. Apple's senior computer scientist who developed the App store, Mr. Eddy Cue, was issued a valid *subpoena ad testificandum*. Gibson Dunn filed a Motion to Quash the subpoena just two days before the hearing – well after the deadline. Apple refused to bring Mr. Cue to the hearing, apparently in contempt as the District Court hadn't ruled on the MTQ before the hearing. Opposing Counsel Mark Perry argued that the *subpoena* constituted "sanctionable early discovery." (FER-7).

Dr. Roberts volunteered to testify about the institutional support he provided *Coronavirus Reporter* from the University of Arizona. Apple's market share of the US Smartphone and app markets, 65% by volume and 80% by profits, would be confirmed by their representative. Mr. Cue was identified as the expert on key disputed facts: the "separate and distinct" nature of operating systems and App

Stores. Apple's MTQ opposed the hearing under *apex doctrine* and because the evidence requested was already public record after *Epic*.

While it is unfortunate that District Court discretion never permitted live testimony, ample evidence nonetheless exists to issue an injunction. The only elemental requirements Apple disputed are the separate and distinct product nature of the App Store and the smartphone. As discussed, there exists no ambiguity in Mr. Cook's deposition that Apple sells devices, distinct from both iOS and the App Store. Apple's refusal to participate in live testimony was improper, but ultimately, their argument that *Epic* provided the necessary evidence does appear correct in hindsight.

### Section 1 Market Analysis Requirements Are Satisfied

Apple cited *Hicks v. PGA Tour, Inc.* as a primary authority in their MTD and now, their Answering Brief. *Hicks*, in turn, cites *Newcal* – another authority Apple cites frequently:

> "Plaintiffs must plead a relevant market to state an antitrust claim under the Sherman Act, unless they assert a *per se* claim." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038,1044–45 (9th Cir. 2008).

Now, the Answering Brief wishes to backtrack and introduces *Ill. Tool Works, Inc. v. Indep. Ink, Inc*., 547 U.S. 28, 35–46 (2006) as their authority of choice on relevant markets. That case was never raised before, and the Answering Brief seems to reference the following language:

"This Court concludes that tying arrangements involving patented products should be evaluated under the standards of cases like *Fortner II* and *Jefferson Parish* rather than the *per se* rule in *Morton Salt* and *Loew*'s. Any conclusion that an arrangement is unlawful must be supported by proof of power in the relevant market rather than by a mere presumption thereof."

For certain patented products, Apple's new authority invokes the "modified *per se* rule" of *Jefferson Parish*, which includes proof of market power. It does not prescribe the rule of reason. While the iPhone and App Store certainly implement proprietary intellectual property, substitute smartphones and app distributors do not need Apple's IP. Hence, smartphones and app stores are not "patented products" within the scope of *Ill. Tool Works.*

In any event, the FAC adequately defines the relevant market with respect to all reasonable substitute smartphones (Samsung, LG, Microsoft) and app stores (Google Play, App Store, Cydia, brick and mortar historically). Even applying the "modified *per se*" rule for market power, the monopolist's most recent press releases assert 65% market share in the US smartphone market.

Regardless, "a plaintiff has less responsibility to analyze the market where the restraint is deemed *per se* anticompetitive. (*National Soc. of Professional Engineers v. U.S.*, 435 U.S. (1878); *In re Insurance Brokerage Antitrust Litigation*, 618 F 3d 300 (2010); or *In re Southeastern Milk Antitrust Litigation*, 739 F.3d 262 (2014).

"EOB at 9). Apple has not refuted this in their Answering Brief. The FAC preserved

this argument, contrary to Apple's suggestion (AAB at 16):

> "Apple has thus engaged in a *per se* illegal tying arrangement and the Court does not need to engage in a detailed [market] assessment of the anti-competitive effects of Apple's conduct or its purported justifications." (FAC p. 224).

