# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

555 Mission Street
San Francisco, CA 94105-0921
Tel 415.393.8200
www.gibsondunn.com

Julian W. Kleinbrodt
Direct: +1 415.393.8382
Fax: +1 415.374.8470
JKleinbrodt@gibsondunn.com

December 16, 2022

**VIA ECF**

Molly Dwyer, Clerk of Court
Office of the Clerk
U.S. Court of Appeals for the Ninth Circuit
P.O. Box 193939
San Francisco, CA 94119-3939

Re:   *Coronavirus Reporter v. Apple Inc.*, Case Nos. 22-15166 & 22-15167

Dear Ms. Dwyer:

I write under Rule 28(j) regarding *Dreamstime.com, LLC v. Google LLC*, No. 20-16472 (9th Cir. Dec. 6, 2022) (Attachment A). In *Dreamstime.com*, this Court affirmed dismissal of antitrust claims asserting that Google had manipulated its online search algorithm to suppress the plaintiff in online search results. Slip Op. at 1–6. The decision addresses two points relevant to this appeal, both supporting affirmance.

First, the Court rejected the argument—advanced by Appellants here—that allegedly "demoting [a plaintiff's] organic search results" and "elevating inferior" results constitutes antitrust injury. *Compare* Slip Op. at 19–20 *with* Opening Br. (Dkt. 17) 16–17 & Reply Br. (Dkt. 52) 24–28 (arguing that "ranking suppression" of Appellants' apps in App Store search results "evidenced antitrust injury"). As the Court explained, one competitor's "diminished performance in . . . search results" does not harm competition *marketwide* as required. Slip Op. at 20–21; *see also* Answering Br. (Dkt. 38) 39–40 (citing the now-affirmed order in *Dreamstime.com*). That is true even where a platform allegedly "preferenc[ed]" results from its own partners, "selectively enforc[ed] the [platform] rules," "suspend[ed] [the plaintiff's] mobile application," and "misappropriat[ed]" the plaintiff's intellectual property. Slip Op. at 17, 20–21; *see also* Opening Br. 16–17 (advancing similar arguments). *Dreamstime.com*'s reasoning parallels that of the district court here, ER31–36, and underscores the absence of alleged antitrust injury in this case.

Second, the Court held that a district court properly denies leave to amend where a plaintiff "failed to add the requisite particularity to its claims" despite multiple opportunities to amend. Slip Op. at 23–24 (quotation omitted). In *Dreamstime.com*, fatal pleading defects including the "definition of the relevant market" had been raised "from the outset," and the plaintiff "repeatedly . . . declined" to rectify deficiencies despite "several opportunities" to do so. *Id.* at 24. Here, similar defects (and more) were identified in seven different Rule 12 motions before dismissal, making any further amendment futile. Answering Br. 56–57.

# GIBSON DUNN

Molly Dwyer, Clerk of Court
U.S. Court of Appeals for the Ninth Circuit
December 16, 2022
Page 2


The Court's decision in *Dreamstime.com* confirms the Court should affirm the order below dismissing the complaint with prejudice.

Sincerely,

/s/ *Julian W. Kleinbrodt*

Julian W. Kleinbrodt

# ATTACHMENT A

**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

<table>
<tr><td>

DREAMSTIME.COM, LLC,

              Plaintiff-Appellant,

v.

GOOGLE LLC,

              Defendant-Appellee.

</td><td>

No.    20-16472

D.C. No. 3:18-cv-01910-WHA

OPINION

</td></tr>
</table>

**FILED**

DEC 6 2022

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

Appeal from the United States District Court
for the Northern District of California
William Alsup, District Judge, Presiding

Argued and Submitted February 16, 2022
San Francisco, California

Before: Ronald M. Gould and Johnnie B. Rawlinson, Circuit Judges, and Jennifer G. Zipps,[*] District Judge.

Opinion by Judge Gould

---

[*] The Honorable Jennifer G. Zipps, United States District Judge for the District of Arizona, sitting by designation.

# SUMMARY**

## Antitrust

The panel affirmed the district court's dismissal of an antitrust claim brought by Dreamstime.com, LLC, an online supplier of stock images, against Google LLC.

