**Nos. 22-15166 & 22-15167**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

DR JEFFREY ISAACS

*Plaintiff-Appellant,*

v.

APPLE INC.

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of California
No. 3:21-cv-05567-EMC
Hon. Edward M. Chen

---

**APPELLANT'S REPLY BRIEF**

---

Dr. Jeffrey Isaacs
10312 Orchid Reserve Drive
West Palm Beach, FL 33449

## APPELLANT'S REPLY BRIEF

Appellant Jeffrey Isaacs concurs with the Reply Brief filed by *Coronavirus Reporter et al*, and likewise, their Opening Brief, filed in December and August 2022, respectively.

After *Coronavirus Reporter* filed its reply, on December 15, 2022 Apple filed a 28(j) Citation of Supplemental Authorities citing *Dreamstime.com, LLC v. Google LLC*, No. 20-16472 (9th Cir. Dec. 6, 2022). Appellee's 28(j) citation, if it pertained to conduct described in this case at all, would only apply to this Appellant and CALID. It does not apply to *Coronavirus Reporter* or *Primary Productions*, as discussed herein.[1]

In their 28(j) filing, Apple again endeavors to defend its conduct by citing inapplicable cases involving other technology firms. This last-ditch effort comes after realizing their argument to "cling to *Microsoft*" and claim the iPhone is a software platform is judicially estopped by their own CEO's testimony that "Apple sells devices." Now, Apple wishes to involve *Google* by asserting the *Dreamstime* court "rejected the argument—advanced by Appellants here—that allegedly "demoting [a

---

[1] The FAC exemplifies anticompetitive restraint in the National Smartphone App markets through description of five diverse apps: Coronavirus Reporter, Bitcoin Lottery, WebCaller, CALID, and Caller-ID. Two of these apps were censored, i.e. blocked from the App Store and iPhone users. The latter three were subject to ranking suppression.

plaintiff's] organic search results" and "elevating inferior" results constitutes antitrust injury." (*Gibson Dunn 28(j) Letter* p.1).

There exist multiple flaws with Apple's eleventh-hour attempt to use *Google* for legal defense. First, *Coronavirus Reporter* and *Primary Productions* do not assert claims for "ranking suppression" – the alleged conduct in *Dreamstime*. Even assuming some connection between *Dreamstime's* organic search advertising market and the FAC's National Smartphone App market – which is hardly clear – the FAC only alleges App Store ranking suppression for three of its apps: WebCaller, CALID and Caller-ID. *Coronavirus Reporter* and *Primary Productions* apps were completely censored by Apple, and hence not subject to ranking manipulation. Censorship, i.e. App Store disallowment, is considerably more egregious conduct than lowering an approved app (or website, in *Dreamstime's* case) in the App Store rankings[2]. The analogous conduct for Google – if it can even be made – would be taking down a website at the host level and removing it entirely from rankings.

The *Dreamstime* decision teaches "such [ranking suppression] agreements could potentially be considered unlawful "restraint[s] of trade," under Section 1 of the Sherman Act, *see generally* 15 U.S.C. § 1, but *Dreamstime* did not assert a Section 1 claim." Our FAC asserts a Section 1 claim covering the DPLA (Count III), generally, which would include App Store ranking policies. The FAC's dedicated "Ranking

---

[2] Both censorship and ranking suppression are forms of self-preferencing, which is detailed in the Congressional Subcommittee report.

Suppression" cause of action (Count IV) discusses both "unlawful restriction of trade" (FAC 210) and "monopolization of any part of trade" (FAC 208), and thus invokes both Sections 1 & 2 of the Sherman Act. Ranking suppression and self-preferencing by Apple is also alleged in Counts X & XI for RICO and Civil Fraud.

Moreover, Plaintiff-Appellant respectfully submits that given the facts alleged, app ranking suppression could violate Section 2. Expert game-theory analysis of ranking dynamics should be permitted at trial, rather than a determination at the Rule 12 stage. Unlike Google search, the App Store is the only ranking of iOS apps and could cause antitrust injury by lessening selection. As best as Appellant can decipher, *Dreamstime* did not make such a request for game-theory level analysis of website ranking suppression to determine antitrust injury.

