**Nos. 22-15166 & 22-15167**

# In the United States Court of Appeals for the Ninth Circuit

CORONAVIRUS REPORTER, CALID INC,
PRIMARY PRODUCTIONS LLC,

*Plaintiffs-Appellants,*

v.

APPLE INC.

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of California
No. 3:21-cv-05567-EMC
Hon. Edward M. Chen

**APPELLANTS' PETITION FOR PANEL REHEARING**

**AND REHEARING EN BANC AND SPECIAL MASTER**

KEITH MATHEWS
ASSOCIATED ATTORNEYS OF NEW ENGLAND
1000 Elm Street #800
Manchester, NH 03101
(603) 622-8100
*Attorneys for Appellants*
  *Coronavirus Reporter, Calid Inc.,*
  *Primary Productions LLC*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................... ii

TABLE OF AUTHORITIES..................................................... iii

INTRODUCTION ................................................................. 1

REASONS FOR GRANTING EN BANC REVIEW ............................. 5

I.   THE PANEL'S MISAPPLICATION OF RELEVANT MARKET
     STANDARDS IS ERRONEOUS UNDER BROWN SHOE.................... 7

II.  TYING DIGITAL SOFTWARE DISTRIBUTION STORES TO
     THE IPHONE DEVICE REPRESENTS PERNICIOUS TYING
     PURSUANT TO NORTHERN PACIFIC................................... 8

III. FREE APPS ARE UNDEFINED UNDER BROWN SHOE
     PRICING FORMULAS, AND REQUIRED THE COURT REVERT
     BACK TO THE ORIGINAL TEXT OF SHERMAN OR MODIFY
     BROWN SHOE FOR SSNDQ. ................................. 10

IV.  THE PANEL'S OVERLOOK OF NOTARY STAMPS AS A
     MODERN-DAY STAMP TAX AGAIN IGNORED BROWN SHOE

V.   THE PANEL'S OVERLOOK OF APPELLANT'S INVOCATION
     OF ASPEN SKIING CO. V. ASPEN HIGHLANDS SKIING CORP.
     DISREGARDED  SUPREME  COURT  PRECEDENT  ON
     EXCLUSIONARY CONDUCT, RATHER THAN RELEVANT
     MARKET, AS THE FOUNDATION OF CERTAIN SECTION 2
     CLAIMS. ................................................. 15

CONCLUSION ................................................. 17

# TABLE OF AUTHORITIES

## Cases

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) ............ 15

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) .................................... 8, 10

FTC v. Qualcomm Inc., 969 F.3d 974, 988 (9th Cir. 2020) .................................... 8

*International Salt Co. v. United States*, 332 U.S. 392 (1947) ............................... 10

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984) ............................ 10

*Northern Pacific Railway Co. v. United States*, 356 US 1 (1958) ........................ 13

## Other Authorities

Loyola Law Review's *Epic Games v. Apple: Tech-Tying and the Future of Antitrust* ......................................................................................................... 5

## INTRODUCTION

This is no ordinary case. It is an unprecedented confrontation with the largest monopoly in history, Apple Inc.—a $3 trillion behemoth whose market valuation eclipses that of the classic textbook example, the British East India Company, by tenfold. Past Sherman Act enforcements against AT&T and Standard Oil pale in comparison. With iPhone's 65% market share, the vast majority of Americans find themselves with limited alternatives for conducting the essential tasks of daily life. Appellee's illegal trust operations extend beyond economic ambitions; this case concerns Apple's desire to censor health care and effect cultural political development on a worldwide basis. Apple's control over their userbase forms the largest censorship and surveillance network in world history[1].

