**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CORONAVIRUS REPORTER; CALID, INC.; PRIMARY PRODUCTIONS LLC, | No. 22-15166 |
| | D.C. No. 3:21-cv-05567-EMC |
| *Plaintiffs-Appellants*, | |
| and | OPINION |
| JEFFREY D. ISAACS, Dr., | |
| *Plaintiff*, | |
| v. | |
| APPLE, INC., | |
| *Defendant-Appellee*, | |
| and | |
| FEDERAL TRADE COMMISSION, | |
| *Defendant*. | |

| | |
|---|---|
| JEFFREY D. ISAACS, Dr., | No. 22-15167 |
| *Plaintiff-Appellant*, and | D.C. No. 3:21-cv-05567-EMC |
| CORONAVIRUS REPORTER; CALID, INC.; PRIMARY PRODUCTIONS LLC, | |
| *Plaintiffs*, | |
| v. | |
| APPLE, INC., | |
| *Defendant-Appellee*, and | |
| FEDERAL TRADE COMMISSION, | |
| *Defendant*. | |

Appeal from the United States District Court
for the Northern District of California
Edward M. Chen, District Judge, Presiding

Argued and Submitted March 29, 2023
San Francisco, California

Filed November 3, 2023

Before:  Ronald M. Gould, Marsha S. Berzon, and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Gould

## SUMMARY[*]

### Antitrust

The panel affirmed the district court's dismissal, for failure to state a claim, of an antitrust action against Apple, Inc., alleging monopolist operation of the Apple App Store.

The panel held that appellants failed to state an antitrust claim under Section 1 or Section 2 of the Sherman Act, arising from Apple's rejection of their apps for distribution through the App Store, because they did not sufficiently allege a plausible relevant market, either for their rejected apps as compared to other apps, or for apps in general.

The panel held that appellants failed to state a claim for breach of contract under California law because they did not identify relevant specific provisions of Apple's Developer Agreement or Developer Program License Agreement or show that Apple breached a specific provision.

Appellants also failed to state a claim under the Racketeer Influenced and Corrupt Organizations Act or for fraud.

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Case: 22-15166, 11/03/2023, ID: 12819362, DktEntry: 68-1, Page 4 of 16

4    CORONAVIRUS REPORTER V. APPLE, INC.

**COUNSEL**

Keith Mathews (argued), American Wealth Protection, Manchester, New Hampshire; Stephan M. Kernan, The Kernan Law Firm, Beverly Hills, California; for Plaintiffs-Appellants.

Jeffrey D. Isaacs (argued), West Palm Beach, Florida, pro se Petitioner.

Julian W. Kleinbrodt (argued) and Rachel S. Brass, Gibson Dunn & Crutcher LLP, San Francisco, California; Cynthia E. Richman, Zachary B. Copeland, and Harry R.S. Phillips, Gibson Dunn & Crutcher LLP, Washington, D.C.; Mark A. Perry, Weil Gotshal & Manges LLP, Washington, D.C.; for Defendants-Appellee.

**OPINION**

GOULD, Circuit Judge:

Plaintiffs-Appellants Coronavirus Reporter, CALID, Inc., Primary Productions LLC, and Dr. Jeffrey D. Isaacs sued Defendant-Appellee Apple for its allegedly monopolist operation of the Apple App Store. The district court dismissed the claims with prejudice for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and denied the remaining motions as moot. Plaintiffs-Appellants appealed. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2008, a year after launching the iPhone, Apple introduced the App Store. In order to distribute apps on the App Store, app developers must abide by the App Store Review Guidelines ("the Guidelines") and enter into two agreements with Apple: the Developer Agreement and the Developer Program License Agreement ("DPLA"). By signing these agreements, app developers expressly "understand and agree" that Apple has "sole discretion" to reject apps. The Guidelines provide developers with the standards Apple applies when it reviews apps.

Plaintiffs-Appellants developed a group of apps that they sought to distribute on Apple's App Store. Two of their apps—Coronavirus Reporter and Bitcoin Lottery—were not approved for distribution. The Coronavirus Reporter app sought to collect "bioinformatics data" from users about COVID-19 symptoms that the app would then share with "other users and [unidentified] epidemiology researchers." The Coronavirus Reporter team allegedly included Dr. Robert Roberts, a former cardiologist for NASA. Apple rejected Coronavirus Reporter under Apple's policy requiring that any apps related to COVID-19 be submitted by a recognized health entity such as a government organization or medical institution.[1] Apple rejected Bitcoin Lottery, a blockchain app, under its policy "generally block[ing] blockchain apps."