**B.    Appellants Have Sufficiently Pled Violations of Sherman Act § 2. Relevant Market Definitions, Not Entirely Mandatory Under DOJ Guidance, Have Been Pleaded via Disclosure of All Actual Economic Substitutes**

Apple hoped to bury their conduct by employing esoteric antitrust market

terminology with little actual analysis. The Answering Brief presents intentionally

vague critique of the FAC relevant product markets. Cross-elasticity and

'interchangeable transactions,' in particular, are nonsensically scattered throughout

the brief and its underlying dispositive motion, in an overall strategy to stir

confusion.

A year ago, opposing counsel refused to Meet & Confer after our request for

further clarification of the purported deficiencies in the market definitions. In light

of this, a Motion to Strike was filed that asserted the MTD itself contained threadbare

recital pleading deficiencies under *Iqbal*. To break it down, by example, we examine

Apple's "cross-elasticity" terminology scattered throughout most of the Answering

Brief and MTD.

As background, we include Apple's summary of market definitions requirements pled in *Epic (Apple Proposed Findings of Fact,* p. 148)*:*

> The relevant *product* market "must encompass the product at issue as well as all economic substitutes for the product." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008); *see also* 5C Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 530c (4th ed. 2020 supp) ("To define a market is to identify those producers providing customers of a defendant firm (or firms) with alternative sources for the defendant's product or service."). "Economic substitutes have a 'reasonable interchangeability of use' or sufficient 'cross-elasticity of demand' with the relevant product." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018) (quoting *Newcal*, 513 F.3d at 1045).

> For products to be economic substitutes, they must be "reasonably interchangeable by consumers for the same purpose." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956).

These market definitions, reasonable enough, are nearly identical to the citations found in Plaintiffs-Appellants two Opening Briefs. In layman's terms these guidelines state that a relevant Sherman Act product market is defined by all reasonable substitutes, and the substitutes themselves are identified through the economic principal of cross-elasticity and interchangeability. That means, roughly, that raising the price of one competitor in the market will cause consumers to purchase another competitor's similar, alternative, offering, making them 'product substitutes.'

In their Motion to Dismiss, Gibson Dunn didn't include the above, reasonably coherent market definition. Instead, they scrambled case law quotations out of any

meaningful context, and embarked on an offensive where, page upon page, they allege *fifteen* purported relevant markets lack "elasticity of demand" or "interchangeability":

> "as a result, it remains unclear who the participants are in the recited markets, what universe of products or services they include, and why they are (or are not) interchangeable." (MTD p.9).

But the MTD never even defines *what* cross-elasticity refers to, briefly mentioning the "universe" of markets "must look at all relevant sources of supply." (MTD at 7). Any mention of "substitute products" was critically omitted. As best as one can tell, the only contextual analysis the MTD placed on cross-elasticity was to the whole supply itself – not the substitutes. Cross-elasticity is meaningless when applied to an entire supply, rather than a specific product substitute, and hence the MTD must fail under *Iqbal*.[3]

Why Gibson Dunn chose to omit *any* use of the word "substitute" in a Motion to Dismiss entirely centered on relevant market definition becomes clear. Rather

---

[3] The Opening Briefs quoted a Big Law publication that *Hicks* applies to artificially narrow product markets (IOB 19-22). Apple now states *Hicks* applies to "overinclusive or underinclusive" definitions equally, citing *Golden Gate Pharm. Servs. v. Pfizer Inc*. This concept was not preserved in the court below. More importantly, it concedes that the MTD does not specify whether the FAC product markets were underinclusive or overinclusive. That is a clear failure pursuant to *Iqbal*.

than addressing the merits of the case, Apple and opposing counsel chose a litigation strategy meant to overwhelm Plaintiffs and counsel, and the general public[4], who are not career antitrust attorneys. Appellants were never properly placed on notice of any market definition deficiency, and the Motion to Strike should have been granted.

**All product substitutes have been reasonably pled.**

The Opening Briefs submit to the Court that the FAC properly pled Sherman relevant markets. Nothing in the Answering Brief defeats this, and in fact, Apple has forfeited the entire argument on the simplest of terms.