Dreamstime alleged that Google violated § 2 of the Sherman Act by maintaining a monopoly in the online search advertising market. Dreamstime asserted that Google furthered this monopoly by impeding Dreamstime's use of Google's paid advertising services as well as harming Dreamstime's performance on Google's free search engine. The district court dismissed on the ground that Dreamstime did not sufficiently allege anticompetitive conduct in the relevant market of online search advertising.

A § 2 claim includes two elements: (1) the defendant has monopoly power in the relevant market, and (2) the defendant has willfully acquired or maintained monopoly power in that market. To meet the first element, a plaintiff generally must (1) define the relevant market, (2) establish that the defendant possesses market share in that market sufficient to constitute monopoly power, and (3) show that there are significant barriers to entering that market. The second element requires that the defendant engaged in willful acts to acquire or maintain a monopoly in the relevant market. This element requires a showing that a defendant possessing monopoly power undertook anticompetitive conduct and did so with an intent to control process or exclude competition in the relevant market.

The panel held that the record did not support Dreamstime's contention that it defined the relevant market to include the online, organic search market (in addition to the online search advertising market). Rather, by its course of conduct before the district court, Dreamstime waived any § 2 claim arising from the online search market.

The panel affirmed the district court's conclusion that Dreamstime failed to allege anticompetitive conduct in the online search advertising market. The panel

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

held that, as to Dreamstime's allegations that Google mistreated Dreamstime as a Google customer, Dreamstime did not show that this mistreatment harmed competition in the online search advertising market, and so there was no antitrust injury. Allegations related to Dreamstime's performance in Google's unpaid, organic search results did not plausibly state a claim for anticompetitive conduct in the online search advertising market. Dreamstime's allegation that Google unlawfully captured data from users and advertisers also did not state anticompetitive behavior.

Finally, the panel held that the district court properly dismissed Dreamstime's § 2 claim with prejudice and without leave to amend.

The panel addressed additional issues in a separate memorandum disposition filed simultaneously with this opinion.

---

## COUNSEL

---

Jaime W. Marquart (argued), Donald R. Pepperman, and Brian T. Grace, Waymaker LLP, Los Angeles, California; James Bailey, Bailey Duquette PC, New York, New York; Jason A. Fischer, Bryn & Associates PA, Miami, Florida; for Plaintiff-Appellant.

Jonathan M. Jacobson (argued) and Brian M. Wilen, Wilson Sonsini Goodrich & Rosati, New York, New York; Lauren Gallo White (argued) and Paul N. Harold, Wilson Sonsini Goodrich & Rosati, San Francisco, California; Kelly M. Knoll and Dylan J. Liddiard, Wilson Sonsini Goodrich & Rosati, Palo Alto, California; for Defendant-Appellee.

Sandeep Vaheesan, Open Markets Institute, Washington, D.C., for Amicus Curiae Open Markets Institute.

GOULD, Circuit Judge:

This appeal arises from an antitrust action brought by Dreamstime.com, LLC ("Dreamstime"), an online supplier of stock images, against Google LLC. In short, Dreamstime alleged that Google violated Section 2 of the Sherman Act by maintaining a monopoly in the online search advertising market. Dreamstime asserted that Google furthered this monopoly by impeding Dreamstime's use of Google's paid advertising services as well as harming Dreamstime's performance on Google's free search engine. The district court dismissed Dreamstime's Section 2 claim with prejudice. The district court reasoned that Dreamstime had not sufficiently alleged anticompetitive conduct in the relevant market of online search advertising. Dreamstime appeals, and we affirm.

## FACTUAL BACKGROUND

## I

Google operates the most used search engine in the world. Google's search engine connects users to websites based on the search query that a user enters into the search bar on Google. Google uses proprietary algorithms to interpret user search queries, cross-reference Google's index of webpages, and display a ranked list of webpages to users. Google's algorithms take into account, among other things, the page's relevance, usability, and age, as well as the user's past behavior and browser settings, to identify and rank relevant webpages. Google also operates

a search engine for images ("Google Images") that shows relevant pictures at the top of the search results. Google Images has become the largest image repository in the world. Google does not charge users for its search services.