With regard to the United States smartphone market, the FAC points out that Google's Android does not censor apps, as it has always permitted sideloading, like every other major computing platform in history. Likewise, the FAC and Congressional Subcommittee point out that Google Play's Developer userbase access is priced less than one-third that of Apple's iOS Developer Program. In the FAC, Google represents the good actor in the US Smartphone market and a basis for comparison to Apple's conduct. Opposing Counsel's 28(j) brings in the far-distant market for web search advertising to this case about smartphones, which is like comparing apples to oranges. *Dreamstime* is simply inapplicable to the US smartphone

app market; it certainly does not apply to wholly censored apps like *Coronavirus Reporter*.

Nonetheless, *Dreamstime* offers the most up-to-date Ninth Circuit opinion on several other issues raised in our appeal briefs. The decision reiterates that "65% market share is sufficient to establish that a defendant has monopoly power." (*Dreamstime Order* at 9). Apple's own recent press releases evidence that iPhone now exceeds 65% market share of the US smartphone market. Our FAC estimates, on a revenue or profitability metric, the iPhone may approach 80% market share. It appears beyond certainty that both Sherman Section 2 and *Jefferson Parish* market power thresholds applies in full force to this matter. Google's share in the US smartphone market is below 30%, which makes the 28(j) letter somewhat mystifying.

*Dreamstime* (*Order* at 22) in turn cites Supreme Court instructions to give plaintiffs in antitrust actions "the full benefit of their proof without tightly compartmentalizing" each individual allegation, because the character and effect of an antitrust injury should not "be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont. Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962). That is particularly relevant to the *Coronavirus Reporter* FAC. Looking at the whole of Apple's decision to censor all COVID startups – even a cardiologist whose invention helped millions – this cost lives, and the District Court lost the big picture when it dismembered portions of the FAC and questioned unimportant specifics like iPad (see below).

*Dreamstime* (*Order* at 22) acknowledged the "inextricably intertwined" doctrine. This doctrine stems from the Supreme Court's decision in *Blue Shield v. McCready*, 457 U.S. 465 (1982). In *McCready*, the Court recognized that an antitrust plaintiff that does not compete with a defendant can still recover for injuries that are "inextricably intertwined" with the "injury the conspirators sought to inflict" on competitors in the relevant market. *Id.* at 484. While the Ninth Circuit found *Dreamstime* didn't plausibly allege anticompetitive conduct in the online search advertising market, the same simply cannot be said for the US smartphone and inextricably intertwined free smartphone app and userbase access markets. While Apple has challenged whether or not Appellants are true competitors, the fact is that Apple offers its own competing free apps, including a COVID app API and a WebCaller-like version of FaceTime. While Appellants may not sell their own smartphones, are not permitted to offer competing app stores, and to the extent Appellant does not sell userbase access, the free apps such as WebCaller and *Coronavirus Reporter* suffered antitrust injury inextricably intertwined to the smartphone market.

Particularly instructive to this appeal is the Ninth Circuit's abuse of discretion analysis of a district court's decision to dismiss a claim with prejudice, under *Coal. to Defend Affirmative Action v. Brown*, 674 F.3d 1128, 1133 (9th Cir. 2012). "[W]here the plaintiff has previously been granted leave to amend and has subsequently failed to add the requisite particularity to its claims, the district court's discretion to deny leave

6

to amend is particularly broad." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 420 (9th Cir. 2020).

The Ninth Circuit found that the *Dreamstime* district court correctly and *repeatedly* raised the issue of relevant market from the outset. The district court gave *Dreamstime* several opportunities to address that issue, including leave to file an amended complaint. In filing its FAC and in its motion to dismiss briefing, *Dreamstime* expressly chose to maintain its theory of the case and pursue a one-market, monopoly maintenance claim centered on the online search advertising market, foregoing any reliance on the online search or stock image markets. In light of this record, the Ninth Circuit concluded that the district court had "particularly broad" discretion in refusing *Dreamstime* yet another opportunity to do what it repeatedly had declined to do. (*Dreamstime Order* at 24).