Every effort until now has failed to stop Apple. In 2010, the United States Copyright Office recognized the right of iPhone users to utilize their property free from Apple's control:

> *"the activity of an iPhone owner who modifies his or her iPhone's firmware/operating system in order to make it interoperable with an application that Apple has not approved, but that the iPhone owner wishes to run on the iPhone, fits comfortably within the four corners of fair use."*

---

[1]Apple has conceded software like Pegasys is deployed for full foreign intelligence surveillance of persons of governmental interest. Apple, of course, moderates such functionality. Hence, it appears undisputed that Apple operates, or at least oversees, a surveillance network with capabilities that exceed CIA and all foreign intelligence agencies combined.

Apple simply ignored the Copyright office. This year, a sweeping bipartisan bill to curtail Apple's power had overwhelming 73% popular support, but suspiciously, Senate Majority Leader Chuck Schumer of California never brought it to floor vote.

*Coronavirus Reporter* filed for an injunction to end Apple's monopolistic control of the internet immediately. Despite Apple forfeiting critical arguments related to *per se* tying in *Microsoft*, the Panel failed to even acknowledge the extensive two-year briefing process and substantial oral argument before dismissing the FAC markets as 'not based on economic reality'—an outrageous conclusion by the District Court now endorsed without scrutiny. This is a travesty of justice. The Panel's affirmance is in stark defiance of the Congressional Subcommittee's warning and objection, and hence, unambiguous legislative intent:

> *"courts have adopted the view that underenforcement of the antitrust laws is preferable to overenforcement, a position at odds with the clear legislative intent of the antitrust laws."*

A long-overdue, landmark preliminary injunction needed to mitigate digital censorship was improperly denied. As Appellants articulated in the oral argument, three different approaches were pleaded to invoke Sherman Act. First, a *per se* tying claim between the iPhone and App Store exemplifies pernicious conduct under *Northern Pacific*. That tying claim also alleges a Notary Stamp tax – which amounts to the largest Stamp Tax in history. Second, Appellants described an App Market

for free apps. Third, Appellants defined a userbase access monopoly subjected to exclusionary behavior under both *MCI* and *Aspen Skiing*.

The Panel failed to meaningfully address any of these three approaches, which were not only reasonably based on economic reality, they were spot on. Instead, the Panel parroted the farcical narrative Apple told the District Court that the FAC was an "eight amendment" at "fifteen relevant Sherman Act markets." The Panel and the court below constructed an Eiron caricature that simply couldn't "pass the muster" against the almighty Apple. But there exists no place for Greek comedy in this matter that affects every aspect of modern life for the past decade.

A noteworthy contrast exists with the *Epic* case.[2] *Epic's* complaint alleged an international market for smartphone operating systems. That market was incorrect and "litigation driven" because, as Tim Cook testified, Apple sells smartphones, not devices. Pursuant to *Brown Shoe* mandate, the *Epic* bench trial engaged in a fact-intensive determination and found their market to be one for *US gaming transactions*. As a result, the narrow market definition contributed to the unraveling of *Epic's* case, inhibiting it from effectively challenging Apple's behavior.

---

[2] Apple filed a disingenuous 28(j) letter asking for the Panel to dismiss our tying claims on the basis of identicalness to *Epic*.

*Coronavirus Reporter*[3] never benefitted from any such fact-finding inquiry of its relevant markets during bench trial. *Coronavirus Reporter's* primary market is hard to dispute: the US smartphone market, of which Apple controls 65%. This is consistent with Tim Cook's own testimony. It is simply not within the discretion of the Panel to determine that the US smartphone market was inapt, along with the three aforementioned downstream markets. The Panel's apparent reliance on *Hicks vs. PGA*, a case involving a golf caddie advertising market deemed detached from reality, unduly upheld the notion that a Brown Shoe fact-finding analysis would be unproductive."