Plaintiffs-Appellants brought claims against Apple for antitrust violations pursuant to Sections 1 and 2 of the

---

[1] Guidelines § 5.1.1(ix): "Apps that provide services in highly-regulated fields (such as banking and financial services, healthcare, and air travel) or that require sensitive user information should be submitted by a legal entity that provides the services, and not by an individual developer."

Sherman Act, breach of contract, racketeering, and fraud, challenging Apple's allegedly monopolist operation of the iPhone "App Store" through the "curation" and "censor[ship]" of apps. Plaintiffs-Appellants assert that they "seek to vindicate" the right of "the end users of Apple's iPhone" to "enjoy unrestricted use of their smartphones" to run "innovative applications, written by third party developers."

The district court dismissed Plaintiffs-Appellants' First Amended Complaint ("FAC") with prejudice on November 30, 2021. The district court dismissed Plaintiffs-Appellants' antitrust claims because they did not allege a plausible relevant market nor antitrust injury. The district court likewise dismissed the claims for breach of contract, racketeering, and fraud because the Plaintiffs-Appellants failed to plead required elements for each. Accordingly, the district court denied as moot Plaintiffs-Appellants' two preliminary injunction motions, Plaintiffs-Appellants' "motion to strike" Apple's motion to dismiss, and Plaintiffs-Appellants' Notices for Discovery of Apple executives and FTC Chair Lina Khan, along with Defendant-Appellee's motion to quash these requests. The district court later rejected Plaintiffs-Appellants' motions for reconsideration.

Plaintiffs-Appellants appeal the district court's dismissal of their claims, as well as the denial of their motions for reconsideration and for preliminary injunction.

## II. STANDARDS OF REVIEW

We review *de novo* a district court's grant of a motion to dismiss under Rule 12(b)(6), "accepting all factual allegations in the complaint as true and construing them in the light most favorable to the nonmoving party." *Ebner v. Fresh, Inc.*, 838 F.3d 958, 962 (9th Cir. 2016) (quoting

*Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1014 (9th Cir. 2012)). The complaint must "plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "Conclusory allegations and unreasonable inferences" do not provide such a basis. *Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007). A dismissal may be affirmed on any proper ground that is supported by the record. *See Johnson v. Riverside Healthcare System, LP*, 534 F.3d 1116, 1121 (9th Cir. 2008); *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004); *Papa v. United States*, 281 F.3d 1004, 1009 (9th Cir. 2002).

Although decisions by the district court on the substance and merits of claims are reviewed *de novo*, *see Ebner*, 838 F.3d at 962, many matters that routinely come before a district court are committed to the sound discretion of the district court and reviewed for abuse of discretion. *See e.g.*, *Ordonez v. Johnson*, 254 F.3d 814, 815 (9th Cir. 2001) (per curiam) (dismissal with prejudice); *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1123 (9th Cir. 2014) (denial of a preliminary injunction); *Kerr v. Jewell*, 836 F.3d 1048, 1053 (9th Cir. 2016) (denial of a motion for reconsideration), *cert. denied sub nom. Kerr v. Haugrud*, 580 U.S. 1198 (2017); *cf. Ryan v. Editions Ltd. W., Inc.*, 786 F.3d 754, 759 (9th Cir. 2015) (denying leave to amend), *cert. denied*, 577 U.S. 876 (2015).

## III. DISCUSSION

### A. Antitrust claims

An antitrust claim brought pursuant to Section 1 of the Sherman Act requires a plaintiff to show: "(1) the existence of an agreement, and (2) that the agreement was in unreasonable restraint of trade." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1177–78 (9th Cir.

2016) (quoting *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 189-90 (2010)); *FTC v. Qualcomm Inc.*, 969 F.3d 974, 988 (9th Cir. 2020) (citing *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018)).

An antitrust claim brought pursuant to Section 2 of the Sherman Act requires proving the following two elements: "(1) the defendant has monopoly power in the relevant market, and (2) the defendant has willfully acquired or maintained monopoly power in that market." *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137 (9th Cir. 2022) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)). To meet the first element, a plaintiff must "(1) define the relevant market, (2) establish that the defendant possesses market share in that market sufficient to constitute monopoly power, and (3) show that there are significant barriers to entering that market." *Id.* The second element requires showing that the defendant undertook anticompetitive conduct that harms the competitive process as a whole, rather than the success or failure of individual competitors. *Id.*; *see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488–89 (1977).