As stated in the Opening Briefs, the

"Sherman markets invoked in the FAC describe *all* reasonably interchangeable substitutes… First, of course, it mentions the overarching US Smartphone market – mentioning all reasonably interchangeable substitutes including Samsung, LG, and Motorola, and even past substitutes such as Windows Phone and Blackberry. (IOB at 9) Likewise, the market for userbase access subscriptions mentioned both the $99 Apple Developer program, and the Android Developer Program as "nearest competitor at $29" (IOB at 23)… It encompasses all free smartphone apps, a vast market of substitutable products. The app market includes co-Plaintiffs' five distinct apps, all within different app categories. (IOB p.19).

---

[4] Press coverage of the matter perpetuated the MTD inaccuracies https://www.jdsupra.com/legalnews/market-definition-is-front-and-center-1044464/. Sherman Act should not be unduly narrowed through legal error, per *DOJ Amicus*.

Likewise, the Motion to Strike defines all software distribution competitors to the app store – even Brick and Mortar competitors that no longer exist:

> "The App Store, despite its immense size, is 'just one store.' Google Play, brick and mortar, and developers own websites all represent alternative stores."

Apple's Answering Brief is *silent* on the Opening Briefs' assertion that all substitutes have been defined. By Apple's own market definition authority, the Plaintiffs-Appellants have met the burden:

---

> "To define a market is to identify those producers providing customers of a defendant firm (or firms) with alternative sources for the defendant's product or service."

---

The FAC defines a market by identifying all producers providing alternative sources. App marketplaces are defined as iPhone App Store (80%), Android Play Store (20%), and even obsolete Blackberry and Microsoft Phone app marketplaces are identified. (FAC p.9).

Apple's Answering Brief dramatically forfeits the matter, and this Court can finally put to rest the relevant market dispute, which has caused substantial loss of time and resources to the District Court, the parties, and the general public. Nowhere in the Answering Brief is any rebuttal advanced for the Opening Brief discussion on specification of product market substitutes.

Furthermore, the Opening Briefs posited that the concept of price-elasticity does not apply to free apps, as there is no elasticity of a zero priced good. (IOB at 4, 21) Similarly, the Opening Briefs maintain "Apple never directly refuted that free apps qualify as commerce under the Sherman Act." (IOB at 4). Neither of these points were addressed in the Answering Brief. The arguments are forfeited completely by Apple; this Court need not engage any more resources in relevant market definitions that are entirely premature for a 12(b)(6) dismissal and inapplicable to *per se* liability.

### Apple's "Tiresome" Relevant Market Defense

Apple might believe that the more confusing they can make this case, the more likely they are to escape Sherman Act enforcement. Take their repeated efforts, again now raised in the Answering Brief, to convince the Court that *all app* markets must be *transactional:*

> *"*The App Store is a two-sided platform facilitating 'transactions between developers and consumers.' ER30. As a matter of law, the relevant market therefore must be some category of 'transactions' between developers and consumers." *Amex, 138 S. Ct. at 2280.*

A Ninth Circuit judge remarked during the *Epic* oral argument that *Amex* is perhaps the "most confusing" antitrust case in recent history. Hence it is hardly surprising Apple wishes to infiltrate this case with *Amex* terminology. Apple's brief basically ignored the five explanations Appellants have written to clarify the matter. (*See generally*, Motion to Strike, Motion for Reconsideration, Oral Argument

19

Transcript, EOB, IOB). Without belaboring the matter again, Appellants have endeavored to explain that like competing book publishers, there is an upstream supply of creative works (books or apps), a downstream retail market of consumer demand, and while some publisher-distributors may have a one-to-one "transactional nature," the markets themselves do not need be restricted to "transactions." The DOJ Amicus guidance puts this succinctly:

> *"Even in the special case when the defendant operates a transaction platform, the relevant market may well be less than the full platform."* (Amicus p.36)

Or consider Apple's incompatible statements on the US Smartphone Market. A year ago, Apple conceded that the FAC US Smartphone Market does not include tablets. But in their Answering Brief, Apple now takes the opposite position:

> "*Plaintiffs appear to limit the tying product market to smartphone devices, yet tablets are also 'portable electronic devices that allow users to perform myriad communications and computing functions.*'" ER 0465.