Instead, Google's search services are monetized, in part, by advertising revenues. Google's online advertising service is called "Google Ads."[1] Google Ads charges companies to display their ads next to the search results generated by Google's search engines as well as on other websites. When displayed next to Google's search results, these advertisements are referred to as "sponsored" or "paid" search results. By contrast, the search results generated by Google's search engines—and displayed alongside these advertisements—are referred to as "organic" or "free" search results.

## II

Dreamstime, a supplier of online stock images, is based in Romania. Dreamstime offers a searchable repository of tens of millions of stock photos for purchase as well as millions of free images. Dreamstime, for its business model, relies heavily on user traffic directed to it from search engines like Google. About two-thirds of Dreamstime's customers come to its website from search results generated by such search engines.

---

[1] Google Ads was formerly known as "Google AdWords" and is, at times, referred to as such in the parties' briefing.

3

Dreamstime began advertising on Google in 2004. In doing so, Dreamstime agreed to the Google Ads Agreement, which is a prerequisite for companies to advertise on Google. Among other things, this contract expressly authorized Google to suspend or remove specific advertisements from its network, cancel advertising accounts, and otherwise enforce Google's advertising policies. The agreement made no guarantees about how Dreamstime's advertisements would perform in either sponsored or organic search results. In 2012, Google began offering Dreamstime a dedicated, European-based advertising support team. Throughout its first decade as a Google Ads customer, Dreamstime ranked in the top three organic search results for searches related to stock photography.

### III

In 2015, Google revised the algorithm powering its search engine. This revision altered the "salient terms signal," a part of Google's search algorithm that helps generate terms associated with a webpage so that Google's search engine can find and list webpages responsive to a user's search query. The salient terms revision gave more weight to "certain words based on how the webpage displayed them."

After Google revised its algorithm, Dreamstime's organic search ranking began to fall. Dreamstime alleges that this drop in search ranking caused its number of new customers to fall 30% by April 2016. During this time,

Dreamstime raised the issue of its declining organic search rankings to Google's advertising support team.

In response, Google's advertising support team recommended an external Search Engine Optimization (SEO) expert to help Dreamstime address its search rankings. The SEO expert concluded, in a free analysis sent to Dreamstime, that the reason behind Dreamstime's flagging search ranking was "the weak content of [its] site." Dreamstime then invested millions of dollars in an attempt to improve its search ranking. Despite these efforts, Dreamstime's organic search ranking on Google continued to decline. Dreamstime's organic search ranking on other search engines did not decline during this time.

The parties dispute whether the revision to Google's algorithm caused Dreamstime's organic search ranking to decline. Dreamstime contends that it did, but Google has denied this claim. Both sides point to experiments that Google conducted to test the algorithmic update. One experiment found the proposed algorithmic revision improved the overall customer experience using Google's search engine. A second side-by-side experiment compared salient terms generated for a sample of 2,300 websites before and after the proposed algorithmic change. One of the sample webpages in that experiment was a Dreamstime webpage, and it was rated as a "loss," meaning that the algorithm was worse at identifying that webpage's salient terms because of the change to the algorithm.

5

Dreamstime asserts that this result shows that Google's changed algorithm contributed to Dreamstime's organic search ranking decline.[2]  Google responds that the "loss" rating in the experiment only measured salient term recognition and did not translate to predicting a "loss" in organic search ranking.  Google highlights that many other webpages—including several of its own—received "loss" ratings.  Google points further to notes that accompanied the algorithmic revision launch stating that there was no "correlation between [the algorithmic revision] and any effect on ranking."

## PROCEDURAL BACKGROUND

Dreamstime sued Google in March 2018.  It asserted four claims: (1) violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, (2) breach of contract, (3) breach of the implied covenant of good faith and fair dealing, and (4) violations of California's Unfair Competition Law ("UCL").  Google moved to dismiss all claims.  After briefing and a hearing on Google's motion to dismiss, the district court permitted Dreamstime to file a First Amended Complaint ("FAC").  Dreamstime promptly did so.