The specifics of the *Dreamstime* and the *Coronavirus Reporter* district court records are near polar opposites.

For convenience, *Dreamstime*'s procedural history is summarized from the *Order.* As best as appellant can tell, the *Dreamstime* district court provided no less than four hearings or *Requests for Plaintiff Clarification* to ensure that court understood the relevant markets:

> "In the first paragraph of its original complaint, Dreamstime defined the relevant market as the "*online search advertising*" market and alleged that Google was carrying out a strategy that "further entrench[ed] Google's monopoly of the relevant *online search advertising market*." However, other language in Dreamstime's original complaint appeared to hint at a second market—the online search market—for its Section 2 claim… The confusion

was not lost on the district court, which endeavored to nail down the relevant market for Dreamstime's Section 2 claim. At the hearing on Google's motion to dismiss the original complaint, the district court asked whether Dreamstime was asserting a one-market (*i.e.*, maintenance) theory arising out of the online search advertising market, or a two-market (*i.e.*, leveraging) claim arising out of markets beyond the online search advertising market (*e.g.*, the online search or stock image markets). Dreamstime responded expressly that it was "not alleging a two-market monopoly leveraging theory…"

After this hearing, the district court granted Dreamstime leave to amend ... In its FAC, Dreamstime again asserted that the relevant market for its Section 2 claim was the "*online search advertising market*."

As a result, at the hearing on Google's motion to dismiss the FAC, the district court once again asked Dreamstime to clarify the relevant market for its Section 2 claim. Dreamstime responded, "[t]he relevant market we have defined in the complaint has always been the *online search advertising market*." The district court would again ask Dreamstime what the relevant market was for its Section 2 claim. Dreamstime responded that "the restraint is taking place on Google's search -- *online search advertising website*. That's the market." This answer prompted the district court again to ask whether the relevant market included the online search market "for images." Dreamstime responded again that the market was only "*online search advertising*."

The district court ended the hearing by seeking to eliminate any doubt whatsoever on the relevant market, asking Dreamstime as follows: "Tell me again – I have to bring it to a close . . . Tell me very specifically what is the market that you allege." Dreamstime responded, "[t]he *online search advertising market*."

The district court gave Dreamstime ample opportunity to clarify the relevant market for its Section 2 claim. The district court issued a "Request to Plaintiff for Clarification" after the hearing. Among other things, the district court explained in this request that it understood Dreamstime to have "forsworn any reliance" on [other theories]… In addition, the district court asked Dreamstime's counsel to explain if it thought "online search advertising" meant anything other than "sponsored ads featured on search engines."

Dreamstime responded "yes" to the district court's first request and clarified that "Dreamstime [was] not asserting a separate" two-market leveraging

claim. As to whether it had forsworn the second theory, Dreamstime said it *was* alleging that Google monopolized the "online search advertising relevant market" but Dreamstime clarified that it foreswore the theory that Dreamstime was "a future potential or actual direct competitor" to Google in that market. Finally, Dreamstime affirmed that it "defined the relevant market (or submarket) in this case for antitrust purposes as online search advertising" which included sponsored ads that appear within search results as well as photo ads." (*Order* at 12-14)

Like a pilot reading a mission-critical checklist, the district court in *Dreamstime* carefully and methodically engaged in no less than four verification procedures to ensure it properly understood the alleged relevant markets. As the Ninth Circuit stated, the record is clear: "*Dreamstime* refused expressly and repeatedly to include the online search market within its definition of the relevant market. It is not our role to resuscitate claims that the parties expressly disavowed below." (*Order* at 14)

This standard of diligence was simply not what *Coronavirus Reporter* and this Appellant encountered in the court below. Dr. Isaacs only joined the litigation in the FAC, and had never exercised amendment as of right or been granted leave to amend. Moreover, had the court below investigated the FAC markets with the requisite attention to detail, any confusion would have resolved and the court would have determined that all reasonable substitutes were pled. Apple forfeited these points in their Answering Brief.