*Hicks* is simply inapplicable here, where the most advanced digital marketplaces in history – that fundamentally impact life as we know it – are it issue. With all due respect, the Panel, despite being an esteemed group of Ninth Circuit veterans, are not experts in digital marketplace economics, and therefore should have refrained from engaging in fact-finding tasks beyond their purview. Appellants hereby motion, that in addition to *en banc* rehearing, a Special Master be appointed under the inherent authority of this Court to review the FAC market plausibility in

---

[3] *Coronavirus Reporter*, certainly less known than *Epic's* Fortnight, deserved equal protection by the Panel. That was not afforded. In the 1980s, the company's medical director created the gold-standard test for myocardial infarction that has touched millions of lives. The company's software developer single-handedly authored software used by 200 million user sessions.

conjunction with an unbiased Panel of digital marketplace academic economics experts and DOJ antitrust experts.

Apple's Answering Brief and oral argument presented no viable defense to the issuance of a preliminary injunction. In fact, Appellee conceded that Notarization stamps are an Apple product, refuting the District Court opinion that Notarization Stamps didn't reflect economic reality. They advanced contradictory positions to Apple's CEO testimony, violating the sanctity of the oath. This amounts to forfeiture of key issues with respect to Sherman Act illegal *per se* tying arrangements.

This case presents the perfect vehicle to finally redress Apple's unprecedented antitrust misconduct. The public interest is served by issuing the injunction without delay. Appellants have properly invoked a tying cause of action which is the same tying scrutinized by multiple academic papers on the Apple monopoly, such as Loyola Law Review's *Epic Games v. Apple: Tech-Tying and the Future of Antitrust*. The appropriate *per se* standard permits immediate issuance by the Ninth Circuit of a long overdue injunction against the App Store.

## REASONS FOR GRANTING EN BANC REVIEW

En banc review is necessary because (a) the Panel decision conflicts with multiple Supreme Court decisions, and (b) the case presents an issue of exceptional importance. As discussed in the introductory section, the Supreme Court was unambiguous in *Brown Shoe* that relevant market determination is an intensive fact-

finding procedure for a jury. This case evidences that the Ninth Circuit *Hicks* precedent is being actively used to circumvent the *Brown Shoe* Supreme Court. The District Court, and later the Panel, wove their own farcical narrative of Appellant's relevant markets, incorrectly exonerating Apple from what is now an international consensus on the tying conduct of digital marketplaces to the iPhone that this case concerns.

Recent Department of Justice guidance states relevant markets – an important tool – are not critical to every antitrust case, and do not exhaust other ways to prove competitive harm. Notably, the DOJ guidance remarked on Sherman Act applicability to free digital goods, cautioning the Court to "ensure that the Sherman Act is not unduly narrowed through legal error". The FAC invoked *Aspen Skiing*, and a relevant market for free apps, both of which exempt *Brown Shoe* market boundary definitions. Neither were mentioned by the Panel.

The significance of the litigation against Apple Inc. before this Court transcends mere economic concerns. It calls to question the very fabric of our societal order, defined and heavily influenced under the shadow of Apple's internet dominance. Apple's conduct, unchecked for over a decade, threatens this nation on a cultural, economic, and security basis. For nearly fifteen years, the internet as most Americans know it has been crafted and controlled by Apple Inc's exploitative policies. This has resulted in consequences that are admittedly difficult to assess, as

for many it is difficult to now imagine a world without the iPhone. But what we do know is that Apple monetized people's attention, encouraging addicting apps and services that now constitute over 50% – and growing – of Apple's profits. In other words, Apple as an ongoing concern requires increasing monetization of daily activities, rather than sale of hardware. Appellants, a cohort of developers, bring forth their narrative—a testimony of a decade-long observation of policies carefully designed to capitalize on human behavior. Their story must be told.

Pivotal national metrics – like happiness, student attention span, and mental health – are hitting alarming lows. Social polarization, online bullying, and other woes of the internet age indicate failed leadership under Apple. While we don't understand all of the causes of these serious repercussions, certainly Apple's driving force in monetizing basic human interaction didn't help.  We cannot afford, as a nation, to allow the Apple dictatorship to lead us into the Artificial Intelligence era. Hindsight reflection of Apple's 1984 Big Brother commercial inaugurating the Mac, from which iPhone is derived, could not be more eerie.