"A threshold step in any antitrust case is to accurately define the relevant market." *Qualcomm*, 969 F.3d at 992. For both Section 1 and Section 2 of the Sherman Act, a relevant market defines "the field in which meaningful competition is said to exist." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997). Market definition is essential to any antitrust case because "[w]ithout a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition.'" *Am. Express*, 138 S. Ct. at 2285 (quoting *Walker Process Equip., Inc. v. Food Mach. & Chem.*

*Corp.,* 382 U.S. 172, 177 (1965) (alternations in original). "The principle most fundamental to product market definition is 'cross-elasticity of demand' for certain products or services." *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291 (9th Cir. 1979). Cross-elasticity of demand refers to the extent to which consumers view two "products [as] be[ing] reasonably interchangeable" or substitutable for one another. *Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1025 (9th Cir. 2013) (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). Products or services that are "reasonably interchangeable" should be considered as being in the same market for the purpose of an antitrust claim. *Kaplan*, 611 F.2d at 291–92 (citing *U.S. v. E.I. DuPont De Nemous & Co.*, 351 U.S. 377 (1956)). "A relevant market contains both a geographic component and a product or service component." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 975 (9th Cir. 2023) (citing *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018)). Courts also consider the "practical indicia" of a market, including industrial or public recognition of a market as a separate entity or sensitivity to price changes. *Id.* at 976 (citing *Brown Shoe Co.*, 370 U.S. at 325).

A relevant market can be an aftermarket in which demand depends entirely upon prior purchases in a foremarket. *Id.* (citing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992) and *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1048 (9th Cir. 2008)). However, such a market generally shows that the defendant exploited consumers' unawareness of the restrictions on the aftermarket and must still show the cross-elasticity required to define a market. *Id.*

The relevant market can also be a two-sided market, with consumers on both sides of a platform.[2] *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 837–39 (9th Cir. 2022); *see, e.g.*, *Epic Games*, 67 F.4th at 985 (discussing the "two-sided market for mobile-game transactions," in which the relevant consumers are both game developers and users). Under these circumstances, an antitrust plaintiff must show anticompetitive impact on the "market as a whole." *Id.* at 839 (quoting *Am. Express*, 138 S. Ct. at 2287).

Here, Plaintiffs-Appellants have not adequately defined the relevant market. Plaintiffs-Appellants' FAC alleged in scattergun fashion that there were at least fifteen "relevant markets" pertinent to its antitrust claims but made no effort at all to define the markets or to distinguish them from one another.[3] For example, Plaintiffs-Appellants did not clarify

---

[2] "[A] two-sided platform offers different products or services to two different groups who both depend on the platform to intermediate between them." *PLS.Com, LLC*, 32 F.4th at 837 (quoting *Am. Express Co.*, 138 S. Ct. at 2280). In *American Express*, the Supreme Court gave two examples of two-sided platforms: credit card companies and newspapers. "Credit card companies, the Court explained, sell credit to consumers on one side of the market and sell transaction-processing services to merchants on the other side of the market. Newspapers are also 'arguably' two-sided platforms: they sell advertising space to advertisers and news to subscribers." *Id*. (citing *Am. Express*, 138 S. Ct. at 2280, 2286).

[3] Plaintiffs-Appellants' alleged "relevant markets" are: (1) a "Smartphone Enhanced National Internet Access Devices" market; (2) a "smartphone market"; (3) a "single-product iOS Smartphone Enhanced Internet Access Device" market; (4) "[t]he iOS market"; (5) the "market for smartphone enhanced commerce and information flow (devices and apps) transacted via the national internet backbone"; (6) the "institutional app market"; (7) the "iOS institutional app market"; (8) the "iOS notary stamps" market; (9) the "iOS onboarding software" market; (10) the market for access rights to the iOS userbase; (11) the "national

whether the markets that Plaintiffs-Appellants identified are completely different from one another or whether they overlap. Plaintiffs-Appellants later impermissibly tried through a Motion to Strike to narrow their relevant markets to "two foremarkets" and "four downstream markets," but our "[r]eview is limited to the complaint." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (quoting *Cervantes v. City of San Diego,* 5 F.3d 1273, 1274 (9th Cir.1993)).