> "*The Entities now assert a foremarket for 'smartphones,' EOB 25, even though the Complaint includes tablets as well.*" AAB p.22.

Appropriately remarked to the court below that the "arguments are increasingly tiresome – take for example their assertion that no 'US smartphone market' exists because a 'tablet' could be in this market, despite Plaintiff specifically excluding 'feature phones, tablets" and other non-smartphone devices.'" (FER-3).

20

Similar arguments abound in the Answering Brief. Consider the smartphone userbase access market, described in the Opening Briefs:

> "the market for userbase access subscriptions mentioned both the $99 Apple Developer program, and the Android Developer Program as 'nearest competitor at [$29]' (FAC 140)." (IOB p.23).

The FAC identifies an Android substitute (FAC ¶ 238), and asserts the userbase market is for access to the users of US smartphone device and app markets (FAC ¶234). Despite the fact userbase access is pleaded to include multiple brands, Apple completely ignores the "US smartphone" and "smartphone app" markets, and spends a large portion of their Answering Brief arguing that userbase access is a disfavored single-brand market. Apple's brief argues that Appellants have waived appeal on the single-brand issue. Neither is true. While not exactly forfeiture, Apple simply ignores the non-single brand Android userbase product, the single-brand userbase as a straw-man. Furthermore, Appellants have not waived the possibility of a single-brand determination; our position has been and remains that a trial ultimately determines the contours of the market, single brand or otherwise, and that a 12(b)(6) motion was entirely premature to rule on the matter. Apple has forfeited that price cross-elasticity does not apply to zero-priced goods. Likewise, they have never refuted that Sherman text applies to zero-priced commercial products.[5] *Brown*

---

[5] Zero-priced apps such as Coronavirus Reporter directly facilitate commerce through joint ventures, advertising partnerships, etc, and thus are protected under Sherman Act for conduct restraining interstate trade.

*Shoe* is simply inapplicable to zero-priced digital goods. A trial based on a strict literal interpretation of Sherman is necessary to potentially forge much needed overhaul on digital goods.

### *Aspen, MCI* Exclusionary Conduct Are Alleged, Rather than *Blue Cross* Common Carrier.

Citing *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1413 (7th Cir. 1995), the Answering Brief incorrectly claims Appellants' antitrust allegations

> "would, through litigation, remake the App Store into a 'common carrier' obligated to distribute every app from every developer. But 'the antitrust laws are not a price-control statute or a public-utility or common carrier rate-regulation statute.'" AAB p.15.

To clarify, Appellants' FAC does not seek any redress under rate regulation statutory law. Nor would Apple have to distribute anything – let alone every app from every developer – if they didn't bottleneck the app publishing industry by blocking competing app distributors and sideloading.  In other words, Apple is asked to allow people to use the phones they purchased, like a TV manufacturer allows consumers to watch any program. The US Copyright Office (see, *infra*) understood this concept a decade ago.

Appellants invoke the MCI Test for essential facilities (EOB p. 35). Similarly, Appellants cite the *Aspen* precedent as "Duplicating the entire iPhone userbase is

22

about as feasible as recreating a mountain — in reference to binding caselaw from *Aspen Skiing Co* (472 U.S. 585, 1985)." (FAC ¶ 188).  As Justice Thomas stated:

> "the solution to the unprecedented issues presented by the tech platforms could lie "in doctrines that limit the right of a private company to exclude." "A person always could choose to avoid the toll bridge or train and instead swim the Charles River or hike the Oregon Trail," he wrote. "But in assessing whether a company exercises substantial market power, what matters is whether the alternatives are comparable. For many of today's digital platforms, nothing is." (2-ER-150).

Apple's use of *Blue Cross* is consistent with their strategy to unnecessarily complicate the actual litigation. The FAC used the terminology to explain that, like ubiquitous common carrier telephones and televisions, the iPhone "is the property of the users, the general public, and should exist as a 'common carrier' free from Apple's control."