Google again moved to dismiss.  After further briefing, another motion to dismiss, and an order seeking clarification from both parties, the district court

---

[2] Dreamstime also retained an expert in this litigation who opined that the algorithmic revision was the "most likely cause" for the rankings decline.

granted in part and denied in part Google's motion to dismiss.  The district court

dismissed with prejudice Dreamstime's Section 2 claim.  The district court

reasoned that Dreamstime had "not plausibly allege[d] harm to competition in the

relevant market" of online search advertising.  However, it initially allowed

Dreamstime's remaining claims asserting state law violations to proceed.  The

district court later dismissed Dreamstime's remaining state law claims in Rule 12

and summary judgment proceedings.

Dreamstime timely appeals the district court's dismissal of its Section 2

claim.[3]  We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## STANDARD OF REVIEW

We review *de novo* the district court's dismissal of a claim under Federal

Rule of Civil Procedure 12(b)(6) for failure to state a claim.  *Glen Holly Ent., Inc.

v. Tektronix, Inc.*, 352 F.3d 367, 368 (9th Cir. 2003).  To survive a motion to

dismiss, an antitrust complaint "need only allege sufficient facts from which the

court can discern the elements of an injury resulting from an act forbidden by the

antitrust laws."  *Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 950

(9th Cir. 1996) (citation omitted).  At the motion to dismiss stage, we must accept

---

[3] Dreamstime also appeals the district court's grant of summary judgment in favor of Google on its implied covenant and UCL claim.  We affirm that decision in a separate memorandum disposition filed simultaneously with this opinion.

all facts in Dreamstime's complaint as true. *See Wojciechowski v. Kohlberg Ventures, LLC*, 923 F.3d 685, 688 n.2 (9th Cir. 2019).

## DISCUSSION

Dreamstime argues on appeal that the district court erred in dismissing with prejudice its claim under Section 2 of the Sherman Act. Dreamstime asserts that the district court mischaracterized the relevant market for this claim as only the online search advertising market. Dreamstime insists that its Section 2 claim "defined the relevant market as *both* [the] search and search advertising" markets. Dreamstime contends further that the district court also erred in concluding that Dreamstime failed to allege anticompetitive conduct. Finally, and in any event, Dreamstime argues that the district erred in dismissing its Section 2 claim with prejudice and without leave to amend. For the reasons provided below, we disagree on all three points, and we affirm.

## I

Section 2 of the Sherman Act prohibits concerted and independent action that "monopolize[s] or attempt[s] to monopolize." 15 U.S.C. § 2. A Section 2 claim includes two elements: (1) the defendant has monopoly power in the relevant market, and (2) the defendant has willfully acquired or maintained monopoly

power in that market.[4] *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). Both elements are required. "The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system." *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).

In the context of a Section 2 claim, monopoly power means the power to "control prices or exclude competition." *Grinell*, 384 U.S. at 571 (citation omitted). We have recognized that market share is perhaps the "most important factor to consider" when determining whether a defendant has monopoly power. *Movie 1 & 2 v. United Artists Commc'ns*, 909 F.2d 1245, 1254 (9th Cir. 1990). To meet the first element of a Section 2 claim, a plaintiff generally must (1) define the relevant market, (2) establish that the defendant possesses market share in that market sufficient to constitute monopoly power,[5] and (3) show that there are significant barriers to entering that market. *See Image Tech.*, 125 F.3d at 1202.

The second element of a Section 2 claim requires that the defendant engaged in "willful" acts to acquire or maintain a monopoly in the relevant market.

---

[4] Section 2 plaintiffs must also establish standing. We need not address this issue because Google does not challenge Dreamstime's standing to bring its Section 2 claim.

[5] Generally, 65% market share is sufficient to establish that a defendant has monopoly power. *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997).

*Grinnell*, 384 U.S. at 570–71.  This element is referred to as the "'conduct' element."  *Image Tech.*, 125 F.3d at 1208.  This element requires a showing that a defendant possessing monopoly power undertook "anticompetitive conduct," *Trinko*, 540 U.S. at 407, and that the defendant did so with an "intent to control prices or exclude competition in the relevant market," *Cal. Comput. Prods., Inc. v. Int'l Bus. Machs. Corp.*, 613 F.2d 727, 736 (9th Cir. 1979).  Anticompetitive conduct consists of acts that "tend[] to impair the opportunities of rivals" and "do[] not further competition on the merits or do[] so in an unnecessarily restrictive way."  *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008).