In fact, none of the Appellants were permitted any amendment based on the guidance or questioning of the district court. They certainly weren't issued a "Request for Plaintiff Clarification" to help the district court understand the US Smartphone, userbase access, or National App markets. And there certainly was no back-and-forth

9

dialogue to nail down the precise boundaries of the markets. In fact, the only remotely similar attempt was the District Court asking about single-brand, which Dr. Isaacs responded (see hearing transcript) was only an alternate theory not needed to prevail. Despite being an alternate theory, the District Court spent most of its order ruling on single-brand theories of relief.

In total contrast to *Dreamstime*, the *Coronavirus Reporter* District Court asked basic, fundamental *questions* in the dispositive order itself:

> "Why can the app not be used on laptops and desktops? What is included in the market for U.S. smartphones? All brands? What about devices such as tablets? Do the included products have to be Internet-enabled? What if they access the Internet only through a Wi-Fi connection?" (ER 0020-21) [3]

The *Dreamstime* court understood that questions about market boundaries and product substitutes should have been raised in a direct fashion to comply with *Nguyen*. Given the District Court's failure to apply anywhere near the same level of scrutiny as the *Dreamstime* court, the Ninth Circuit must find that the court below did not properly achieve the "particularly broad" discretion described in *Nguyen v. Endologix*. The district court's final order questioning, and refusal to grant even a first amendment to

---

[3]These questions have reasonably straightforward answers. Apple conceded that tablets were not part of the US smartphone market (see *Coronavirus Reporter* Reply Brief), yet the District Court asked the question in its final dispositive order, never allowing a response or amendment. Apps are the preferred modality for most smartphone users, and websites do not offer reliable geolocation or other API-level calls necessary for a pandemic tracking app.

Dr. Isaacs for a patent issued after the final order[4], substantiates concern of a court that simply closed its doors on a case involving Apple.

## CONCLUSION

The case litigates conduct detailed in a multi-year Congressional Subcommittee investigation. That Subcommittee report called on the courts to better enforce the Sherman Act of 1890 for new digital products. That report also resulted in the bipartisan Open App Markets Act being advanced to the US Senate floor by a near unanimous committee vote. Despite having the senate votes, and 73% popular support, last week it was confirmed that the bill had been "killed" after Charles Schumer refused to bring it to full vote. Apple spent nearly $100 million to lobby against it.

In response, Brookings Institute notes that the European Commission will offer open app markets next year, and inquires to companies like Apple "You can do this to help Europeans, why not help Americans?" (*Brookings Institute Techtank*, "Big Tech giving European consumers what they deny Americans.", December 28, 2022). Indeed, Bloomberg just reported that the cost to implement such changes in the USA (and the FAC injunction, in this case) will be minimal, since Apple is making the

---

[4] Apple's Answering brief does not contest the patent matter (IOB 27), and has forfeited that issue. Dr. Isaacs must be granted amendment on the reissue patent's infringement and relevance to the FAC claims.

changes anyway for Europe.

Notably, last week a multi-year investigation by a French competent authority determined Apple's conduct results in antitrust injury to developers. That authority is deferring corrective action in light of the EU DMA going into effect.

This is an unacceptable end-result to the US citizen, and if it persists, represents a clear instance of a government unwilling to enforce antitrust laws against a multi-national trust that it hosts. This matter should have been resolved by the US Copyright Office a decade ago, had Apple complied with the intent of their decision.

This case, as best as Appellant is aware, represents the only pending process in the United States that could mitigate the damages inflicted by Apple in the foreseeably near future. The bipartisan Senate efforts will take at least another year to restart, if ever. The *Epic* appeal seems unlikely to provide redress any sooner, and might only apply to gaming. This Court has a clear mandate and obligation to the people of the United States to implement the FAC injunction without delay.


Date: January 1, 2023


/s/ Jeffrey Isaacs
Dr. Jeffrey Isaacs

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 22-15166 & 22-15167

I am the attorney or self-represented party.

**This brief contains 2775 words,** including  0  words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature**  /s/ Jeffrey Isaacs         **Date** 1/1/2023