## I. THE PANEL'S MISAPPLICATION OF RELEVANT MARKET STANDARDS IS ERRONEOUS UNDER BROWN SHOE.

The Panel's affirmation of the District Court's market definitions constrains the scope of the Sherman Act against the weight of precedent. For over a century, antitrust law has recognized the nuanced reality presented by evolving markets. The United States Supreme Court in *Brown Shoe Co. v. United States*, 370 U.S. 294

7

(1962), mandates judicial cognizance of varying dynamics in market interaction when assessing what constitutes a "relevant market." The imperative to allow for a fact-driven inquiry into the "reasonable interchangeability" and "cross-elasticity of demand" between Apple's App Store and reasonable alternatives was sidestepped by the Panel in favor of a narrow and constrained interpretation, where the judges impermissibly did the fact-finding.

Contrary to established law, the Panel underscored a singular, static view of market definition rather than embracing the necessary holistic and adaptable approach that the realities of digital commerce require. This approach is not only supported by *Brown Shoe* but also by recent jurisprudence, which recognizes that in the high-tech sector, particularly, market boundaries often defy conventional categorization (see *FTC v. Qualcomm Inc.,* 969 F.3d 974, 988 (9th Cir. 2020)).

## II. TYING DIGITAL SOFTWARE DISTRIBUTION STORES TO THE IPHONE DEVICE REPRESENTS PERNICIOUS TYING PURSUANT TO NORTHERN PACIFIC.

The Panel's affirmance has no mention of the meticulous *per se* illegal tying claims that Appellants implicated as a focal point of both the briefed submissions and the oral argument. Anchored in a lineage of case law, *per se* illegality does not necessitate a sophisticated analysis of the relevant market when the conduct in question is so inherently anticompetitive.

8

The U.S. Smartphone market was unequivocally elucidated within the First Amended Complaint (FAC), where the Appellants detailed the extensive and unambiguous market over which the Appellee has exerted control. Similarly, the downstream tied market for App Stores was delineated with precision, identifying all economically interchangeable substitutes (Google Play, Microsoft Store, and several Chinese app stores) – the undisputed standard for market definition. Appellant's own store – a distribution website blocked by Apple's notarization requirements – also encompasses alternative digital distributions which end-users might have availed in the absence of Apple's monopolistic impositions. By pleading all conceivable App Store substitutes, the FAC set the stage for a classic tying arrangement bound by *per se* examination, or a rule of reason analysis, at the very least.

The Panel's oversight is not merely a matter of bypassing nuances but involves a fundamental refusal to acknowledge the most profitable tying arrangement in history. The Panel was provided a Loyola Law Review article on the illegality of Apple's tying the App Store to the iPhone. Foregoing the core argument — whereby the App Store's tie to the iPhone emerges from the FAC as "plain and simple"— is a judicial error necessitating correction. It is an error with egregious implications, not only in the context of antitrust jurisprudence but also for the voluminous number of developers and consumers directly impacted by such exclusionary practices.

This justification alone propounds the necessity for a rehearing en banc. The Panel's elision of the central tying claims raised by the Appellants is a critical error that delays the issuance of a critical preliminary injunction. The Appellants have adequately contended, consistent with legal precedents such as *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984) and *International Salt Co. v. United States*, 332 U.S. 392 (1947), that *per se* tying need not be encumbered by a profound analysis of market definition. It is the tying itself—the deprivation of consumer choice and hindrance to competition—that the Sherman Act prohibits unambiguously.

### III. FREE APPS ARE UNDEFINED UNDER BROWN SHOE PRICING FORMULAS, AND REQUIRED THE COURT REVERT BACK TO THE ORIGINAL TEXT OF SHERMAN OR MODIFY BROWN SHOE FOR SSNDQ.