Even if we were to review the narrower set of markets posited in Plaintiffs-Appellants' Motion to Strike, the alleged markets lack sufficient clarity to state an antitrust claim plausibly. *See Am. Express*, 138 S. Ct. at 2285. The FAC does not attempt to demonstrate the cross-elasticity of iOS end users' demand either for Plaintiffs-Appellants' rejected apps as compared to other apps, or for apps in general, as it must. *See Kaplan*, 611 F.2d at 291-92. The FAC fails to draw the market's boundaries to "encompass the product at issue as well as all economic substitutes for the product." *Hicks*, 897 F.3d at 1120 (quoting *Newcal*, 513 F.3d at 1045).

Additionally, the Plaintiffs-Appellants allege downstream markets in a manner that implies that the Apple App Store's apps constitute their own market, which amounts to an allegation of a single-brand market. This allegation fails because Plaintiffs-Appellants did not allege the prerequisites for a single-brand market. For example, Plaintiffs-Appellants do not demonstrate that iOS end consumers lacked awareness that buying an iPhone

---

smartphone app distribution market"; (12) the "iOS App market"; (13) the "US iOS Device App market"; (14) the "market of COVID startups"; and (15) "the App Market."

12    CORONAVIRUS REPORTER V. APPLE, INC.

constrains which apps would be available to them through the App Store. *See Epic Games*, 67 F.4th at 976–77 ("[T]o establish a single-brand aftermarket, a plaintiff must show . . . the challenged aftermarket restrictions are 'not generally known' when consumers make their foremarket purchase."). Nor do Plaintiffs-Appellants demonstrate that iOS end users would, if they could do so more readily, obtain apps through means other than Apple's App Store due to cost sensitivity or for other reasons. *See id.* at 976–77 ("[T]o establish a single-brand aftermarket, a plaintiff must show . . . 'significant' monetary or non-monetary switching costs exist."). To the extent that Plaintiffs-Appellants attempt to define a two-sided platform market, they fail to properly allege a relevant market (that is, a category of transactions between developers and consumers on a two-sided platform), given their reference to a broader market for smartphones and the corresponding ability to access apps outside of the Apple App Store's two-sided platform. *See id.* at 976, 985.

Because Plaintiffs-Appellants do not meet the threshold step of defining a relevant market, we reject their antitrust claims and need not proceed further with the analysis. Failing to define a relevant market alone is fatal to an antitrust claim. *See Qualcomm*, 969 F.3d at 992. Without a defined relevant market in terms of product or service, one cannot sensibly or seriously assess market power. *See Epic Games*, 67 F.4th at 975.

Because the Plaintiffs-Appellants did not define the relevant market, it follows that they could not, and did not, establish that the Defendant-Appellee created an agreement that unreasonably restrained trade, as required for a Section 1 claim. *See Aerotec Int'l*, 836 F.3d at 1177–78; *Qualcomm*, 969 F.3d at 988. It also follows that they could not, and did

CORONAVIRUS REPORTER V. APPLE, INC.        13

not, establish that the Defendant-Appellee possesses a market share in a relevant market sufficient to constitute monopoly power, nor did they show that there were existing barriers to entry to that market, as required for a Section 2 claim. *See Dreamstime.com*, 54 F.4th at 1137.[4]

Further, Plaintiffs-Appellants did not demonstrate that the Defendant-Appellee undertook anticompetitive conduct in that market sufficient to harm the competitive process as a whole. *See id.*; *see also Brunswick*, 429 U.S. at 489. Two of Plaintiffs-Appellants' five apps did not get approved for distribution for reasons explicitly set out in the Developer Agreement and the DPLA. Antitrust law does not seek to punish economic behavior that benefits consumers. *See Dreamstime.com*, 54 F.4th at 1137. Disapproval of these two apps on grounds ostensibly designed to protect consumers, absent factual allegations to believe that these disapprovals occurred for pretextual reasons, does not suffice to demonstrate anticompetitive conduct. Further, Plaintiffs-Appellants have not explained why or how they could not distribute their apps by other means, even if not by their most preferred means.

For all of these reasons, Plaintiffs-Appellants' antitrust claims must fail.