This idea has been longstanding. Dating back to June 11, 2010, the United States Copyright Office recognized the right of iPhone users to utilize their property free from Apple's control:

> "the activity of an iPhone owner who modifies his or her iPhone's firmware/operating system in order to make it interoperable with an application that Apple has not approved, but that the iPhone owner wishes to run on the iPhone, fits comfortably within the four corners of fair use."

**DOJ Position on Marketplace as a Tool**

23

Both Opening Briefs included guidance from the DOJ that relevant markets – an important tool – are not critical to every antitrust case, and do not exhaust other ways to prove competitive harm. (EOB p. 32). Notably, the DOJ issued guidance on Sherman Act applicability to free digital goods (IOB p. 21). As best as Appellants are aware, this litigation is the only Apple case currently pending with an emphasis on free apps. It is significant that the DOJ invested time and resources to, in their words, to "ensure that the Sherman Act is not unduly narrowed through legal error" with regards to Sherman market definitions – for free or non-zero priced digital goods.

Within one day of the DOJ issuing guidance, Appellants asked the court below to take judicial notice.   Apple's Answering Brief, notably, does not contest any of the DOJ guidance. Avoiding attention to the matter, their Answering Brief doesn't even mention it by name or reference. Apple merely wrote "Appellants never opposed dismissal on these bases, forfeiting any such argument." (AAB p. 16) In the interest of judicial economy, judicial notice of the DOJ's efforts would have been most appropriate. Nonetheless, the District Judge commented on the guidance and dismissed its relevance, making it ripe for *de novo* appeal.  It is not as if Appellants raised these arguments after a jury or bench trial. This is a *highly disfavored* 12(b)(6) disposition. The DOJ guidance is timely and relevant.

**Censorship is Vast Antitrust Injury**

24

Apple's only rebuttal to the potential loss of lives from blocking *all* COVID startups is a cryptic footnote invoking *Iqbal*[6]. AAB p.35. The FAC states that "blocking all startups from assisting with COVID app development likely cost lives." (FAC ¶ 65). The Opening Brief declares "even if damage to competition was limited to COVID startups— it cost lives... This itself *is* widespread damage." (EOB p.7). The FAC details Dr. Roberts' interview with CNBC on the matter, and the two-year delays with Apple's own COVID app.

Apple's Answering Brief fails to acknowledge antitrust injury which is teeming throughout international government publications, press coverage and the FAC. The thrust of their response is that "plead[ing] injury to [one]self" does not lead to the "conclusion that competition has been harmed… The Entities cannot wring marketwide harm from their personal grievances." (AAB p. 34). But Apple forfeits the Opening Brief assertion that as a class action, the FAC covers losses to "Plaintiffs' five apps, and the class members' apps, representing "improper rejections [uncovered by] the Congressional Subcommittee Report." (EOB p. 15).

---

[6] The Opening Briefs concur with opposing counsel that *Iqbal* is the appropriate pleading standard. IOB at 11. None of this appeal relies upon the 'outdated' (AAB 2) *Twombly* threshold. Rather, Apple's own Motion to Dismiss fails at *either* threshold in that it doesn't even identify the element 'product substitutes' they belatedly now assert (AAB 18), let alone plead an *Iqbal* analysis of substitutes.

By definition, the conduct alleged in the FAC is not limited to several competitors, but reflects an entire class of plaintiffs, and hence, injury in the market at large.

Apple disputes the relevance of the Subcommittee Report, claiming:

"The Complaint and briefing below never linked any specific portion of that report to the theories advanced in this case… they can point to no spot in the record in which they identified information to support their theory of marketwide injury deriving from the conduct they challenged." (AAB at 38).

This is erroneous; the conduct described in the FAC is directly linked to the Subcommittee Report. The underlying class action is the *only* pending or attempted case seeking redress for nearly $1000 in improper taxes levied on each developer by Apple. The FAC accurately linked its Count VI developer fee cause of action to the report:

"The Congressional Subcommittee refers to this as an illegal tax that may have amounted to nearly $20billion over the last ten years. The Subcommittee states that the $99 fee is nowhere near Apple's actual cost to notarize and run the software platforms" (FAC ¶ 236).