The focus of this element is on conduct that harms "the competitive process" as a whole; it is "not on the success or failure of individual competitors."  *Id.* at 902.  We must "ensur[e] that [enforcing] the antitrust laws do[es] not punish economic behavior that benefits consumers and will not cause long-run injury to the competitive process."  *Id.* at 903.  Indeed, anticompetitive conduct does not include "growth or development" that occurs "as a consequence of a superior product, business acumen, or historic accident."  *Grinnell*, 384 U.S. at 571.  Likewise, Section 2 generally does not require firms that "acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers . . . to share the source of their advantage."  *Trinko*, 540 U.S. at 407.

10

Section 2 permits different theories of unlawful monopolization. For example, a "maintenance theory" alleges that the defendant by improper conduct maintained a monopoly in one market. *Image Tech*, 125 F.3d at 1208. By contrast, a "leveraging theory" alleges that the defendant used its monopoly in one market to gain (or attempt to gain) a monopoly in a second, downstream market, *id.*, as that is also willful anti-competitive conduct.[6]

## II

One important question on appeal lies at the threshold: Did Dreamstime define the relevant market for its Section 2 claim to include the online, organic search market (in addition to the online search advertising market)? Dreamstime maintains that it did, and that the district court erroneously focused solely on the online search advertising market as the sole relevant market. This issue is critical to evaluating Dreamstime's claim that the district court erred in concluding that Dreamstime did not allege anticompetitive conduct in the relevant market.

We hold that the record does not support Dreamstime's current contention that it included online search in its definition of the relevant market. To the contrary, the district court repeatedly offered Dreamstime the opportunity to define the relevant market as including the online search market, and, at every turn,

---

[6] We do not suggest that these two examples exhaust the categories of conduct that may support a monopolization claim.

Dreamstime expressly disavowed any intent to do so. By such a course of conduct, Dreamstime waived any Section 2 claim arising from the online search market.

## A

Questions and confusion surrounded the relevant market for Dreamstime's Section 2 claim from the outset of this action. In the first paragraph of its original complaint, Dreamstime defined the relevant market as the "*online search advertising*" market and alleged that Google was carrying out a strategy that "further entrench[ed] Google's monopoly of the relevant *online search advertising market*." Later, the complaint repeated that "the *online search advertising* market" was "the relevant antitrust market for purposes of this case."

This would seem clear enough. However, other sections of Dreamstime's original complaint muddied the waters. Other language in Dreamstime's original complaint appeared to hint at a second market—the online search market—for its Section 2 claim. Specifically, Dreamstime alleged as follows:

> Though the online search market and online search advertising markets are described separately for the sake of precision, and though the online search advertising market is the relevant antitrust market for purposes of this case, they are essentially one and the same, and Google's monopoly power exists in both. *In essence, Google is monetizing a monopoly position in online search by selling advertising on top of search results.*

The confusion was not lost on the district court, which endeavored to nail down the relevant market for Dreamstime's Section 2 claim. At the hearing on

12

Google's motion to dismiss the original complaint, the district court asked whether Dreamstime was asserting a one-market (*i.e.*, maintenance) theory arising out of the online search advertising market, or a two-market (*i.e.*, leveraging) claim arising out of markets beyond the online search advertising market (*e.g.*, the online search or stock image markets). Dreamstime responded expressly that it was "not alleging a two-market monopoly leveraging theory." Dreamstime further explained that its claim arose from its position as "a consumer of Google's AdWords services in the *search advertising market*." Dreamstime specified that it was "not claiming there is a downstream stock photo market that Google is trying to monopolize." Instead, Dreamstime assured the district court that it was asserting a "straightforward monopoly maintenance"—*i.e.*, one-market—claim. When the district court suggested that Dreamstime's best strategy could be to pursue a two-market leveraging claim that included the market for searching online images, Dreamstime expressly disavowed that it was pursuing such a theory.

After this hearing, the district court granted Dreamstime leave to amend its original complaint in response to the arguments raised in Google's original motion to dismiss and discussed at the hearing, which Dreamstime elected to do. In its FAC, Dreamstime again asserted that the relevant market for its Section 2 claim was the "*online search advertising market*." But, as in the original complaint, the FAC mentioned both the online search and the online stock photo markets in

detail.  The question then remained whether Dreamstime was pursuing a single-market claim based on the online search advertising market alone, or whether it was now pursuing a two-market claim that included the online search market.