The Panel decision failed to discuss or acknowledge the inapplicability of traditional market analysis methodologies, such as that stated in *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962), to the context of free applications (apps). This oversight constitutes significant grounds for reversal of the Panel's decision.

Free apps preclude the notion of price elasticity—a fundamental economic concept underpinning the competitive significance of market delineation as held in *Brown Shoe*—and thus evade the conventional frameworks for analyzing antitrust implications. Price elasticity concerns the responsiveness of consumer demand to price changes; however, for free apps, which bear no price tag, such elasticity is non-

existent. Consequently, this economic measure falls short in assessing the unique marketplace for free apps—a space rife with innovation and competitive nuances.

Appellants argued in depth through citation of academic journals that such a distinction could be resolved through novel measures such as SSNDQ (quality elasticity), or alternatively, a default to the plain language of the Sherman Act, which does not require an assessment of the relevant market or, indeed, any elasticity in establishing antitrust violations. The Sherman Act's unadorned text is clear and unequivocal, allowing no room for judicially-created market definitions to override the statute's fundamental purpose: the prohibition of monopolistic practices that tamper with the natural flow of commerce and innovation.

Despite this, the Panel's analysis remained tethered to an anachronistic application of market definition principles, ill-suited for the digital economy's contemporary landscape, where many services and products are offered free of charge, yielding profits through alternative channels peripheral to direct consumer transactions. The Panel's failure to recognize and address the limitations of *Brown Shoe* market tests to free apps represents a disregard for a key distinction upon which Appellants' claims rest—an error rendering the entirety of the decision flawed.

Given the burgeoning significance of free digital services in today's economy and their role in fostering a competitive landscape, a clear directive is needed from the judiciary to affirm that the antitrust laws of yesteryears adapt to the evolution

within today's marketplace. Applying standards developed for an economy rooted in monetary transactions to markets operating primarily through free exchanges – where currency is a user's attention span and time, rather than money – is fundamentally incongruous.

The Panel's disregard for this critical distinction, briefed about for over two years, underscores not just an analytical oversight but a pressing need for a judicial framework attuned to the modern digital economy's complexities. It is, therefore, necessary and proper that a rehearing en banc be granted to reconcile this misapplication and to reinforce the enduring applicability of the Sherman Act in protecting against anticompetitive practices, irrespective of whether those practices impact goods or services exchanged without a price.

## IV.   THE PANEL'S OVERLOOK OF NOTARY STAMPS AS A MODERN-DAY STAMP TAX AGAIN IGNORED BROWN SHOE

The implications of Gibson Dunn's 28(j) letter and its potential for erroneously shaping antitrust law enforcement demand an en banc review, in and of itself. The Panel's decision—by entangling itself in Defendant-Appellee's misrepresentation of relevant markets and theories—creates a precedent that fundamentally misunderstands and misapplies antitrust principles as applied to the digital economy.

Contrary to Gibson Dunn's characterization of the App Store as a platform and not the tied product, our claim clearly identifies the App Store as tied to the physical

devices, the iPhone. The tying of the iPhone to Notary Stamps, an electronic signature to censor and charge commissions on software, was likewise alleged in the FAC'S Tying Count V. Such description of tying practices uniquely positions our case in the antitrust landscape, differing from *Epic* and others on this landmark issue, necessitating en banc review to correctly adjudicate under the pernicious effect principle of tying set forth in *Northern Pacific Railway Co. v. United States*, 356 U.S. 1 (1958).

The Panel's decision to overlook the real and substantiated market of Apple's notarization requirement for software—deemed the largest stamp tax in history— stands as a stark historical anomaly necessitating urgent corrective action through an injunction.