## B. Breach of contract

To state a breach of contract claim under California law, plaintiffs must show: (1) there was a contract, (2) plaintiff either performed the contract or has an excuse for nonperformance, (3) defendant breached the contract, and

_____

[4] We do not address whether, under different circumstances, a complaint alleging antitrust claims could define a cognizable market encompassing the Apple App Store.

(4) plaintiff suffered damages as a result of defendant's breach. *Hamilton v. Greenwich Invs. XXVI, LLC*, 126 Cal. Rptr. 3d 174, 183 (Cal. Ct. App. 2011).

Here, Plaintiffs-Appellants do not identify relevant specific provisions of the Developer Agreement or the DPLA, much less show that Apple breached a specific provision. Plaintiffs-Appellants contend that there is a "promise" in the Developer Agreement that "entities with 'deeply rooted medical credentials' were permitted to publish COVID apps on the App Store." But neither the Developer Agreement nor any other contract between Plaintiffs-Appellants and Defendant-Appellee contains any such guarantee. Instead, and sharply to the contrary, the DPLA specifically states that Apple has "sole discretion" to approve or deny requests to distribute apps on the App Store. Plaintiffs-Appellants' contract claim fails because there was no breach of contract. Similarly, in an attempt to make a claim for breach of the covenant of good faith and fair dealing, Plaintiffs-Appellants simply repeat their breach allegations. This claim likewise fails.

## C. RICO or fraud

To plead a civil claim under 18 U.S.C. § 1962(c) of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, Plaintiffs must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's business or property." *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005) (quotation marks omitted). If a corporation is the enterprise, it cannot also at the same time be the RICO defendant. *See Rae v. Union Bank*, 725 F.2d 478, 481 (9th Cir. 1984). Parties must allege fraud with particularity under Federal Rule of Civil

Procedure 9(b), including the "who, what, when, where, and how of the misconduct charged . . . ." *See Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 668 (9th Cir. 2019) (internal quotations and citations omitted).

Here, Plaintiffs-Appellants allege that Apple and individuals within Apple's App Store management, App Review, their counsel, and friends formed a RICO enterprise and engaged in predicate acts such as screening Plaintiffs-Appellants' apps for purported compliance with the DPLA while appropriating Plaintiffs-Appellants' ideas into Apple's own competing apps, as well as wire and mail fraud by assigning Apple's App Review employees to give false, pretextual reasons for rejecting the apps of small developers. These allegations center on the conduct of Apple and its employees without describing in any particularity conduct or activity outside of Apple as a corporation. As articulated, this claim makes Apple as a corporation both the enterprise and the RICO defendant, which is not permitted in a RICO claim. *See Rae*, 725 F.2d at 481. To the extent the Plaintiffs-Appellants attempt to make out a further claim for fraud, their allegations are vague and conclusory without the particularity required by FRCP 9(b). *See Depot, Inc.*, 915 F.3d at 668.

**D. Dismissal without leave to amend**

Federal Rule of Civil Procedure 15(a) states that leave to amend "shall be freely given when justice so requires," but "[a] district court acts within its discretion to deny leave to amend when amendment would be futile[.]" *Chappel v. Lab'y Corp. of Am.*, 232 F.3d 719, 725–26 (9th Cir. 2000). Here, the district court did not abuse its discretion in concluding that further amendment was not warranted. While the district court dismissed the Plaintiffs-Appellants'

first amended complaint in this case, Plaintiffs-Appellants were given a total of seven opportunities to amend similar complaints across jurisdictions and between various permutations of plaintiffs, but still failed to state their claims here adequately. It is within the district court's discretion to determine that an eighth opportunity would produce a similar result. *See Ryan*, 786 F.3d at 759.

### E. Remaining motions

Because the district court properly dismissed with prejudice all of the claims against Apple, it correctly denied the remaining pending motions as moot. The court also properly denied the motions for reconsideration by finding that the Plaintiffs-Appellants simply reiterated their prior claims and did not present newly discovered evidence or controlling law, nor an error of law or manifest injustice. *See Sch. Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993); *Kerr*, 836 F.3d at 1053.

## IV. CONCLUSION

We affirm the decisions of the district court to dismiss Plaintiffs-Appellants' FAC for failure to state any claim under Federal Rule of Civil Procedure 12(b)(6) and to deny Plaintiffs-Appellants' motions for reconsideration and for preliminary injunction.

**AFFIRMED.**