"The third market is that for access rights to the smartphone enhanced internet userbase. Apple likewise charges developers $99 for these (partial, selectively limited) access rights. The nearest competitor charges $29 annually for rights, and offers a free bypass sideloading way for developers to reach their audience. This itself is indicative of anticompetitive restraint in the market, as pointed out by the Subcommittee." (FAC ¶ 140)

Far from "conclusory, threadbare recitals," the FAC identifies an issue thoroughly researched by Congress and pleads a cause of action to seek redress for an entire class of developers. The amount of damages from the illegal tax – a figure

cited in the Report – approaches $20 billion. The FAC even links the tax issue to a reduction in apps marketwide:

> "Not only are Apple's fees an illegal tax of nearly $1000 to each of these developers over their career, but they heavily impede interstate commerce. A developer who does not pay this tax, perhaps because they cannot afford it, will not produce apps. App output is restricted unless one assumes that 100% of developers can afford to pay this tax without consequence to their productivity. Clearly such an assumption is not reasonable. (FAC ¶ 239).

The damage to the economy for censored apps dwarfs the Subcommittee estimate of tax damages. As the FAC points out, if Apple wrongly censored just *one* Top 100 app, it is evident Apple's conduct caused substantial antitrust damage to the economy. Moreover, qualitative censorship damages extending beyond the developer fee are also properly linked in the FAC to the Subcommittee:

> "The Subcommittee findings re Apple's anti-competitive behavior, approximately ten pages in Exhibit A, are hereby asserted by Plaintiffs and class members as if fully pleaded herein. (FAC at 45). Described is Apple's history of "closely monitoring the success of apps in the App Store, only to copy the most successful." Apple "takes other companies innovative features," which was the case with Coronavirus Reporter and Facetime 15/WebCaller. In sum, Plaintiffs and class members have experienced such anti-competitive behavior as described in the report." (FAC ¶ 41).

In sum, Apple's conduct described in the FAC, including self-preferencing, Sherlocking, and an illegal tax on developers, is *directly* linked to the Report for each allegation. Apple's Answering Brief actually highlights the propriety of FAC's allegations.

Most outrageously, Apple asserts "Censorship Harm Is Not Antitrust Injury" in their Ninth Circuit briefing (AAB at 34). The monopoly – the largest ever – rationalizes their doctrine by once again shifting to *Amex* transactions. (AAB p.37). They then make the "comply for your own good" argument every censoring body in history has made in one form or another: "Apple's enforcement of its Guidelines produces a store with higher quality apps that are more attractive to consumers." If their store is superior, why block competitors? If that sounds un-American, consider that various recent media sources peg China's ownership of the iPhone value chain, by component value, between 25% and 40%.[7] Hence the Apple monopoly is truly a multi-national empire, already prompting the European Union to protect its citizens with Digital Markets Act going into force next year to permit alternative app stores[8].

Appellants are confident the general public would take offense at the declaration "Censorship Harm Is Not Antitrust Injury." Censorship – an injury to society – is certainly an antitrust injury when it economically harms competitors and consumers. Once again, the record shows Apple has previously taken a different position. In 1984, a more modest Apple promised the world that Macintosh – the software from which iOS is derived – "won't be like" Orwellian Big Tech:

---

[7] https://www.nytimes.com/2022/09/06/technology/china-apple-iphone.html

[8] https://www.wired.com/story/europe-dma-prepares-to-rewrite-the-rules-of-the-internet



Image: Apple 1984 commercial captioned
("On January 24th, Apple Computer will introduce Macintosh.
And you'll see why 1984 won't be like '1984'")



Image: Dystopian Big Brother assembly with respiratory-masked population;
Macintosh logo wearing protagonist appears.