As a result, at the hearing on Google's motion to dismiss the FAC, the district court once again asked Dreamstime to clarify the relevant market for its Section 2 claim.  Dreamstime responded, "[t]he relevant market we have defined in the complaint has always been the *online search advertising market*."  The district court would again ask Dreamstime what the relevant market was for its Section 2 claim.  Dreamstime responded that "the restraint is taking place on Google's search -- *online search advertising website*.  That's the market."  This answer prompted the district court again to ask whether the relevant market included the online search market "for images."  Dreamstime responded again that the market was only "*online search advertising*."  The district court ended the hearing by seeking to eliminate any doubt whatsoever on the relevant market, asking Dreamstime as follows: "Tell me again – I have to bring it to a close . . . Tell me very specifically what is the market that you allege."  Dreamstime responded, "[t]he *online search advertising market*."

The district court gave Dreamstime ample opportunity to clarify the relevant market for its Section 2 claim.  The district court issued a "Request to Plaintiff for Clarification" after the hearing.  Among other things, the district court explained in

this request that it understood Dreamstime to have "forsworn any reliance" on two theories: (1) that "Google leveraged its position in the market for online search advertising to reduce competition in the market of online stock photography," and (2) that "Google engaged in predatory acts to monopolize the online search advertising market in a specific attempt to destroy Dreamstime as a future potential competitor in that market." In addition, the district court asked Dreamstime's counsel to explain if it thought "online search advertising" meant anything other than "sponsored ads featured on search engines."

Dreamstime responded "yes" to the district court's first request and clarified that "Dreamstime [was] not asserting a separate" two-market leveraging claim. As to whether it had forsworn the second theory, Dreamstime said it *was* alleging that Google monopolized the "online search advertising relevant market" but Dreamstime clarified that it foreswore the theory that Dreamstime was "a future potential or actual direct competitor" to Google in that market. Finally, Dreamstime affirmed that it "defined the relevant market (or submarket) in this case for antitrust purposes as online search advertising" which included sponsored ads that appear within search results as well as photo ads.

## B

The record is clear: Dreamstime refused expressly and repeatedly to include the online search market within its definition of the relevant market for its Section

2 claim before the district court.  It is not our role to resuscitate claims that the parties expressly disavowed below.  The responsibility for framing the case lies with the parties.  *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) ("[I]n both civil and criminal cases, in the first instance and on appeal ..., we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.").  We will not consider Dreamstime's claim on appeal that the district court erred by not considering the online search market.  *In re Mortg. Elec. Registration Sys., Inc. v. Amer. Home Mortgage*, 754 F.3d 772, 780 (9th Cir. 2014) ("[A]rguments not raised in the district court will not be considered for the first time on appeal."); *see also USA Petroleum Co. v. Atl. Richfield Co.*, 13 F.3d 1276, 1286 (9th Cir. 1994) (considering an antitrust theory waived that plaintiff "recognized was available but expressly chose not to pursue" because that would impermissibly allow a "second bite at the apple").  We review this case on the basis that Dreamstime litigated it. We proceed on the understanding that the relevant market for Dreamstime's Section 2 claim is the online search advertising market.

### III

We now consider whether the district court properly concluded that Dreamstime failed to allege anticompetitive conduct in the online search advertising market.  Dreamstime expressly disclaimed any intent to compete with

16

Google in the online search advertising market. Instead, Dreamstime's theory is that Google undertook anticompetitive conduct to damage Dreamstime's online image business to maintain Google's monopoly in the online search advertising market, which thereby harmed Dreamstime as an online search advertising consumer. In its FAC, Dreamstime alleged that Google committed eight acts that (individually and taken as a whole) harmed competition in the online search advertising market. Those acts are as follows: (1) rigging the Google Ads bidding process; (2) demoting Dreamstime's organic search results on Google; (3) favoring Google's stock photo contractual partners, Shutterstock and Getty Images; (4) selectively enforcing the Google Ads rules and terms; (5) elevating inferior stock photo websites above Dreamstime in search results; (6) suspending Dreamstime's mobile application; (7) misappropriating Dreamstime's licensed photos and showing them on Google Images; and (8) unlawfully capturing data from users and advertisers. For the reasons set forth below, we hold that the district court did not err in concluding that the alleged actions (individually and taken together) did not harm competition in the online search advertising market.