During oral argument, Apple made the breathtaking concession that notary stamps are indeed a digital product Apple designed to "mark software as approved." No computing platform in history had such a requirement. In other words, Apple's notarization turned a computer platform into an authoritarian technology. This acknowledgment is in direct contrast to the district court's conclusory dismissal of the notary stamp market's reality, which described it as a fictional creation of the Plaintiffs. Such a characterization fails to grasp the robust economic and historical weight of notarization as a gatekeeping tool in the software industry, and is precisely why a marketplace should be determined by fact, not a court on a motion to dismiss.

13

Furthermore, evidence reiterated via Appellants responsive 28(j) letter highlighted the unprecedented scale of Apple's notary requirement. It emphasized the fee's unparalleled scope, calling into question the District Court's erroneous perception of the matter. It is incontrovertible: Apple's notarization scheme represents far more than a mere procedural hurdle or a fictionalized market—it is a monetization and control strategy deftly positioned to exploit the indispensability of software distribution within the modern digital ecosystem.

Critically, embedding this notarization stamp requirement within a computing system showcases one of the most pernicious tying arrangements presently conceivable—a mechanism monopolizing approval and access within a field where openness and competition birth innovation and consumer value. This binding process, which ties the sale of digital goods directly to a stamp tax, evokes historical precedents where, indeed, stamp taxes have inspired revolutions and reshaped economies.

Against such a backdrop, the Panel's decision to sideline this issue represents a concerning reticence in facing the broader ramifications of such a monopolistic practice. This is not a knit-picking argument buried within the complexities of economic theory; it is the recognition of a monopolist seizing control over the very arteries that feed the software industry.

This case stands at an inflection point, unfolding against a backdrop of failed efforts to reign in Apple's digital monopoly. Yet the gravity of this development has been disregarded by the Panel where a flagrant digital stamp tax was shrouded within the myopia of legal oversight. The stark reality is that the practice of requiring notarization redefines power dynamics between platform providers and software creators, setting dangerous precedents on market control and operational freedom that the drafters of the Sherman Act envisioned in 1890.

The implications of ignoring this conspicuous tying scheme have profound consequences for the future of digital commerce and antitrust law interpretation. Therefore, en banc review is more than warranted—it is imperative to ensure that the judiciary adequately scrutinizes and reflects upon its capacity to adjudicate the actions of monopolistic forces with such unparalleled influence on the industry and society at large. The Panel's failure to even acknowledge the notary tax issue warrants an en banc hearing to correct this historic judicial oversight.

## V. THE PANEL'S OVERLOOK OF APPELLANT'S INVOCATION OF ASPEN SKIING CO. V. ASPEN HIGHLANDS SKIING CORP. DISREGARDED SUPREME COURT PRECEDENT ON EXCLUSIONARY CONDUCT, RATHER THAN RELEVANT MARKET, AS THE FOUNDATION OF CERTAIN SECTION 2 CLAIMS.

The Panel's decision has engendered a significant lapse in antitrust jurisprudence by sidestepping the doctrinal implications of Appellant's invocation of *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985). This

oversight by the Panel necessitates en banc reconsideration to correct the inadvertent narrowing of antitrust scrutiny and ensure adherence to established precedent for Section 2 of the Sherman Act.

*Aspen* unequivocally broadens the examination of monopolistic behavior beyond the boundaries of market definition into the realm of exclusionary conduct. The Supreme Court laid vital groundwork, recognizing that a monopolist's refusal to deal with competitors, absent a credible efficiency rationale, can constitute a standalone concern under the purview of antitrust enforcement. The operative conduct under scrutiny is exclusionary in nature, not the defendant's power within a strictly defined market.

The record demonstrates that *Coronavirus Reporter* was a competing app to Apple's own Covid-19 SDK applications, as were the remaining appellants' software programs. Hence, the Appellants presented clear allegations that mirrored the factual antecedents of *Aspen Skiing*—articulating a pattern of exclusionary actions directed against competitors by Apple which bore no relation to efficiency or consumer benefit, instead stifling innovation, competition, and market accessibility. This conduct, tantamount to the exclusionary practices in *Aspen Skiing*, where the Supreme Court found monopoly leveraging absent a detailed market analysis, calls for substance over strict formality in identifying antitrust violations.