29

**CONCLUSION**

The public interest in issuing the preliminary injunction could not be greater. Apple, a multi-national empire that controls nearly 80% of internet software, is the largest monopoly in history. The "Executive Order on Promoting Competition in the American Economy" signed into law by President Biden last year specifically tasks the federal government to address "unfair competition in major internet marketplaces." The DOJ, closely monitoring pending Apple antitrust litigation, has asked the Ninth Circuit to "ensure that the Sherman Act is not unduly narrowed through legal error." A Congressional Subcommittee was tasked to investigate the same anticompetitive conduct alleged in this lawsuit, including Apple's illegal $99 developer tax, Sherlocking, and self-preferencing. The Subcommittee warned

*"courts have adopted the view that underenforcement of the antitrust laws is preferable to overenforcement, a position at odds with the clear legislative intent of the antitrust laws."*

A sweeping bill that would enact the strongest restrictions on Big Tech companies in the United States has been stalled in the Senate. Numerous sources assert overwhelming 73% popular support for two bipartisan bills that somehow

have not been brought to vote by Senate Majority Leader Chuck Schumer.[9] These bills, with regard to Apple, appear to be unnecessary if the Sherman Act is properly enforced.

This Court should view with particular concern United States Senator Klobuchar's complaint that the government lacks the legal resources to reign in Apple: "I have two lawyers. They have 2,800 lawyers and lobbyists. So I'm not naive about the David versus Goliath."[10]

Similarly, *Time* investigated Apple's massive lobbying efforts that derailed the bills: "It's a classic example of the corrupting influence of money in our political system." Ken Buck, lead sponsor of the House version, told TIME in September "Maybe Big Tech owns them. I have no idea… They pass legislation when they want to."[11]

In contrast, the European Union will be protecting its citizens from Apple's conduct beginning in 2023. In addition to competitive harm from Apple's conduct, America risks losing its leadership role in technology regulation if it fails to address its own antitrust laws.

---

[9] https://www.nytimes.com/2022/08/05/business/antitrust-bill-klobuchar.html

[10] https://www.vox.com/recode/2022/9/6/23332620/amy-klobuchar-antitrust-code-2022

[11] https://time.com/6235180/tech-antitrust-bills-white-house-congress

According to Forbes, "political clout won't have the same impact on the court system as it does on Congress, where the cases will be decided on legal merits. Without legislation to change the antitrust framework, the courts may not be keen on upending the traditional paradigm of analyzing corporate power that has benefitted Big Tech in the past. The real battles will be in the courts."[12]

The United States copyright office acknowledged the rights of iPhone users to run software of their choosing a decade ago. Unfortunately, since then, Apple has stalled further enforcement in the courts. *Pepper* is still in progress after an eight-year SCOTUS petition. *Epic*[13] may face complex 'failure of proof' retrials spanning many more years. *Cydia* – the first iOS app store – is pending appeal in this circuit with an unclear procedural future. *Coronavirus Reporter*, which would be at an early pre-discovery posture after appeal, invokes a straightforward tying claim, amongst others, to immediately redress Apple's conduct and illegal taxation that has taken a decade to regulate.

A long-overdue, landmark preliminary injunction needed to mitigate digital censorship was improperly denied by the lower court. For the foregoing reasons,

---

[12]https://www.forbes.com/sites/benkoltun/2022/11/25/big-tech-will-survive-but-not-thrive-in-washington-dc

[13]*Epic's* proposed redress for alternative iOS game stores would be rendered moot if Appellants' injunction issues for the App Store, generally.

the parties hereby request the Ninth Circuit reverse the Judgment and Order and issue the proposed preliminary injunction without delay.

Date: December 7, 2022              ASSOCIATED ATTORNEYS OF NEW ENGLAND

/s/ Keith Mathews

KEITH MATHEWS
1000 Elm Street #800
Manchester, NH 03101
(603) 622-8100
*Attorneys for Appellants*
*Coronavirus Reporter, Calid Inc.,*
*Primary Productions LLC*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 22-15166 & 22-15167

I am the attorney or self-represented party.

**This brief contains 6990 words,** including  17  words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature**   /s/ Keith Mathews        **Date** 12/7/2022