## A

Four of the anticompetitive behaviors alleged by Dreamstime relate to purported mistreatment of Dreamstime as a Google customer: (1) rigging the advertisement auction bidding, (2) selectively enforcing its terms and rules, (3)

removing Dreamstime's mobile application, and (4) favoring contractual stock photo partners over Dreamstime and smaller stock photo websites.  These allegations fall short of alleging anticompetitive conduct in the online search advertising market.  Google harming one of its own online search advertising customers does not exclude its competitors in the online search advertising market, *i.e.*, Yahoo! and Bing.  Harm to a single customer does not, by itself, constitute "harm [to] the competitive process" that "*thereby* harm[s] *consumers*" as a whole. *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 987 (9th Cir. 2020) (emphasis added).  Indeed, Google's alleged mistreatment of customers may lead harmed customers, such as Dreamstime, to spend more on paid search opportunities with Google's competitors.  These allegations do not constitute anticompetitive conduct.

Dreamstime counters that Google's "rigged" policies and "selective enforcement" of policies on Google Ads "spawns monopoly pricing."  This allegation also misses the mark.  Merely possessing monopoly power and charging monopoly prices—without accompanying anticompetitive conduct—is not enough to state a claim under Section 2.  *Trinko*, 540 U.S. at 407.  This is because the "opportunity to charge monopoly prices" is a feature, not a bug, of the free market system, according to the Supreme Court.  *Id.*

18

Likewise, the fact that Google entered into partnerships with Dreamstime's competitors in the online stock photo market, or that it allegedly favored those contractual partners, is not anticompetitive conduct under Section 2.[7]  The Sherman Act aims to "preserve the right of freedom to trade," and it does not infringe upon a company's right "freely to exercise [its] own independent discretion as to parties with whom [it] will deal." *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919).  Section 2 does not require Google to enter into a partnership with Dreamstime like the one it has with Shutterstock and Getty Images.

In sum, these allegations have, at most, alleged that Google mistreated Dreamstime as a Google customer.  They have not shown, as they must to sustain a Section 2 claim, that this mistreatment harmed competition in the online search advertising market.  There was no antitrust injury.  *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

**B**

Next, three of the alleged anticompetitive behaviors relate to Dreamstime's performance in Google's unpaid, organic search results: (1) demoting Dreamstime's organic search results on Google; (2) elevating inferior stock photo

---

[7] Such agreements could potentially be considered unlawful "restraint[s] of trade," under Section 1 of the Sherman Act, *see generally* 15 U.S.C. § 1, but Dreamstime did not assert a Section 1 claim.

websites above Dreamstime in search results; and (3) misappropriating Dreamstime's licensed photos and showing them on Google Images. Dreamstime has similarly asserted, in its briefing before us, that Google "self-preferenced" Google Images in its search results by giving Google Images a unique, static placement at the top of all searches on its website (which includes organic search results and paid search results). Accepting these allegations as true, as we must for purposes of a motion under Rule 12(b)(6), these allegations could be taken to show harm to Dreamstime in the online search market for images. However, Dreamstime disavowed any reliance on the theory that Google is harming competition in the online search market for images.

Focusing instead on the online search advertising market, these allegations do not plausibly state a claim for anticompetitive conduct. Dreamstime contends that Google prevented online search advertising companies from accessing Dreamstime's stock images for use in advertisements in two different ways. First, by preferencing in Google search results the suppliers of stock images with which Google has a partnership, and second, by thwarting Google users' ability to access Dreamstime's stock images. But Dreamstime has not plausibly alleged that its diminished performance in Google's search results has inhibited other online search advertisers from accessing stock images from anyone other than Dreamstime. Nor, as the district court noted, has Dreamstime alleged that Google

20

bars its stock image partners from contracting with other online search advertisers. We agree with the district court that none of these alleged anticompetitive acts plausibly suggests that Google harmed competition in the online search advertising market.