By overlooking the critical *Aspen Skiing* precedent raised by the Appellants, the Panel has inadvertently upheld a restrictive interpretation that may imperil rigorous and comprehensive antitrust enforcement, potentially allowing monopolistic entities to evade liability through a mechanical application of market definition.

A rehearing en banc is imperative not only to address this critical oversight but to anchor future adjudications firmly within the broad protective sweep intended by the antitrust statute—ensuring that exclusionary behavior, irrespective of exacting market definitions, does not escape due judicial intervention.

Therefore, with the weight of the Supreme Court's guidance in *Aspen Skiing*, Appellants respectfully submit that this significant judicial oversight underscores the necessity for a rehearing en banc. Only through vigilant application of this precedent may the judiciary impede exclusionary strategies that otherwise deprive the marketplace of the diversity and vibrancy that the Sherman Act seeks to safeguard.

## CONCLUSION

After years of previous attempts to regulate Apple's expansive reach have astonishingly failed, *Coronavirus Reporter* is notable for directly and accurately confronting the *per se* illegal tying and exclusionary conduct orchestrated by Apple. Rather than granting a long-overdue preliminary injunction to put an end to Apple's conduct today, the District Court and now the Panel perplexingly transmuted the

FAC into strawman arguments. To witness its meticulously outlined claims translated into something they were not is not just disheartening but deeply concerning. This, at a time when Big Tech's pervasive grip impacts almost every aspect of our existence, is not acceptable.

While recognizing Apple's significant market share, it is essential to understand the broader impact of its dominance and the illusion of choice it creates for consumers. Every transaction, swipe, and download within Apple's ecosystem strengthens its monopolistic grip, often to the detriment of competition and consumer autonomy. The company's control extends well beyond the sale of devices—into the very fabric of digitally mediated existence. The curated walled garden of the App Store not only stifles technological diversity but also constrains the consumer's ability to seek alternatives. This monopolistic strategy has essentially transformed Apple from a hardware manufacturer to a gatekeeper of digital life, shaping behaviors and habits with profound societal implications.

It is time for this Court to exercise its authority to uphold the tenets of antitrust laws established by the Sherman Act, and to decisively intercede before the monopolistic tide becomes indomitable. The moment to act is now—waiting another three years, or a decade, is a luxury of time we can ill afford. The potential damage left unchecked promises to be as significant as it is irreversible, for once a monopoly

embeds itself into the societal fibre to the extent Apple has, dislodging it often comes at a prohibitive cost.

For the reasons stated herein, Appellants respectfully request a rehearing and rehearing en banc, and an appointment of Special Master under the inherent authority of this Court.

Date: November 17, 2023         ASSOCIATED ATTORNEYS OF NEW ENGLAND

/s/ Keith Mathews _____
KEITH MATHEWS
1000 Elm Street #800
Manchester, NH 03101
(603) 622-8100
*Attorneys for Appellants*
  *Coronavirus Reporter, Calid Inc.,*
  *Primary Productions LLC*

# UNITED STATES COURT OF APPEALS FOR
# THE NINTH CIRCUIT

## Form 11. Certificate of Compliance for Petitions for
## Rehearing/Responses

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form11instructions.pdf

**9TH CIR. CASE NUMBER(S)**   | 22-15166 & 22-15167 |

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 35-4 or 40-1, the attached petition

for Panel rehearing/petition for rehearing en banc/response to petition is (*select*

*one*):

○ Prepared in a format, typeface, and type style that complies with Fed. R. App.
P. 32(a)(4)-(6) and **contains the following number of words**: | 4082 | .
*(Petitions and responses must not exceed 4,200 words)*

**OR**

○ In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**SIGNATURE** | s/ Keith Mathews |   **DATE** | 11/17 |

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 11**                                             *Rev. 12/01/2021*