## C

Dreamstime also contends that Google "unlawfully captur[ed] data from users and advertisers." This allegation also does not state anticompetitive behavior. Collecting user data, on its own, is not unlawful under the Sherman Act. That is because, standing alone, it is an example of a company using a competitive advantage gained from "establishing an infrastructure that renders them uniquely suited to serve [its] customers," *Trinko*, 540 U.S. at 407, or from "a consequence of a superior product," *Grinnell*, 384 U.S. at 571, neither of which is anticompetitive. We agree with the district court that Dreamstime did not plausibly allege how Google's data collection techniques are improper or unlawful, and its conclusory statements to this effect in its pleadings are inadequate to state a claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–80 (2009).

## D

Dreamstime's final argument is that the district court erred by not assessing the anticompetitive effect of Google's predatory acts taken together as an overall scheme. The Supreme Court has instructed courts to give plaintiffs in antitrust

actions "the full benefit of their proof without tightly compartmentalizing" each

individual allegation, because the character and effect of an antitrust injury should

not "be judged by dismembering it and viewing its separate parts, but only by

looking at it as a whole." *Cont. Ore Co. v. Union Carbide & Carbon Corp.*, 370

U.S. 690, 699 (1962). Giving Dreamstime "the full benefit of [its] proof,"

however, does not save its Section 2 claim here. As we have reasoned, "there can

be no synergistic result" from "a number of acts none of which show causal

antitrust injury" to the plaintiff. *Cal. Computer Prods.*, 613 F.2d at 746. That

principle is dispositive here. Because each individual action alleged by

Dreamstime does not rise to anticompetitive conduct in the relevant market, their

collective sum likewise does not.

     Dreamstime's theory under the "inextricably intertwined" doctrine falls

short for a similar reason. This doctrine stems from the Supreme Court's decision

in *Blue Shield v. McCready*, 457 U.S. 465 (1982). In *McCready*, the Court

recognized that an antitrust plaintiff that does not compete with a defendant can

still recover for injuries that are "inextricably intertwined" with the "injury the

conspirators sought to inflict" on competitors in the relevant market. *Id.* at 484.

     Here, Dreamstime insists that the injuries it has suffered are "inextricably

intertwined" with Google's maintenance of its online search advertising monopoly.

But Dreamstime's issue is not its failure to properly allege that its business

22

suffered; the fatal flaw is that it has not carried its burden of plausibly alleging anticompetitive conduct in the online search advertising market. Whatever injuries Dreamstime may have itself suffered, Dreamstime is missing the necessary harm to competition in the relevant market with which Dreamstime's injuries are "inextricably intertwined." Lacking that critical element, Dreamstime's Section 2 claim was properly dismissed.

## E

Dreamstime expressly tied its Section 2 claim to the online search advertising market. It did not identify any actions by Google that tended to harm competition in that market. We conclude that the district court properly dismissed its Section 2 claim.

## IV

Finally, we address whether the district court erred in dismissing Dreamstime's Section 2 claim with prejudice. Dreamstime argues that it did and asks that we remand with instructions to permit amendment.

We review a district court's decision to dismiss a claim with prejudice for abuse of discretion. *Coal. to Defend Affirmative Action v. Brown*, 674 F.3d 1128, 1133 (9th Cir. 2012). "[W]here the plaintiff has previously been granted leave to amend and has subsequently failed to add the requisite particularity to its claims,

the district court's discretion to deny leave to amend is particularly broad." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 420 (9th Cir. 2020).

We hold that the district court did not abuse its discretion. The district court repeatedly raised the issue of Dreamstime's definition of the relevant market from the outset. The district court gave Dreamstime several opportunities to address that issue, including leave to file an amended complaint. In filing its FAC and in its motion to dismiss briefing, Dreamstime expressly chose to maintain its theory of the case and pursue a one-market, monopoly maintenance claim centered on the online search advertising market, foregoing any reliance on the online search or stock image markets. In light of this record, we cannot conclude that the district court abused its "particularly broad" discretion in refusing Dreamstime yet another opportunity to do what it repeatedly had declined to do.

## CONCLUSION

For the foregoing reasons, we conclude that the district court did not err in dismissing Dreamtime's antitrust claim with prejudice.

**AFFIRMED**.